1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRIS HUNICHEN, individually and on
behalf of all others similarly situated,

                        Plaintiff,

            v.

ATONOMI LLC, et al.,

                        Defendants.

CASE NO. C19-0615-RAJ-MAT

REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Chris Hunichen, individually and on behalf of all others similarly situated, alleges a violation of the Washington State Securities Act (WSSA), RCW 21.20.010 et seq., through the sale of unregistered, non-exempt securities. Defendants Atonomi LLC (Atonomi), CENTRI Technology, Inc. (CENTRI), Vaughan Emery, Rob Strickland, Kyle Strickland, Don DeLoach, Wayne Wisehart, Woody Benson, Michael Mackey, James Salter, and Luis Paris (collectively the "Atonomi defendants" or defendants) move to compel arbitration and stay court proceedings or, in the alternative, to dismiss. (Dkt. 31; *see also* Dkt. 35 (defendant David Fragale's joinder to the motion to compel arbitration or to dismiss).) Plaintiff opposes the motion. (Dkt. 36.) Both defendants and plaintiff request oral argument. Now, having considered the briefing and relevant

1    record, the undersigned finds oral argument unnecessary and concludes defendants' motion to

2    compel arbitration or to dismiss (Dkt. 31) should be DENIED.

3                                              BACKGROUND

4            This matter involves the sale of virtual or digital "tokens" known as "ATMI tokens" by

5    Atonomi, a wholly owned subsidiary of CENTRI.  (*See* Dkt. 15 (First Amended Class Action

6    Complaint ("FAC")); Dkt. 32, ¶¶5-6.)  CENTRI is engaged in the business of providing "a

7    complete, advanced security solution for the Internet of Things [("IoT")]."  (FAC, ¶32.)  CENTRI

8    formed Atonomi to serve as its "'block-chain based arm'", launched the "Atonomi Network, a

9    crypto-security protocol" that would "enable advanced trust and identity validation for IoT

10   devices" (FAC, ¶¶34-35), and created the ATMI as a blockchain-based utility token (Dkt. 32, ¶5).

11   (*See also* FAC, ¶¶28-30 (describing blockchain technologies and crypto-securities).)

12           Atonomi first offered ATMI tokens for purchase in an "Initial Coin Offering" or "ICO," a

13   private pre-sale conducted over the course of the first five months of 2018.  Atonomi subsequently

14   held a public sale, which both began and concluded on June 6, 2018.

15           On February 22, 2018, plaintiff participated in the Atonomi ICO by signing a Simple

16   Agreement for Future Tokens ("SAFT") and paying 225 Ethereum ("ETH"), a cryptocurrency

17   amount valued at $191,250.00.  (FAC, Ex. A; Dkt. 32, ¶9.)  This gave plaintiff the right to purchase

18   ATMI tokens "subject to the terms and conditions set forth" in the SAFT.  (FAC, Ex. A at § 1(a).)

19           The SAFT provided that, in connection with the purchase of tokens, the purchaser "will

20   execute and deliver to the Company all transaction documents related to the Token Sale (the

21   'Token Sale Documents'); provided, that such Token Sale Documents are the same documents to

22   be entered into with the Public Purchasers (the 'Final Token Sale Terms')."  (*Id.*)  It stated the

23   Final Token Sale Terms "will supersede" prior terms and conditions, with the exception of the

REPORT AND RECOMMENDATION
PAGE - 2

price per token, and that the purchaser "acknowledges that the terms of the sale of the Tokens, until superseded by the Final Token Sale Terms, are subject to change in the sole and absolute discretion of the Company as and to the extent the Company deems necessary or advisable in connection with the Token Sale." (*Id*.) As a purchaser under the SAFT, plaintiff agreed he was an "accredited investor," with adequate information on which to base his decision to purchase tokens through the SAFT notwithstanding the fact the terms of sale were not yet final and potential changes may be significant, and that the Final Token Sale Terms "will be binding . . . regardless of the extent, nature or impact of such changes." (*Id*., § 6(b), (d).) The SAFT also provided that any of its provisions "may be amended, waived or modified only upon the written consent" of Atonomi and the holders of the SAFT, and that the SAFT "set[] forth the entire agreement and understanding of the parties[.]" (*Id*., § 8(a)-(b).)

On June 5, 2018, defendant Vaughan Emery sent an email to "existing SAFT investor[s] in Atonomi" stating the Atonomi public token sale would begin on the following day. (FAC, ¶¶138-140; Dkt. 32, ¶¶10-13 and Ex. B.) The email stated the "final terms of the sale" could be found through a hyperlink contained in the email. (*Id*. ("The final terms of the sale can be found here: https://atonomi.io/terms-of-sale."))

Defendants provide both the June 2018 email and a copy of the Terms of Token Sale they assert could be found at the hyperlink in the email. (*See* Dkt. 32, Exs. B & C; *see also* Dkt. 33.)[1]

---

[1] Defendants proffer and rely on these materials, as well as supportive declarations (Dkts. 32-34), solely in relation to the motion to compel arbitration, not the Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Lutz v. Cont'l Servs.*, C07-974-TSZ, 2007 U.S. Dist. LEXIS 89750 at *1 (W.D. Wash. Nov. 16, 2007) (considering parties' briefs, declarations, and exhibits in granting motion to compel arbitration); *Regents of the Univ. of Cal. v. Japan Sci. & Tech. Agency*, C14-4419, 2014 U.S. Dist. LEXIS 199896 at *7, n.24 (C.D. Cal. Oct. 16, 2014) ("Although the court normally cannot consider matters outside the pleadings in deciding a Rule 12(b)(6) motion to dismiss, . . . it may consider such evidence in deciding a motion to compel arbitration.") (cited cases omitted).

REPORT AND RECOMMENDATION
PAGE - 3

The opening paragraph of the Terms of Token Sale advises:  "NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER, WHICH IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS.  IF YOU DO NOT AGREE TO THESE TERMS OF SALE, DO NOT PURCHASE TOKENS."  (Dkt. 32, Ex. C at 1 (emphasis in original).)  The terms state the purchase of ATMI "during the ATMI public token sale ("Token Sale") . . . is subject to the Terms of Sale ("Terms"[]), and:  "By purchasing ATMI from us during the Token Sale, you will be bound by these Terms and all terms incorporated by reference." (*Id*.)  The "Scope of Terms" provides that they "govern only your purchase of ATMI from us during the Token Sale." (*Id*., § 3.)  It requires purchasers of ATMI tokens to acknowledge reading and understanding both the Terms (*id*., § 10(b)) and the sale procedures and specifications, the latter of which provides:  "Before purchasing ATMI in the Token Sale, you will be required to review, agree to, and comply with these Terms."  (*Id*., Ex. C at § 5 and at § 4 of Ex. B to Ex. C.)

At Section 15, the Terms of Token Sale outlines the terms addressing dispute resolution and arbitration, including the waiver of the right to have disputes resolved by a court or to a class action and the applicability of the Federal Arbitration Act.  This section includes a right to opt-out, stating: "YOU HAVE THE RIGHT TO OPT OUT OF BINDING ARBITRATION WITHIN 30 DAYS OF THE DATE YOU FIRST ACCEPTED THE TERMS OF THIS SECTION 15 BY EMAILING THE COMPANY[.]"  (*Id*., § 15(k) (emphasis in original).)

Atonomi held its public sale on June 6, 2018.  On or about July 18, 2018, Atonomi delivered the ATMI tokens to plaintiff and all other persons who had previously signed a SAFT and submitted payment for the tokens during the pre-sale.  (FAC, ¶151 and Dkt. 32, ¶14.)

Plaintiff alleges that, after the public sale, instead of developing blockchain technology to enable security for IoT devices, Atonomi launched, distributed, and "'unlocked'" tokens for

trading immediately, that the tokens were issued and exist solely on the Ethereum cryptocurrency network, and that they have developed no substantive utility other than as a vehicle for investment. (FAC, ¶¶82-85.)  He alleges that, since July 2018, the price of the Atonomi tokens has collapsed by over ninety-nine percent and that the tokens "are currently worthless."  (FAC, ¶158.)  Plaintiff seeks the return of the some twenty-five million dollars raised by Atonomi in the ICO, along with statutory interest and attorneys' fees, alleging defendants procured those funds from investors through the sale of unregistered securities in violation of the WSSA.

## DISCUSSION

Defendants seek to compel arbitration of plaintiff's claims against all defendants and to either stay this action during arbitration or to dismiss the action in its entirety.  Alternatively, defendants move to dismiss the amended complaint for failure to state a claim.

A.     Motion to Compel Arbitration

Defendants assert the Federal Arbitration Act (FAA) governs plaintiff's claim and precludes him from pursuing class relief.  Under the FAA, written agreements to arbitrate disputes arising out of transactions involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. A party aggrieved by the failure or refusal to arbitrate under a written agreement for arbitration may petition the district court for an order directing arbitration to proceed as provided for in the agreement.  9 U.S.C. § 4.

However, a court may not compel arbitration before resolving whether a valid arbitration agreement exists.  *Lifescan, Inc. v. Premier Diabetic Servs.*, 363 F.3d 1010, 1012 (9th Cir. 2004). *See also AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986) ("'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has

not agreed so to submit.'") (quoted source omitted). Plaintiff disputes the existence of an agreement to arbitrate. Therefore, in considering the motion to compel arbitration, the Court must determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

The party seeking to compel arbitration "bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecomm. Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoted source omitted). This burden is substantial and the Court must give the party denying the existence of an agreement to arbitrate "'the benefit of all reasonable doubts and inferences that may arise.'" *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). *Accord Peters v. Amazon Services LLC*, 2 F. Supp. 3d 1165, 1169-70 (W.D. Wash. 2013). *Cf. Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (a "presumption in favor of arbitrability" applies only where the *scope* of an agreement to arbitrate is ambiguous: "If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply.")

In deciding whether an agreement to arbitrate exists, the Court applies ordinary state-law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Norcia*, 845 F.3d at 1283. A federal court sitting in diversity, as in this case, looks to the law of the forum state when making a choice of law determination. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Washington contract law therefore governs the question of whether the parties in this case entered into an agreement to arbitrate.

Under Washington law, the formation of a contract requires an objective manifestation of

mutual assent. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (citing *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177, 94 P.3d 945 (2004) (en banc) ("Washington follows the objective manifestation test for contracts."), and *In re Marriage of Obaidi & Qayoum*, 154 Wn. App. 609, 616, 226 P.3d 787 (2010) ("A valid contract requires a meeting of the minds on the essential terms.")) "It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time. Mutual assent generally takes the form of an offer and an acceptance.'" *Yakima Cty. Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388-89, 858 P.2d 245 (1993) (quoting *Pacific Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 555-56, 608 P.2d 266 (1980)). "Acceptance of an offer may be made through conduct." *Am. Express Centurion Bank v. Stratman*, 172 Wn. App. 667, 673, 292 P.3d 128 (2012) (citing *Discover Bank v. Ray*, 139 Wn. App. 723, 727, 162 P.3d 1131 (2007)). Whether the parties manifested mutual assent is a question of fact. *Sea-Van Investments Assocs. v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994).

Defendants argue the SAFT and Terms of Token Sale together constitute a single "layered contract," as explained and adopted by the Washington Supreme Court in *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 998 P.2d 305 (2000). In *Mortenson*, the court upheld the validity of a "shrinkwrap" agreement, wherein, after an initial purchase order, the purchaser received software with the full text of a license agreement on the outside of each diskette pouch and on the inside of accompanying instruction manuals, the first screen that appeared each time the software was used referenced the license, and the license was wrapped around sealed protection devices that must be affixed to computers in order to operate the software. *Id.* at 574. After opening the packaging, installing the software, and attaching the protection devices, the purchaser used the software. *Id.* at 575-76. When the software malfunctioned, the purchaser filed suit and

1    the software developer defended the claim based on the limitation-of-remedies-and-liabilities

2    provision contained in the license agreement, but not in the purchase order.  *Id*. at 576-77.

3            The Washington Supreme Court rejected a contention the purchase order constituted a fully

4    integrated contract.  *Id*. at 578-80.  Relying on the Uniform Commercial Code article governing

5    the sale of goods and following the reasoning of other courts allowing similar "'layered

6    contracts,'" the court held "the terms of the license were part of the contract" and "Mortenson's

7    use of the software constituted its assent to the agreement, including the license terms."  *Id*. at 582-

8    84 (citing RCW 62A.2-204 (contract for the sale of goods "may be made in any manner sufficient

9    to show agreement, including conduct by both parties which recognizes the existence of such a

10   contract" and an "agreement sufficient to constitute a contract for sale may be found even though

11   the moment of its making is undetermined."); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th

12   Cir. 1996) ("Notice on the outside, terms on the inside, and a right to return the software for a

13   refund if the terms are unacceptable (a right that the license expressly extends), may be a means

14   of doing business valuable to buyers and sellers alike."); *Hill v. Gateway 2000, Inc.*, 105 F.3d

15   1147, 1148-49 (7th Cir. 1997) ("The question in *ProCD* was not whether terms were added to a

16   contract after its formation, but how and when the contract was formed--in particular, whether a

17   vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the

18   payment of money or a general 'send me the product,' but after the customer has had a chance to

19   inspect both the item and the terms.  *ProCD* answers 'yes,' for merchants and consumers alike.");

20   and *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 250-51, 676 N.Y.S.2d 569 (1998) (shrinkwrap

21   license terms delivered after a mail order purchase were part of the original agreement between

22   the parties, not proposed additions to the contract)).

23           Defendants maintain *Mortenson* is directly on point.  They assert the SAFT did not set

REPORT AND RECOMMENDATION
PAGE - 8

forth the complete terms of the contract and, indeed, explicitly provided the purchase of ATMI tokens would be subject to the final token sale terms, which would supersede the terms in the SAFT. (FAC, Ex. A at § 1(a).)  In the SAFT, plaintiff affirmatively represented and acknowledged he had adequate information on which to base his decision despite the fact the terms of the sale were not yet final, and acknowledged changes may be significant and would be binding regardless of their extent, nature or impact.  (*Id.*, § 6(b), (d).)  Defendants contend the SAFT's boilerplate integration clause (*see id.*, § 8(b) ("This instrument sets forth the entire agreement and understanding of the parties[.]")) contradicts these other provisions and is therefore inoperative and not binding.  *See Denny's Rests., Inc. v. Sec. Union Title Ins. Co.*, 71 Wn. App. 194, 203, 859 P.2d 619 (1993) ("Although the policy contains an integration clause, the courts of this state have repeatedly recognized that boilerplate integration clauses are inoperative if they are false; parties to a contract are not bound by incorrect statements of fact.").  They argue the existence of a single layered contract is even stronger here than in *Mortenson* insofar as the SAFT, unlike the purchase order in *Mortenson*, specifically alerted the pre-sale participants additional terms would apply. *See, e.g., Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 766 (N.D. Ohio 2009) (where the original customer agreement stated the agreement may be updated and subscribers would accept updated terms by continuing to accept service and plaintiffs did not dispute the terms or cancel service after receiving copies of original and updated agreements, plaintiffs agreed to the terms and conditions in the original and updated agreements by continuing to accept service).

Defendants assert plaintiff was on "inquiry notice" through the SAFT his purchase of ATMI tokens was subject to the Terms of Token Sale (*see* FAC, Ex. A at §§ 1(a), 6(d)), and had at least constructive notice of the final terms through the email sent more than a month before he completed his transaction by receiving ATMI tokens (Dkt. 32, ¶¶10-13 (declaration of Emery

REPORT AND RECOMMENDATION
PAGE - 9

attesting he sent the email and the active and working hyperlink on June 5, 2018) and Exs. B & C).) They maintain it was irrelevant whether the arbitration provision was known, or may not have even existed, when plaintiff signed the SAFT.  That is, as a sophisticated investor, plaintiff bore a responsibility to make himself familiar with the final terms before proceeding with his purchase. *See Enter. Timber v. Wash. Title Ins. Co.*, 76 Wn.2d 479, 483, 457 P.2d 600 (1969) ("One who has notice of facts sufficient to prompt a person of average prudence to inquire is deemed to have notice of all facts which reasonable inquiry would disclose.")  Further, given the constructive notice, it is irrelevant whether plaintiff read the final terms before accepting the tokens.  *See Mortenson*, 140 Wn.2d at 584 (because the terms "were either set forth explicitly or referenced in numerous locations . . . within the shrinkwrap packaging . . . it was not necessary for Mortenson to actually read the agreement in order to be bound by it."); *Murphy v. DirecTV, Inc.*, No. 07-6465, 2011 U.S. Dist. LEXIS 87625 at *7 (C.D. Cal. Aug. 2, 2011) (where an arbitration agreement was contained in a customer agreement not received by plaintiffs when they signed up for DirecTV service at Best Buy, but was referenced on receipts and mailed with billing statements, plaintiffs "received . . . and were bound by the contract, even if they did not read it."), *aff'd in part and rev'd in part on other grounds*, 724 F.3d 1218 (9th Cir. 2013).

Defendants contend plaintiff unambiguously consented to the Terms of Token Sale through his conduct "when he made the decision to proceed with his purchase" and "voluntarily accepted" the ATMI tokens.  (Dkt. 31 at 24; Dkt. 37 at 14.)  *See Mortenson*, 140 Wn.2d at 584 ("use of the software constituted . . . assent to the agreement"); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (even though website users were not required to check an "I agree" box agreeing to terms of use:  "Each was offered access to information subject to terms of which they were well aware. Their choice was either to accept the offer of contract, taking the information

REPORT AND RECOMMENDATION
PAGE - 10

subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits.")  They argue plaintiff further demonstrated his acceptance of and acquiescence to the arbitration agreement by failing to take the opportunities provided in the Terms of Token Sale to not purchase tokens if he disagreed with the arbitration requirement or to opt out of that requirement.  *See Schmidt v. Samsung Elecs. Am., Inc.*, No. C16-1725-JCC, 2017 U.S. Dist. LEXIS 80768 at *7-8 (W.D. Wash. May 25, 2017) ("Just like in *Mortenson*, Plaintiffs could have opened the box to find the agreement, read and disagreed with the terms, and then returned the device (or opted out)[,]. . . .  had similar adequate notice that additional terms and conditions existed, and should have read further to inquire[,]" and therefore assented to arbitration).  "Under Washington law, a consumer 'cannot successfully argue that the contract is unenforceable as long as [he] was *not deprived of the opportunity* to read it.'"  *Id.* (quoting *Signavong v. Volt Mgmt. Corp.*, C07-515-JLR, 2007 U.S. Dist. LEXIS 45089 at *9 (W.D. Wash. June 21, 2007) (emphasis added).[2]

Plaintiff denies he and other SAFT participants are bound to an arbitration agreement given that Washington law precludes agreement to non-existent terms.  *See, e.g., Keystone Land & Dev. Co.*, 152 Wn.2d at 177 ("Agreements to agree are unenforceable in Washington."); *Hubbell v. Ward*, 40 Wn.2d 779, 785, 246 P.2d 468 (1952) ("A contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations.")  He asserts the only viable path to enforce terms not contained in the SAFT is through "incorporation by reference," which did not occur here because he could not have had knowledge of or assented to terms which did not exist.  *See, e.g., Stuebe v. S.S. Indus., LLC*, No.

---

[2] Defendants additionally argue there is no valid defense, such as fraud, duress, or unconscionability, to the agreement to arbitrate.  (Dkt. 31 at 26-29.)  Plaintiff does not raise and the Court therefore does not address this argument.

REPORT AND RECOMMENDATION
PAGE - 11

C17-5814-BHS, 2018 U.S. Dist. LEXIS 121771 at *5-6 (W.D. Wash. July 20, 2018) ("'It is well settled that terms of another unread, unsigned agreement can be incorporated by reference *so long as the unsigned document is identified and readily available for inspection*.' . . . Additionally, . . . , "'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms . . . .'") (quoting *Pantrol, Inc. v. Eltek Valere, Inc.*, C12-158, 2012 U.S. Dist. LEXIS 74765 at *11-12 (E.D. Wash. May 30, 2012)) (emphasis added). *See also W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 494-95, 7 P.3d 861 (2000) ("It must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms[.]") (internal quotation marks and quoted sources omitted).

Plaintiff also points to the SAFT's requirement that purchasers execute and deliver transaction documents related to the token sale. (FAC, Ex. A at § 1(a) ("In connection with the purchase of Tokens . . . , the Purchaser will execute and deliver to the Company all transaction documents related to the Token Sale . . .; provided, that such Token Sale Documents are the same documents to be entered into with the Public Purchasers . . . ."); *see also* Dkt. 32, § 4 of Ex. B to Ex. C (requiring participants in the public sale to "review, agree to, and comply" with the Terms before purchasing ATMI tokens).) Under Washington law, as elsewhere, the "offeror is the master of the offer", "may propose acceptance by conduct, and the buyer may accept by performing those acts proposed by the offeror." *Discover Bank*, 139 Wn. App. at 727 (citing *Mortenson* Co., 140 Wn.2d at 590, 595). Plaintiff argues defendants are bound to, but never required plaintiff or any member of the putative class to fulfill the condition precedent set forth in the SAFT. He also suggests the Terms of Token Sale applied only to the public ICO. (*See, e.g.*, Dkt. 32, Ex. C at 1 ("Your purchase of [tokens] during the ATMI public token sale ("Token Sale") . . . is subject to these Terms of Sale ("Terms") (emphasis removed) and at § 3 ("[T]hese Terms govern only your

purchase of ATMI from us during the Token Sale.")

Plaintiff denies the existence of any evidence showing he or any other investor in the Atonomi ICO assented to the arbitration clause. He also counters defendants' depiction of a layered contract. The undersigned, for the reasons set forth below, concludes defendants fail to meet their burden of proving the existence of an agreement to arbitrate.

There is no dispute that, on February 22, 2018, plaintiff both signed the SAFT and paid cryptocurrency valued at $191,250.00. (FAC, Ex. A; Dkt. 32, ¶9.) The evidence also shows defendant Emery, on June 5, 2018, sent an email to SAFT signatories containing a link to the Terms of Token Sale. (FAC, ¶138; Dkt. 32, ¶10.)[3] Neither party submits evidence showing or even suggesting plaintiff opened either the email or its attachment. Both parties concede defendants subsequently delivered the ATMI tokens to plaintiff in mid-July 2018. Little to no information is provided as to the delivery of the tokens. (*See* FAC, ¶¶60, 81-82, 144-147; Dkt. 32, ¶14; Dkt. 36 at 8 (stating defendants "simply delivered the ATMI to Plaintiff's cryptocurrency-wallet.")) These facts reflect several critical differences between this case and layered contract cases like *Mortenson*.

As previously explained by this Court, the Washington Supreme Court found shrinkwrap agreements valid and the terms contained within them enforceable "because the purchaser accepts the terms when it uses the product." *Kwan v. Clearwire Corp.*, No. 09-1392-JLR, 2011 U.S. Dist. LEXIS 150145 at *24 (W.D. Wash. Jan. 3, 2012). Central to the court's analysis in *Mortenson*

---

[3] The FAC avers that, on information and belief, Emery sent an email containing a link to the Terms of Token Sale to SAFT signatories on June 5, 2018, but that it was not sent to all SAFT investors because many of those investors were members of "pools" and did not individually sign SAFTs. (FAC, ¶¶138-139; *see also* FAC ¶¶105-107 (describing pools or "syndicates" comprised of groups of "unsophisticated retail investors" who pooled funds to invest into SAFT offerings, with a designated "lead investor" signing a SAFT and transmitting funds to the ICO).)

REPORT AND RECOMMENDATION
PAGE - 13

and in the cases on which it relied "was the fact that the terms and conditions at issue were included

with the product purchased by the consumer." *Id*. at *26. *See Mortenson*, 140 Wn.2d at 584 ("The

terms of the license were included with the shrinkwrap packaging of each copy of the [software];

they were present in the manuals accompanying the software; they were included with the

protection devices for the software without which the software could not be used.").[4] Thus, "the

central issue of concern in Washington in determining whether or not a consumer is bound by an

alleged contract is whether the consumer has notice of and access to the terms and conditions of

the contract prior to the conduct which allegedly indicates his or her assent." *Kwan*, 2011 U.S.

Dist. LEXIS 150145 at *26; *accord Robbins v. Comcast Cable Communs., LLC*, No. 19-5603-

RBL, 2019 U.S. Dist. LEXIS 148505 at *11 (W.D. Wash. Aug. 30, 2019) (same).

Defendants here rely on the SAFT's identification of future undefined terms and the later

email attachment as notice of the arbitration agreement, and on defendants' own acts and plaintiff's

passive or absent response as subsequent conduct showing acceptance of that agreement. (*See*

Dkt. 37 at 14 (plaintiff "voluntarily accepted" the ATMI tokens (1) after "being expressly notified"

in the SAFT of the superseding Terms of Token Sale; (3) after "receiving" a direct link to the

Terms; (3) after "having access to and the ability to review" the Terms for some six weeks before

"receiving" the tokens; and (4) where, "if he had bothered to click on the link" in the email, he

would have seen the arbitration requirement and statement he should not purchase tokens if he did

not consent to the Terms prominently disclosed on the first page and, later in the document, his

---

[4] *See also Hill*, 105 F.3d at 1148-49 (purchaser ordered a computer over the telephone, received the order in a box containing the computer along with printed contract terms, and did not return the computer within the thirty days required by the terms); *ProCD*, 86 F.3d at 1452 (purchaser retained product after receiving software in a box containing license terms and with the terms displayed on computer screen every time a user executed the software program); and *Brower*, 246 A.D.2d at 251 (arbitration clause included in box with computer and software retained by purchaser).

REPORT AND RECOMMENDATION
PAGE - 14

ability to opt out of the requirement).)  Defendants do not identify notice and conduct akin to (1) breaking open shrinkwrap and/or installing software and necessarily encountering a binding term or condition to an agreement in so doing, or (2) subsequently using a product or item after receiving notice of and access to the binding term, thereby indicating assent.  Defendants did not, for example, provide and necessitate, or even invite, review of the Terms of Token Sale with the delivery of the ATMI tokens.  Nor do defendants identify a single affirmative act undertaken by plaintiff at any point after February 22, 2018.  Moreover, while defendants depict the tokens as a benefit retained by plaintiff, plaintiff alleges the tokens lack value.  It cannot be said that, as in *Mortenson*, plaintiff was bound by notice of and access to terms and conditions prior to engaging in conduct indicating assent.[5]

A review of basic contract principles outside the parameters of a shrinkwrap agreement provides confirmation of this conclusion.  As stated above, the manifestation of mutual assent is a question of fact.  *Sea-Van Investments Assocs.*, 125 Wn.2d at 126.  The Court may deduce the existence of mutual assent from circumstances surrounding the formation of a contract.  *Nicosia*, 834 F.3d at 232 (citing *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wn. App. 743, 765, 162 P.3d 1153 (2007)).

While an offeree to a contract need not have read terms or conditions to be bound, they must have notice of the existence of those terms or conditions.  *Id*. at 232-33.  For example, in *Carlsen v. Global Client Solutions, LLC*, No. 10-35324, 2011 U.S. App. LEXIS 5829 at *2 (9th

---

[5] This case is distinguishable in other respects.  For example, in *Mortenson*, the court observed the absence of an integration clause and other terms supported the conclusion a purchase order was not the complete agreement between the parties.  140 Wash.2d at 579-80 ("The presence of an integration clause 'strongly supports a conclusion that the parties' agreement was fully integrated[.]") The SAFT did contain an integration clause.  However, it also contained other language contradicting the intent to create a fully integrated contract.

REPORT AND RECOMMENDATION
PAGE - 15

Cir. Mar. 21, 2011), the Ninth Circuit affirmed a finding there was no agreement to arbitrate where an initial written agreement indicated terms and conditions were further described in a separate document that included an arbitration clause, but the separate document was not provided until after the initial agreement was signed and there was no evidence it "was reasonably available to them when they signed." As explained in the underlying district court decision, the plaintiffs "could not have agreed to the terms of a contract (including the arbitration clause) of which they were not aware[.]" *Carlsen*, No. C09-246, 2010 U.S. Dist. LEXIS 29255 at *7 (E.D. Wash. Mar. 4, 2010). In Washington, notice may be found through actual knowledge or "'*inquiry* notice of the term'" and assent to it through "'conduct that a reasonable person would understand to constitute assent.'" *Nicosia*, 834 F.3d at 233 (quoted and cited sources omitted).

The mere fact the SAFT reserved the right to later change or add terms did not bind plaintiff to any changed or additional terms without notice. *See id*. at 235 ("While the 2008 Conditions of Use did reserve Amazon's right to change those terms at any time, this did not necessarily bind Nicosia to any change of terms without notice.") "Under Washington contract law, such unilateral modifications are only binding if there is notice and assent to the changed terms." *Id*. (citing *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 435, 815 P.2d 1362 (1991) (employee not bound by unilateral changes to company policy because she did not receive reasonable notice of changes)).

Defendants maintain provisions allowing for unilateral amendment of agreements are fully enforceable. However, the cases on which they rely do not support the enforceability of the arbitration agreement in this case. For example, in *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1175-76 (W.D. Wash. 2014), this Court held only that a provision allowing for unilateral amendment did not *alone* render the agreement illusory and thus per se invalid. Noting that Ninth

REPORT AND RECOMMENDATION
PAGE - 16

Circuit cases relied upon by the plaintiffs simply identified the presence of a unilateral change-in-terms provisions as one of several factors supporting a finding of unconscionability and therefore unenforceability of an arbitration agreement, the Court observed that "'neither Washington courts nor the Ninth Circuit have ever held an arbitration agreement unenforceable solely because it is in a contract that allows changes." *Id*. at 1176 ("'To hold otherwise would be to invalidate countless arbitration agreements across the country.'")  Moreover, in *Ekin*, the defendant did not argue earlier agreements plaintiffs entered into had been changed to include an arbitration agreement; it argued plaintiffs repeatedly entered into and were bound by agreements that "*featured arbitration agreements from their inception*[.]" *Id*. (emphasis in original).  The Court distinguished a case in which an "unenforceable arbitration agreement was forced on . . . plaintiffs through a 'browsewrap' 'agreement' which *required absolutely no affirmative action on the part of consumer*s." *Id*. at 1177, n.7 (citing *In re Zappos.com, Inc*., 893 F. Supp. 2d 1058, 1063 (D. Nev. 2012)) (emphasis added).[6]  In *Ekin*, the Court found the inclusion of a provision allowing for the ability to change an agreement without notice "irrelevant" given that the agreements on which the motion to compel arbitration was based "*were* presented to and agreed to by [plaintiffs] each and every time they made a purchase" after a certain date.  *Id*. at 1177 (emphasis in original).

---

[6] Parties may enter into "clickwrap" or "browsewrap" agreements, or some combination thereof, through the internet.  In a "clickwrap" agreement, wherein an internet user is required to click an "I agree" box after being presented with a list of terms or conditions, users "'expressly and unambiguously manifest either assent or rejection prior to being given access to the product.'" *Nicosia*, 834 F.3d at 233 (quoting *Register.com*, 356 F.3d at 402-03 ("Verio visited Register's computers daily to access WHOIS data and each day saw the terms of Register's offer; Verio admitted that, in entering Register's computers to get the data, it was fully aware of the terms on which Register offered the access.")) In a "browsewrap" agreement, terms and conditions for use of a website or downloadable product are posted via a hyperlink somewhere on a webpage, notice is determined by whether the design and content of the webpage made the terms reasonably conspicuous, and assent is given through use, whether by entering the website or downloading a product. *Id*. at 236-38; *Kwan*, 2011 U.S. Dist. LEXIS 150145 at *20-21, 31-32. *See also Nguyen*, 763 F.3d at 1177 ("[T]he validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.").

REPORT AND RECOMMENDATION
PAGE - 17

Defendants also cite to *Carlsen,* 2011 U.S. App. LEXIS 5829 at *3, as indicating the absence of an agreement to arbitrate from a signed contract does not preclude enforcement of an arbitration agreement that is subsequently incorporated into the contract, where the signed contract "provide[s] that Defendants could unilaterally add to or amend the contract terms, or specify that additional terms would be deemed accepted by conduct." However, in *Carlsen*, the Ninth Circuit made this observation in rejecting an argument the plaintiffs had assented to arbitration through their conduct, *id.*, which in that case entailed months of performance and realization of benefits under the contract, *Carlsen*, 2010 U.S. Dist. LEXIS 29255 at *7. The Court specifically stated: "Defendants' argument that Plaintiffs assented to arbitration through their conduct does not persuade us. The Application did not provide that Defendants could unilaterally add to or amend the contract terms, or specify that additional terms would be deemed accepted by conduct." *Carlsen*, 2011 U.S. App. LEXIS 5829 at *3. In this case, there is neither language in the SAFT specifying conduct that would be deemed acceptance of future undefined terms, nor any conduct on the part of plaintiff subsequent to the SAFT.[7]

Defendants fail to establish constructive notice through the later delivery of an email containing a link to the Terms of Token Sale. Even assuming plaintiff opened and read the email, the email did not itself contain any language regarding mandatory arbitration or any other provision in the Terms of Token Sale. It did not require or even ask that recipients click on the

---

[7] Defendants also appear to misconstrue *Carlsen* as applying California law. (*See* Dkt. 37 at 19, n.11); *Carlsen*, 2011 U.S. App. LEXIS 5829 at *2-3 (citing *Mattingly v. Palmer Ridge Homes, LLC*, 157 Wn. App. 376, 238 P.3d 505, 512 (2010) ("Although 'parties have a duty to read the contracts they sign,' documents incorporated by reference usually must be reasonably available, at the least, so that the essentials of a contract can be discerned by the signer.'"), and *W. Wash. Corp. of Seventh-Day Adventists*, 7 P.3d at 865 ("[I]ncorporation by reference is ineffective to accomplish its intended purpose where the provisions to which reference is made do not have a reasonably clear and ascertainable meaning.") (quoted sources omitted).

REPORT AND RECOMMENDATION
PAGE - 18

link provided or identify any conduct that could be construed as reflecting assent to additional or changed terms.  The mere fact of the email delivery does not, as such, support the contention plaintiff was provided sufficient notice of additional terms.  *See, e.g., Robbins*, 2019 U.S. Dist. LEXIS 148505 at *14-15 (while the evidence showed plaintiff received and read an email, the email alone was "insufficient to form an arbitration agreement because it contains no language that would put a reasonable employee on notice that an offer to contract was on the table[,]" and "although clicking on the hyperlink . . . may tip employees off regarding the contractual nature of the program, this is unhelpful when the email itself does not inform employees that this is the case.")  *See also Nicosia*, 834 F.3d at 236-38 (Amazon failed to show plaintiff was on notice of and agreed to mandatory arbitration where it chose not to employ a "clickwrap" mechanism, and instead included language on an order page stating placement of the order indicated agreement to conditions of use and both that and another "conditions of use" phrase on the page created a clickable link to a separate webpage containing a mandatory arbitration provision); *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1037-38 (W.D. Wash. 2018) ("The defining features that makes clickwrap agreements regularly valid are the forced confrontation with the terms and the forced decision to accept or reject them by clicking a button.  However, even if a website or app contains just a hyperlink to the terms, courts have been more willing to find a valid agreement if the user is still forced to somehow manifest their assent to the terms, as opposed to passively browsing the site. The key questions in such situations is whether the website or app adequately informs a reasonable user that by clicking a certain button they are also agreeing to be bound by the terms.") (citations omitted); and *Kwan*, 2011 U.S. Dist. LEXIS 150145 at *20-21, 31-32 (finding, in part, mere access to a website containing "I accept terms" webpages and retention of a product did not establish notice and assent where webpages did not immediately display terms

REPORT AND RECOMMENDATION
PAGE - 19

of service, appeared to require the user to either click on a hyperlink or scroll down an inset page, and there was no evidence plaintiff took those actions or even viewed any such pages). *Cf. Holl v. U.S. Dist. Ct. (In re Holl)*, 925 F.3d 1076, 1083-84 (9th Cir. 2019) (while the location of an arbitration clause required "several steps and a fair amount of web-browsing intuition[,]" there was no question of affirmative assent to a document that incorporated the arbitration clause by reference: "He checked a box acknowledging as much."; it was also "undisputed that, at all relevant times, users could access" the document containing the arbitration clause on the website); *Spam Arrest, LLC v. Replacements, Ltd.*, C12-481-RAJ, 2013 U.S. Dist. LEXIS 124820 at * 26-27 (W.D. Wash. Aug. 29, 2013) ("So long as a Sentient Jet sender could have seen a reasonably conspicuous reference to the Sender Agreement while completing the verification process, a jury could conclude that the sender manifested assent.").

Moreover, even assuming plaintiff opened and reviewed the email attachment, language within the Terms of Token Sale raises additional questions as to sufficiency of notice. That is, the applicability of the arbitration agreement to SAFT investors, each of whom had already paid for ATMI tokens in the ICO, is not clear. (*See, e.g.*, Dkt. 32, Ex. C at 1 ("If you do not agree to [the arbitration agreement and class action waiver], do not purchase tokens.") (case of text altered); *id.* at 1 and § 3 ("[T]hese Terms govern only your purchase of ATMI from us during the Token Sale [(earlier defined as the ATMI public token sale)].") ; and *id.* at § 4 of Ex. B to Ex. C ("Before purchasing ATMI in the Token Sale, you will be required to review, agree to, and comply with these Terms.")) Nor is it clear whether or when the opt out provision would have applied to SAFT investors. (*Id.*, § 15(k) ("You have the right to opt out of binding arbitration within 30 days of the date you first accepted the terms of this section[.]") (case of text altered)). Plaintiff's status as a "sophisticated investor" does not resolve these questions. *Cf. Nguyen*, 763 F.3d at 1179 (rejecting

1    contention a website user's familiarity with other websites governed by similar browsewrap terms,

2    including his own website, gave rise to an inference of constructive notice:  "Whether Nguyen has

3    experience with the browsewrap agreements found on other websites . . ., has no bearing on

4    whether he had constructive notice of Barnes & Noble's Terms of Use."); *Wilson*, 349 F. Supp. 3d

5    at 1038 ("Playtika's argument that Wilson was an especially sophisticated app user who should be

6    charged with knowledge of the Terms of Service is unpersuasive.  Although Wilson may have

7    downloaded and played multiple gaming apps, this does not make him more likely to have

8    knowledge of terms that are equally inconspicuous on each app."; contrasting cases wherein

9    websites provided "'clear notification' regarding the Terms of Service.")

10    Finally, plaintiff's silence following delivery of the email and tokens is not reasonably

11    construed as assent to binding arbitration.  Assent may manifest through silence or inaction.  *See*

12    *Jones v. Brisbin*, 41 Wn.2d 167, 172, 247 P.2d 891 (1952) ("Where a person, with reasonable

13    opportunity to reject offered services, takes the benefit of them under circumstances which would

14    indicate, to a reasonable man, that they were offered with the expectation of compensation, a

15    contract, complete with mutual assent, results."), and *Pantrol, Inc.*, 2012 U.S. Dist. LEXIS 74765

16    at *15 ("An expression of assent to terms may be by words or silence (acquiescence or lack of

17    objection), an act or inaction, or any conduct which manifests the affirmative intention of a party.")

18    However, this is only true where there is prior notice of the term to which a party is purported to

19    assent.  *Compare Jones*, 41 Wn.2d at 172-73 (respondents "sat mute while appellants made the

20    suggested changes[,]" and "tacitly approved and actively accepted the architects' labors."), *with*

21    *Pantrol*, 2012 U.S. Dist. LEXIS 74765 at *16-17 (rejecting assertion of implied assent where there

22    was no evidence a party had been acting pursuant to any agreement other than the one originally

23    entered into or that they knew of or assented to other terms).  It must also be reasonable to infer

REPORT AND RECOMMENDATION
PAGE - 21

assent from silence or inaction. *See Nicosia*, 834 F.3d at 232 ("Manifestation of assent to an online contract is not meaningfully different [to a paper contract], and can be accomplished by 'words or silence, action or inaction,' so long as the user 'intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'") (quoted and cited sources omitted).

In this case, there is insufficient evidence plaintiff had notice of an arbitration agreement and it is not reasonable to infer he assented to that term merely by receiving tokens. Defendants delivered the tokens without requiring plaintiff to execute and deliver "all transaction documents related to the Token Sale", as has been provided for in the SAFT. (FAC, Ex. A at § 1(a).) Defendants argue, as the offeror, they could waive the mode of acceptance provision, given that the party for whose benefit a provision is included in a contract has an absolute right to waive that provision. *See, e.g., Karpenski v. Am. Gen. Life Cos., LLC*, 999 F. Supp. 2d 1235, 1239 (W.D. Wash. 2014) ("A party to a contract may impliedly waive a contract provision meant for its benefit through 'unequivocal acts of conduct evidencing an intent to waive.'") (quoted source omitted); *Mike M. Johnson, Inc. v. Spokane Cty.*, 150 Wn.2d 375, 386, 78 P.3d 161 (2003) ("A party to a contract may waive a contract provision, which is meant for its benefit, and may imply waiver through . . . conduct [that unequivocally evidences an intent to waive].").   However, defendants waived this requirement with no notice, in advance or otherwise. Plaintiff's passive receipt of tokens does not, under these and the circumstances as a whole, reflect intentional conduct, made knowing or with reason to know defendants could infer from his conduct he assented to arbitration.

Defendants, in sum, fail to meet their burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. Their motion to compel arbitration should be denied.

/ / /

REPORT AND RECOMMENDATION
PAGE - 22

B.     <u>Alternative Motion to Dismiss</u>

Defendants alternatively seek dismissal under Federal Rule of Civil Procedure 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must determine whether the complaint alleges factual allegations stating a claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While detailed factual allegations are not necessary, a complaint must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action[.]" *Twombly*, 550 U.S. at 555. Dismissal is appropriate if the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

The Court accepts all facts alleged in the complaint as true and draws all inferences in the light most favorable to the non-moving party. *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). The Court is not bound to accept the non-moving party's legal conclusions. *Iqbal*, 556 U.S. at 678.

Plaintiff raises a single claim for relief. He alleges defendants sold or were directly or indirectly involved in the sale of unregistered securities in violation of the WSSA. (FAC, ¶¶194-196.) Defendants argue plaintiff's claim falls short of the pleading requirements in three respects: (1) plaintiff fails to plausibly allege the ATMI tokens are securities under the WSSA; (2) plaintiff does not allege he tendered or resold any alleged security; and (3) plaintiff failed to plausibly plead any basis exists to pursue a WSSA claim against individual Atonomi defendant Kyle Strickland.

1      1.    <u>ATMI Tokens as Securities</u>:

Defendants maintain this matter is subject to dismissal based on the failure to adequately allege the ATMI tokens are securities, a required element under the WSSA.  RCW 21.20.140 (providing that is unlawful to offer or sell any "security" unless it is registered, exempt, or a federal covered security).  They note the description of ATMI tokens as "securities" in the FAC, without an allegation the tokens are "investment contracts" as defined in *S.E.C. v. W.J. Howey Co. ("Howey")*, 328 U.S. 293 (1946), or an explanation as to how they otherwise constitute a security as defined in RCW 21.20.005(17)(a).  (*See* FAC, ¶¶86, 152.)

In *Howey*, 328 U.S. at 298-99, the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  The elements for establishing an investment contract under *Howey* include: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."  *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991).  Washington courts apply the *Howey* test, and subsequent modifications to the requirement that "profits be derived 'solely' from the efforts of others" to "one that the profits come 'primarily' or 'substantially' from the efforts of others[,]" as the law in Washington.  *Cellular Eng'g v. O'Neill*, 118 Wn.2d 16, 25-26, 820 P.2d 941 (1991) (quoted and cited cases omitted).  *See also McClellan v. Sundholm*, 89 Wn.2d 527, 531-32, 574 P.2d 371 (1978) (identifying the third requirement as "where the investor expects to reap profits from the efforts of the promoter or a third party" or "an expectation by the investor that profits will be gained from the efforts of some other party").

Washington courts also recognize "the definition of security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes

1    devised by those who seek the use of the money of others on the promise of profits.'" *Cellular*

2    *Eng'g*, 118 Wn.2d at 25-26 (quoting *Howey*, 328 U.S. at 299).   In determining whether a

3    transaction constitutes the sale of a security, substance prevails over form, consistent with the

4    purpose of protecting the investing public. *Id*. at 24-25 (citing *Tcherepnin v. Knight*, 389 U.S. 332,

5    336 (1967), and *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)).

6         Defendants assert that, while the subjective intent of purchasers may have some bearing on

7    whether they entered into investment contracts, a court must focus on "what the purchasers were

8    offered or promised." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (noting "courts

9    have frequently examined the promotional materials associated with an instrument or transaction

10   in determining whether an investment contract is present") (cited cases omitted).   They argue the

11   allegations related to what purchasers of ATMI tokens were led to expect are too vague and

12   conclusory to support a conclusion the tokens are securities.   (*See, e.g.*, FAC, ¶130 (alleging

13   Atonomi conducted numerous public presentations and pitches open to the public in attempting to

14   solicit investors and generate interest in the ICO, and discussed the terms of the ICO and solicited

15   indications of interest to invest with members of the public).)   They note allegations in the

16   complaint suggesting ATMI token purchasers expected them to have utility or value other than as

17   investments.   (*See* FAC, ¶78 (alleging the SAFT described use of the ATMI tokens to provide

18   security for IoT devices).)

19         Plaintiff alleges both the SAFT and the ATMI tokens are securities.   Defendants do not

20   contend the complaint fails to adequately allege the SAFT, as an "investment contract," is a

21   security.   (FAC, ¶65.)   Defendants also fail to explain why plaintiff's claim should be dismissed

22   in full based on an alleged failure in relation to only one of two alleged unregistered securities.

23   Nor, for the reasons set forth below, does the Court otherwise find this matter properly dismissed

REPORT AND RECOMMENDATION
PAGE - 25

for failure to state a claim in relation to the ATMI tokens.

Plaintiff alleges an investment of 225 ETH, valued at $191,250.00, into the Atonomi ICO to purchase ATMI tokens.  (FAC, ¶14 and Ex. A.)  This allegation, as in other cases involving the use of digital currencies to purchase digital coins or tokens, satisfies the first prong of the *Howey* test in alleging an investment of money.  *See, e.g., Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. Mar. 31, 2019); *Solis v. Latium Network, Inc.*, C18-10255, 2018 U.S. Dist. LEXIS 207781 at *5-9 (D. N.J. Dec. 10, 2018); *United States v. Zaslavskiy*, C17-647, 2018 U.S. Dist. LEXIS 156574 at *13-14 (E.D. N.Y. Sept. 11, 2018).

Under the second prong of *Howey*, there must be either a common enterprise between an investor and a seller, promoter, or third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality).  *R.G. Reynolds Enters.*, 952 F.2d at 1130. Horizontal commonality entails the pooling of investor funds and interests, *Brodt v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir. 1978), while "[v]ertical commonality may be established by showing 'that the fortunes of the investors are linked with those of the promoters.'"  *R.G. Reynolds Enters.*, 952 F.2d at 1130 (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985)).[8]

Plaintiff alleges Atonomi informed investors the ICO would be used "to develop blockchain technology and issue future tokens, from which investors would profit."  (FAC, ¶72; *see also id.*, ¶¶47-48.)  He alleges investors did not expect to themselves develop the technology needed to succeed and return a profit.  (FAC, ¶76.)  Plaintiff asserts vertical commonality through

---

[8] Because both the Ninth Circuit and Washington Supreme Court utilize vertical commonality as the test for a common enterprise, there need not also be horizontal commonality. *Winkler v. Trico Financial Corp.*, 693 F. Supp. 896, 898-99 (W.D. Wash. 1987) (citing *United States v. Jones*, 712 F.2d 1316, 1321 (9th Cir. 1983) (funds of investors need not be pooled); *McClellan*, 89 Wn.2d at 532 (ongoing relationship is test of commonality)).

REPORT AND RECOMMENDATION
PAGE - 26

the necessary reliance on defendants to write the software code and deliver the ATMI tokens, as well as horizontal commonality through the pooling of twenty-million dollars in funds from plaintiff and other ICO investors (*see* FAC, ¶¶1, 7, 57-59).  These allegations suffice to withstand the motion to dismiss.  *See, e.g.*, *Balestra*, 380 F. Supp. 3d at 352-53 (plaintiff alleged the fortunes of all ICO investors were tied together in the pooling of ICO investments under the control of the defendants, and that potential profits from the future valuation of digital coins were reliant on the success of defendants' new blockchain technology; "Essentially, the Defendants encouraged investors to purchase ATB Coins based on the claim that the speed and efficiency of the ATB Blockchain would result in an increase in the coins' value."; concluding the value of the coins "was dictated by the success of the . . . enterprise as a whole, thereby establishing horizontal commonality."); *Solis*, 2018 U.S. Dist. LEXIS 207781 at *6 (finding sufficient pleading of commonality in allegation that funds raised through ICO were pooled to develop and maintain a blockchain-based tasking platform and that an investor's return on an ICO investment was directly proportional to the investor's financial stake and the numbers of tokens owned).

The third and final element is the expectation of profits produced by the efforts of others. *R.G. Reynolds Enters.*, 952 F.2d at 1130. "By contrast, when a purchaser is motivated by a desire to use or consume the item purchased . . .  the securities laws do not apply." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  The third *Howey* requirement is met when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *R.G. Reynolds Enters.*, 952 F.2d at 1130 (internal quotation marks and quoted sources omitted).

Plaintiff alleges:  "Atonomi informed investors that the reason for the ICO was to raise funds for Atonomi to develop blockchain technology and issue future tokens, from which investors

REPORT AND RECOMMENDATION
PAGE - 27

would profit."  (FAC, ¶72; *see also id.*, ¶45 ("Atonomi conducted the ICO for the purpose of raising investment capital."))  He explicitly alleges he and other pre-sale investors expected to profit from their investments in the ICO.  (FAC, ¶¶72, 75-76.)  He also points to multiple forms of communication, solicitation, and advertising to secure investments from the public and the resulting investment of some 14,000 ETH in the one-day public sale.  (FAC, ¶¶55-58, 128-135.)  Plaintiff alleges: "Atonomi advertised that the project for which it conducted its ICO would use blockchain technology that it intended to develop after its ICO."  (FAC, ¶29.)   These allegations sufficiently plead that investors purchased ATMI tokens with an expectation of profit based primarily or substantially on the efforts of defendants.  *See, e.g.*, *Balestra*, 380 F. Supp. 3d at 355-57 (plaintiff's allegations established "the purchasers of ATB Coins reasonably believed that these coins would increase in value based primarily on Defendants' entrepreneurial and managerial efforts."; further finding satisfactory pleading "[g]iven the content of Defendants' marketing materials and their sole responsibility for developing and launching the ATB Blockchain – the performance of which largely dictated the value of  ATB Coins[.]"); *Solis*, 2018 U.S. Dist. LEXIS 207781 at *7-8 (factual allegations, including promotional and other materials promoting investment opportunity and the fact the blockchain-based tasking platform had only limited functionality and had not yet been launched, supported inference plaintiff purchased tokens "with expectation of profit rather than as a means of using the tasking platform."); and *Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574 at *19-22 (investors in cryptocurrency tokens or coins "undoubtedly expected to receive profits on their investments" and could have reasonably expected profits to be derived primarily from managerial efforts of defendants).  *Cf. Warfield*, 569 F.3d at 1020 (rejecting argument "investors did not make any 'investment of money' within the meaning of *Howey* because they lacked the requisite intent to realize financial gain through the transactions, and

REPORT AND RECOMMENDATION
PAGE - 28

intended instead to make charitable donations.")

Defendants' various arguments to the contrary lack merit.  *Compare Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574 at *21-22 ("that market forces might contribute to the value of the schemes' underlying assets does not change the fact that" defendants "induced investors to participate based on 'the soundest' investment strategies."), *with Svets v. Osborne Precious Metals Co., Inc.*, C92-0357, 1992 U.S. Dist. LEXIS 15266 at *5-6 (N.D. Cal. June 8, 1992) (as with other cases involving the purchase of "'precious metals on margin'", once plaintiffs made their investment "their profits depended upon the fluctuations of the market, not the managerial effort of defendants."), and *Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980) (same).  The Court here concludes plaintiff has, at this early stage of the proceedings, sufficiently alleged the ATMI tokens are investment contracts under the *Howey* test.  *See Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574 at *13-14 ("Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry.  This is especially true in the context of 'relatively new, hybrid vehicle[s],' which require 'case-by-case analysis into the economic realities of the underlying transaction[s].'") (quoted and cited cases omitted).

    2.   <u>Tender of Security</u>:

Pursuant to RCW 21.20.430(1), the purchaser of a security in violation of the WSSA may "recover the consideration paid for the security . . . less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security." Pointing to a case in which this Court dismissed a WSSA claim where the plaintiffs chose to retain the security and seek damages, *Windswept Corp. v. Fisher*, 683 F. Supp. 233, 239 (W.D. Wash. 1988), defendants argue plaintiff fails to adequately plead a WSSA violation in failing to allege he tendered or resold any securities.

REPORT AND RECOMMENDATION
PAGE - 29

This argument lacks merit.  The case relied upon is plainly inapposite in that plaintiff does not here seek to retain the alleged securities.  *See id*. ("Because plaintiffs chose to retain the stock and seek damages, their claim pursuant to the [WSSA] must be dismissed.")[9]  Plaintiff seeks rescission.  (FAC, ¶1 ("This suit seeks the return of approximately $20-25,000,000 worth of funds, together with statutory interest and attorneys' fees, which defendants procured from investors through the sale of unregistered securities in violation of the [WSSA]."), ¶3 ("The [WSSA] requires sellers and controllers of the purchase price of unregistered securities plus statutory 8% interest from the date of the sale, together with reasonable attorneys' fees."); and at VII (C) (seeking award of "the remedy of recovery of the consideration paid for the security" together with interest "from the date of payment").)  The WSSA provides that "[a]ny tender specified in this section may be made at any time before entry of judgment."  RCW 21.20.430(6).  This matter is not subject to dismissal based on alleged deficiency in pleading regarding tendering or reselling securities.  *See In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1303 (E.D. Wash. 2007) (finding defendants mistakenly argued plaintiffs failed to state a claim under RCW 21.20.430 because they had not alleged they tendered their securities back to the seller or sold them:  "While [the WSSA] states that there is no liability where the buyer chooses to retain the stock, it also provides that 'any tender specified in this section may be made at any time before entry of judgment.' Under the plain language of WSSA, the Plaintiffs need not allege tender in their complaint.")

---

[9] Nor does the decision in *McGinley v. Am. Home Mortg. Servicing, Inc.*, C10-1157-RJB, 2010 U.S. Dist. LEXIS 113290 at *9-13 (W.D. Wash. Oct. 15, 2010), provide support for defendants' position. In that case, the Court dismissed with leave to amend where plaintiffs failed to allege facts showing "either the present ability to tender the loan proceeds or the expectation that they will be able to tender within a reasonable time" and would not be entitled to rescission unless they could tender the principal balance of the loan. *Id*. at 12-13 ("It makes little sense to let Plaintiffs' rescission claim proceed absent some indication that the claim will not simply be dismissed at the summary judgment stage after needless depletion of the parties' and the Court's resources.")

REPORT AND RECOMMENDATION
PAGE - 30

3.    <u>Defendant Kyle Strickland</u>:

Defendants argue plaintiff insufficiently pleads liability under the WSSA as to Atonomi defendant Kyle Strickland, contending the claim is based on little more than his title or position at Atonomi.  (*See* FAC, ¶21.)  Defendants assert an absence of any facts suggesting Strickland plausibly acted as a "substantial contributive factor" in the sale of any alleged security, as would be required to establish primary liability under the WSSA.  *See Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 131-32, 744 P.2d 1032 (1987) (holding a defendant is liable as a seller under the WSSA "if his acts were a substantial contributive factor in the sales transaction.") Defendants also assert the failure to adequately plead secondary or "control person" liability against Strickland through a plausible allegation he "directly or indirectly" controlled Atonomi. RCW 21.20.430(3) (providing for joint and several liability for every person who directly or indirectly controls a seller who sells a security in violation of the Act).

The Washington Supreme Court employs a three-part test to determine whether a defendant's acts are a substantial contributive factor in the sale of a security under the WSSA. *Viewpoint-North Stafford LLC v. CB Richard Ellis, Inc.*, 175 Wn. App. 189, 197, 303 P.3d 1096 (2013) (relying on *Haberman*, 109 Wn.2d at 131-32).  First, a court looks "at the other factors, aside from the defendant's alleged actions, that contributed to the sale and the extent of the effect which they have in producing the sale."  *Id*.  Second, a court looks "at whether the defendant's conduct has created a force or series of forces that are in continuous and active operation up to the time of sale, or whether the defendant's conduct has created a situation harmless unless acted upon by other forces for which the defendant is not responsible."  *Id*. Third, a court considers "whether a time lapse occurred between the defendant's conduct toward the sale and the time of the sale."  *Id*.  This test provides for the imposition of liability "in addition to the immediate seller if the

REPORT AND RECOMMENDATION
PAGE - 31

1    person's participation was a substantial contributing factor in the violation of the Act." *Id*. This

2    determination "is necessarily a question of fact." *Haberman*, 109 Wn.2d at 132.

3         The WSSA also provides for joint and several liability for "[e]very person who directly or

4    indirectly controls a seller or buyer", "every partner, officer, director or person who occupies a

5    similar status or performs a similar function of such seller or buyer, every employee of such a

6    seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson, or

7    person exempt [under another provision] who materially aids in the transaction[.]"    RCW

8    21.20.430(3).   "To state a claim for control person liability, a plaintiff must allege: (1) a primary

9    violation of securities law; and (2) that the defendant exercised control over the primary violator."

10   *Boilermakers Nat. Annuity Tr. Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748

11   F. Supp. 2d 1246, 1257 (W.D. Wash. 2010) ("Control means 'the possession, direct or indirect, of

12   the power to direct or cause the direction of the management and policies of a person, whether

13   through ownership of voting securities, by contract, or otherwise.'") (quoted source omitted).  As

14   with the fact-dependant determination of primary liability, "'[c]ontrol' must be determined by

15   evaluating the day-to-day affairs of the corporation as a whole, not the particular transaction at

16   issue in the litigation." *Capital Ventures Int'l v. Network Commerce, Inc.*, C02-0682-RSL, 2006

17   U.S. Dist. LEXIS 14657 at *6 (W.D. Wash. Mar. 16, 2006).

18        Plaintiff brings a single cause of action against all named defendants, alleging they "sold

19   unregistered securities, directly or indirectly controlled the seller . . . , were a partner, officer,

20   director or person who occupies a similar status or performs a similar function of such seller . . . ,

21   or were the employee of such a seller . . . who materially aided in the sale."  (FAC, ¶196.)  He

22   identifies Kyle Strickland as the "'community manager' for Atonomi," and states Strickland, in

23   that role, "directed and continues to direct numerous company communications with investors and

REPORT AND RECOMMENDATION
PAGE - 32

prospective investors about the ICO." (FAC, ¶21.) He alleges Strickland, as Atonomi's community manager, "materially aided each transaction in the securities through his acts in conducting and/or directing all company communications with investors and prospective investors about the ICO." (FAC, ¶181.) Plaintiff also describes defendants' reliance on general solicitation and advertising to encourage investment in the ICO as including communications through Atonomi's own "Telegram Channel" and public website, public presentations and pitches, Twitter, and other forums. (FAC, ¶¶123-135.)

Defendants accurately observe the absence of significant detail in the pleading as to defendant Kyle Strickland's role and conduct as either an alleged seller of an unregistered security or a person subject to secondary liability. The FAC does not, for example, identify specific communications by Strickland in the portion of the pleading outlining defendants' reliance on general solicitation and advertising. The pleading, instead, outlines the various modes of communications, solicitation, and advertising engaged in by defendants as a general matter and provides specific examples of communications made by some of the other individual named defendants. (*See* FAC, ¶¶123-135.)

However, plaintiff need not provide detailed factual allegations in order to survive the motion to dismiss and here provides more than mere labels and conclusions. *Cf. Boilermakers Nat. Annuity Trust Fund*, 748 F. Supp. 2d at 1258 ("Plaintiffs simply allege the Individual Defendants were either officers or directors of WMAAC and that they signed the Registration Statements. Based on nothing more, Plaintiffs claim each of the Individual Defendants are control persons 'by virtue of his or her control, ownership, offices, [or] directorship.' Such allegations, alone, are insufficient to state a claim.") (internal citations omitted). At this juncture, accepting all facts alleged in the complaint as true and drawing all inferences in the light most favorable to

REPORT AND RECOMMENDATION
PAGE - 33

plaintiff as the non-moving party, the Court finds the pleading to set forth a facially plausibly claim

of liability on the part of Strickland.  The ultimate question of whether plaintiff's allegations have

merit "can be explored in discovery and, if necessary, at trial."  *Bridges v. Gilbert*, 557 F.3d 541,

552 (7th Cir. 2009).[10]

### CONCLUSION

Defendants fail to establish plaintiff should be compelled to pursue his claim in arbitration

or that this matter is subject to dismissal for failure to state a claim.  Accordingly, the Court

recommends Defendants' Motion to Compel Arbitration and Stay Court Proceedings or, in the

Alternative, to Dismiss (Dkt. 31) should be DENIED.

### OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

Recommendation is signed.  Failure to file objections within the specified time may affect your

right to appeal.  Objections should be noted for consideration on the District Judge's motions

calendar for the third Friday after they are filed.  Responses to objections may be filed within

**fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

ready for consideration by the District Judge on **November 15, 2019**.

DATED this 28th day of October, 2019.

Mary Alice Theiler
United States Magistrate Judge

---

[10] Alternatively, should review of this Report and Recommendation lead to a different conclusion, the undersigned recommends dismissal of the claim against Kyle Strickland without prejudice to the submission of a second amended complaint.

REPORT AND RECOMMENDATION
PAGE - 34