UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHRIS HUNICHEN, individually and on
behalf of all others similarly situated,

                    Plaintiff,

        v.

ATONOMI LLC, et al.,

                    Defendants.

CASE NO. C19-0615-RAJ-MAT

REPORT AND RECOMMENDATION

<u>INTRODUCTION</u>

Plaintiff Chris Hunichen, individually and on behalf of all others similarly situated, alleges violation of the Washington State Securities Act (WSSA), RCW 21.20.010 et seq., through the sale of unregistered, non-exempt securities by defendants Atonomi LLC (Atonomi), CENTRI Technology, Inc. (CENTRI), Vaughan Emery, Rob Strickland, Kyle Strickland, Don DeLoach, Wayne Wisehart, Woody Benson, Michael Mackey, James Salter, Luis Paris (collectively the "Atonomi Defendants"), and David Fragale. (Dkt. 15.) Plaintiff filed a Motion for Preliminary Injunction seeking a freeze and accounting of assets relevant to the subject matter of this suit.

REPORT AND RECOMMENDATION
PAGE - 1

1  (Dkt. 44.)  Defendants oppose the motion.  (Dkts. 49 & 56.)[1]  The parties request oral argument.

2  Now, having considered the briefing and relevant record, the undersigned finds oral argument

3  unnecessary and concludes plaintiff's motion should be GRANTED in part and DENIED in part.

4  <u>BACKGROUND</u>

5  CENTRI describes itself as a "Seattle-based software company that builds technology to

6  protect data that is stored and transmitted between Internet-of-Things (IoT) devices."  (Dkt. 52

7  (Mackey Decl.), ¶3.)  An IoT device is a physical object "with embedded microchips, sensors, and

8  communications capabilities that connect through the Internet, such as smart appliances,

9  thermostats, lighting systems, vehicles, [and] activity trackers[.]"  (Dkt. 49 at 4.)  CENTRI formed

10  Atonomi, a wholly owned subsidiary, to build the "Atonomi Network" and enable interoperability

11  and security for IoT devices using "blockchain" technology. (Dkt. 52, ¶¶6-8.)

12  Blockchain is an "'electronic distributed ledger or list of entries'" maintained in a network

13  of computers, using "'cryptography to process and verify transactions on the ledger,'" and

14  "'providing comfort to users and potential users of the blockchain that entries are secure.'"  (First

15  Amended Class Action Complaint (FAC), ¶28 (quoted source omitted).)  Blockchain technologies

16  include, for example, Bitcoin and Ethereum virtual currencies.  (*Id*.)  Creators of blockchain

17  technologies may create and disseminate "crypto-securities in the form of virtual 'tokens' or

18  'coins.'"  (FAC, ¶31.)  A token or coin may provide certain rights, such as the right to use services

19  provided by the issuer, and may be traded on online exchanges, "in exchange for virtual or fiat

20  currencies, and through convertibility into other tokens."  (*Id*.)

21

22

23  [1] Defendant David Fragale proceeds with separate counsel in this matter, but objects to plaintiff's motion for both the reasons raised in his opposition and the reasons argued in the opposition of the Atonomi Defendants.  (Dkt. 56 at 3.)  Unless otherwise specified, the Court herein refers generally to all defendants.

REPORT AND RECOMMENDATION
PAGE - 2

This matter involves the sale of "ATMI tokens." Atonomi asserts it created ATMI tokens as a "utility" token for uses and services within the Atonomi Network and intended the network and tokens "to provide device identity registration, activation, validation, and reputation to secure the rapidly growing" IoT. (Dkt. 52, ¶¶6-11.) Plaintiff maintains Atonomi sold ATMI tokens to raise investment capitol to develop blockchain technology and issue future tokens, and that he and other investors who bought the tokens had a reasonable expectation of profits.

Atonomi first offered ATMI tokens for purchase in a private pre-sale conducted in the first five months of 2018. In February 2018, plaintiff participated in the pre-sale by signing a Simple Agreement for Future Tokens ("SAFT") and paying 225 Ethereum ("ETH"), a cryptocurrency amount valued at $191,250.00. (FAC, ¶14, Ex. A.) As a SAFT purchaser, plaintiff agreed he was an "accredited investor," with adequate knowledge and experience on which to base his decision to purchase tokens through the SAFT. (*Id.* at § 6(b).) Atonomi subsequently held a public sale which both began and concluded on June 6, 2018 and allowed purchase of tokens without signing a SAFT. (FAC, ¶¶53-56.) Through both sales, Atonomi raised approximately 42,000 ETH, amounting to some twenty-five million dollars in funds. (FAC, ¶¶56-59; Dkt. 46, Ex. B.) Plaintiff depicts the sales as an "Initial Coin Offering" or "ICO", typical of cryptocurrency sales at that time, while defendants maintain this phrase inaccurately depicts its "public sale of tokens" (PST). (Dkt. 44 at 3; Dkt. 49 at 2; Dkt. 59 at 2.) Atonomi released the ATMI tokens on July 12, 2018.

Plaintiff alleges that, after the public sale, instead of developing blockchain technology to enable security for IoT devices, Atonomi launched, distributed, and "unlocked" tokens for trading immediately, that the tokens were issued and exist solely on the Ethereum cryptocurrency network, and that they have developed no substantive utility other than as a vehicle for investment. (FAC, ¶¶82-85.) He alleges that, since July 2018, the price of ATMI tokens has collapsed by over ninety-

REPORT AND RECOMMENDATION
PAGE - 3

nine percent and the tokens are currently worthless.  (FAC, ¶158.)  He contends defendants used the proceeds from the ICO to pay CENTRI's bills, that they appear to have dissipated most, if not all, of the funds raised, and that CENTRI and Atonomi appear defunct, with the last public announcement from either company appearing in May 2019.  (FAC, ¶¶161-62; Dkt. 46, Exs. I, K.)

The Atonomi Defendants assert Atonomi launched the Atonomi Network in May 2018 and that it remains running and available to the public today.  (Dkt. 52, ¶¶13-20.)  Defendant Vaughan Emery, founder and former CEO of both CENTRI and Atonomi, attests Atonomi used the proceeds from the sale of ATMI tokens to run its operations.  (Dkt. 50 (Emery Decl.), ¶91.)  Emery explains that, following a global cryptocurrency market crash impacting most blockchain projects, Atonomi turned the ETH "into dollars as the funds were needed for regular operation of the business, including focusing on getting people to use it." (*Id*., ¶¶93-94.)  He denies any misuse of funds and asserts Atonomi's focus on defending itself in this lawsuit since May 2019.  (*Id*., ¶¶96-97.)

<u>DISCUSSION</u>

In the current motion, plaintiff contends the dissipation of funds from the ICO and collapse in the market price of the ATMI tokens puts at issue his equitable right of rescission in his $191,250.00 investment.  He seeks an order: (1) preliminarily enjoining defendants and their agents from dissipating any assets derived from or traceable to the Atonomi ICO and opening, closing, or modifying any associated accounts; (2) preliminarily ordering an asset freeze on all proceeds derived from or traceable to the ICO in all financial institutions which receive actual notice of the asset freeze; (3) authorizing plaintiff and his attorneys to notify any financial institution of the injunction and asset freeze; and (4) ordering defendants to prepare and file with the Court a detailed and complete schedule of all assets derived from or traceable to the ICO.

/ / /

REPORT AND RECOMMENDATION
PAGE - 4

A.    Preliminary Injunction Standard

To obtain preliminary injunctive relief, plaintiff must demonstrate: (1) the likelihood of success on the merits; (2) the likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the alternative, "'if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied.'" *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoted sources omitted).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A court may issue an injunction preventing the dissipation of assets in order to preserve a party's equitable remedies. *In re Focus Media, Inc.*, 387 F.3d 1077, 1084-85 (9th Cir. 2004); *Reebok Int'l, Ltd. v. Marnatech Enters.*, 970 F.2d 552, 559 (9th Cir. 1992) (cited source omitted). *See also Dargan v. Ingram*, No. 08-1714-RSL, 2009 U.S. Dist. LEXIS 47823 at *8-10 (W.D. Wash. May 22, 2009) ("The Court has inherent equitable power to issue provisional remedies, such as a freeze asset order, which are ancillary to its authority to provide final equitable relief."). A preliminary injunction is, however, "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoted source omitted; emphasis added by Supreme Court). *See also Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

/ / /

REPORT AND RECOMMENDATION
PAGE - 5

B.    <u>Evidentiary Objections</u>

Defendants raise evidentiary objections (*see* Dkts. 54 & 55) to declarations and exhibits submitted by plaintiff in support of the motion for a preliminary injunction.  They contend plaintiff relies on "out-of-context hearsay, hearsay upon hearsay, speculation, and insinuations[,]" rather than evidence based on personal knowledge.  (Dkt. 49 at 6-7.)  The evidence at issue includes, for example, screenshots of chats, messages, and posts taken from messaging services and forums such as Telegram, Skype, and LinkedIn.  (*See* Dkts. 46 & 60.)

Given its limited purpose, often urgent nature, and timing, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Camenisch*, 451 U.S. at 395; *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.").  The Court may therefore exercise its discretion to consider otherwise inadmissible evidence in ruling on a motion seeking preliminary injunctive relief.  *Herb Reed Enters., LLC*, 736 F.3d at 1250 n.5 (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue the preliminary injunction.")); *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary injunction."); *Organo Gold Int'l, Inc. v. Ventura*, C16-487-RAJ, 2016 U.S. Dist. LEXIS 58839 at *8, n.7 (W.D. Wash. May 3, 2016) ("Even if inadmissible, the Court may consider inadmissible evidence in ruling on a preliminary injunction.")  The form the evidence takes goes to the weight the Court accords it in assessing the request for equitable relief.  *Citizens for Quality Education San Diego v. Barrera*, 333 F. Supp. 3d

1003, 1012 n.3 (S.D. Cal. 2018). *See also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."; admitting evidence challenged on hearsay grounds).

Given the nature and stage of this proceeding, the Court will consider the evidence provided by plaintiff in support of his motion. The Court overrules defendants' objections.

C.      Plaintiff's Motion for Preliminary Injunctive Relief

        1.      Likelihood of Success on the Merits:

        Under the WSSA, it is unlawful to offer or sell any "security" unless it is registered, exempt, or a federal covered security. RCW 21.20.140. Plaintiff alleges defendants sold or were directly or indirectly involved in the sale of unregistered securities in violation of the WSSA. (FAC, ¶¶194-96.) He contends the securities took two forms – the SAFTs and the ATMI tokens. The Court therefore addresses the likelihood of success on the merits in relation to each alleged unregistered security.

                a.      SAFTs:

        The SAFT signed by plaintiff was, on its face, an unregistered security. (FAC, Ex. A at 1 ("THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933[.]")) Atonomi sought exemption from registration by filing a United States Securities and Exchange Commission (SEC) "Form D", relying on Rule 506(b) of Regulation D of the Securities Act. (Dkt. 46, Ex. A.) Under that rule, securities are exempt from registration if there are "no more than 35 purchasers", excluding accredited investors, and each non-accredited investor has "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the

REPORT AND RECOMMENDATION
PAGE - 7

prospective investment[.]" 17 C.F.R. § 230.506(b)(2).

Under SEC Rule 502(c), issuers relying on Rule 506(b) may not "offer or sell the securities by any form of general solicitation or general advertising[.]"  17 C.F.R. § 230.502(c).  General solicitation and advertising include, but are not limited to: "(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and (2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising[.]"  *Id.*

Rule 502(d) places resale restrictions on securities issued under Rule 506(b).  Under that provision, the insurer "shall exercise reasonable care to assure that the purchasers of the securities are not underwriters[,]" with reasonable care established through: (1) "Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;" (2) "Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available;" and (3) "Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities."  17 C.F.R. § 230.502(d) (also clarifying these actions are "not the exclusive method to demonstrate" reasonable care).  Purchasers of securities offered pursuant to Rule 506 receive "restricted" securities, meaning the securities cannot be sold for at least six months or a year without registration.  *See* 17 C.F.R. § 230.144.

Plaintiff claims the SAFTs were unregistered, non-exempt securities, not compliant with Rule 506(b) because defendants actively solicited plaintiff and thousands of others to invest, avoided the accredited investor and lockup requirements via "pooling" or secondary market

trading of ATMI tokens, actively solicited exchanges for listing the tokens, and quickly released the tokens for speculative trading.  He avers public solicitation through mailing lists, chat rooms open to the public, internet forums, live presentations before groups of investors, and tweets and live question and answer sessions on Twitter.  (FAC, ¶¶123-35.)  He alleges that, while every early investor was supposed to have signed the SAFT, many invested through "pools" or "syndicates", wherein a lead investor would sign the SAFT and transmit funds to the ICO while representing a group of unsophisticated investors.  (FAC, ¶¶105-22.)  He avers defendants released the ATMI tokens mere weeks after the ICO closed, then actively solicited exchanges to list the tokens for trading.  (FAC, ¶¶151-55; Dkt. 46, Exs. C & G.)

Defendants maintain Atonomi entered into SAFTs with only verified, accredited investors, and complied with Rule 502(d) through language in the SAFT and by requiring the completion of an investor questionnaire and verification by a third party.  (Dkt. 50, ¶¶21-32, Exs. A & B.)  They deny they allowed pooling and distinguish "groups" of accredited investors, each of whom separately applied and qualified.  (*Id.*, ¶¶64-66, 74.)  They deny they advertised or sought to generate publicity, promote, or solicit, contending their public statements were focused on the product – the Atonomi Network – and that they needed to distribute the ATMI tokens so that the product could be used.  (*Id.*, ¶¶68-71.)  They hired a firm to monitor the Atonomi "Telegram Community" channel so they could answer questions and rebut false rumors.  (*Id.*, ¶71.)  They deny they directly elicited or proactively sought listing on an exchange.  (*Id.*, ¶¶75-77.)  Defendants argue plaintiff lacks evidence to support his contentions, relying on his own unverified pleading, taking on-line conversations out of context, and pointing to unrelated events occurring after the SAFTs and relating to the later public sale of ATMI tokens.  They posit that, because the SAFT is exempt under Rule 506(b) of Regulation D of the Securities Act, it is pre-empted from State

regulation under RCW 21.20.  *See generally* 15 U.S.C. § 78a.

Plaintiff presents screenshots of Atonomi's Telegram channel and posts, chats, and/or messages in that channel and in other forums.  Beginning January 5, 2018, the Atonomi Telegram channel listed the Atonomi website and Twitter, Facebook, and Reddit pages, noted the project white paper and roadmap would be forthcoming, and discussed past and upcoming national and international events.  (Dkt. 60 (Ni Decl.), Ex. A.)  One posting notes an upcoming pitch for Atonomi at "CoinAgenda" in Vegas and a presentation to "150 high net worth investors" at a "wealth management event" in Rhode Island.  (*Id*.)  The channel included photographs of events, one captioned: "Mob scene after panel.  Took 2 hours to talk to everyone about Atonomi afterward."  (*Id*.)  On January 8, 2018, a moderator on the channel fielded inquires about the upcoming "ICO."  (*Id*., Ex. B.)  The following day, after Emery expressed thanks for the interest in the Atonomi project, two individuals wanted to "join [in] pre sale" and were promptly told by a moderator they should send or would receive a "pm" (private message).  (*Id*.)  By February 17, 2018, the Atonomi Telegram channel had over 14,000 members.  (*Id*., Ex. C.)

Plaintiff also provides numerous messages/chats discussing investor "groups", "pools", or "syndicates."  (*Id.*, Ex. I (Emery on January 30, 2018:  "we are oversubscribed by at least 3x and need to make some hard choices to allow as many positive groups into the private [sale.] . . . i really hope he is not upset, but rather view the demand as positive for groups investment[.]  we are pushing hard to give everyone an opportunity to participate."); Ex. J (Emery on February 6, 2018: "fyi, there are three syndicates that we have allocated more than 1M ETH, the balance is spread among many. . . .  your group is one of the three[,] we are pushing for as broad a dist as possible; even through the public sale[.]"), Ex. K (Emery discussing "private" sale on January 1, 2018:  "No problem with 5k ETH.  We have a couple groups in the same range. . . .  They are private investors.

My feeling is that they are not early crypto, since they are changing fiat in ETH before investing. They passed KYC in Jibrel case, so I think they are ok. . . "), Ex. L (Telegram participant to AmaZix employee: "My pool had a representative there doing research and was impressed with your answers. Watching the project closely."))

Plaintiff likewise provides numerous messages/chats in which defendants discussed plans and efforts to list ATMI tokens on exchanges. (Dkt. 46, Exs. C (in a January 2018 exchange with a potential "group" investor, Emery noted the plan for listing on major exchanges "after the ICO", but "being cautious about any public discussions that might raise the attention of the SEC."; when the investor stated "if somehow you had a bittrex commitment BEFORE finishing ICO would be huge and [the group] would be very interested", Emery responded he understood "the importance of listing on the major exchanges" and could say "the founders of Atonomi personally know the founder of Bittrex and Poloniex[,]" to which the investor replied: "Hmmmmmm  I get what you're saying  lol"), Ex. F (Atonomi "FAQS":  "We are actively engaged in dialogue with top exchanges."), and Ex. G (discussing hope for Bittrex listing); Dkt. 60, Ex. E (Emery messages, dated between June and October 2018, discussing efforts to list on multiple exchanges, including, on July 23, 2018:  "The token has taken a beating since unlocked.  Really disappointed with early pre-sale people dumping.  This coming week we will be announcing the ARM Mbed program, hopefully followed by Bittrex next week."))

While defendants now reject the description of an "ICO," evidence submitted by plaintiff shows they repeatedly either defined or failed to correct the depiction of token sales in those terms. (*See, e.g.*, Dkt. 46, Ex. C (January 2018); Dkt. 60, Ex. D (August 2018, November 2018, February 2019).)  Plaintiff also provides evidence of statements made by defendant David Fragale regarding the intent of the ICO and the use of funds raised.  (*See* FAC, ¶161 & Ex. B; Dkt. 60, Ex. H.)  For

instance, in one LinkedIn exchange, Fragale states he joined Atonomi "to build a blockchain company[,]" but "[o]nce ICO money was certain, Vaughan [Emery] began to remove me from the project and wanted to use funds for Centri which was failing." (Dkt. 60, Ex. H.)  After Emery's removal, the new CEO "combined Centri and Atonomi into one company so ICO funds could pay for centri payroll", refused to recognize Fragale as a founder or executive "because he turned Atonomi into a 'project' of Centri so he could pay Centri bills[,]" and "[t]hen he fired everyone tied to Atonomi project." (*Id*.)  Fragale further states:

> [N]ew ceo hired his sister and Son and paid them w ICO funds.  Do I need to keep going?  I want nothing to do w this company. . . . [B]usy working means busy using ICO funds to pay for Centri. There is no one at atonomi w blockchain experience or skills anymore.  Everyone was forced to quit or were fired.
>
> I believe a community should be supported.  Not a single dollar should be used for anything other than the blockchain project. Motivations became very clear once ICO money was certain. . . . I refused to benefit from a clear misuse of funds and 180 degree shift from what was told to investors.

(*Id*.)

Plaintiff, in sum, presents evidence supporting his allegation of a failure to abide by Rule 506(b) exemption requirements, including restrictions on advertising/solicitation, the limit on unaccredited investors, and lockup rules.  The evidence calls defendants' defenses to these and other allegations into question.   The Court therefore finds plaintiff to demonstrate at least serious questions going to the merits and, it appears, a likelihood of success in relation to the SAFTs.

        b.   <u>ATMI tokens</u>:

Defendants did not register or seek an exemption for the ATMI tokens and denies the tokens constitute securities under the WSSA.  They maintain the tokens are more appropriately characterized as a type of utility "currency" or a commodity to be used on the Atonomi Network.

REPORT AND RECOMMENDATION
PAGE - 12

A security is generally defined as an "investment contract." *See* 15 U.S.C. § 77b(a)(1); RCW 21.20.005(17)(a). In *S.E.C. v. W.J. Howey Co. ("Howey")*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." The elements for establishing an investment contract under *Howey* include: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991). Washington courts apply the *Howey* test, and subsequent modifications to the requirement that "profits be derived 'solely' from the efforts of others" to "one that the profits come 'primarily' or 'substantially' from the efforts of others[,]" as the law in Washington. *Cellular Eng'g v. O'Neill*, 118 Wn.2d 16, 25-26, 820 P.2d 941 (1991) (quoted and cited cases omitted). *See also McClellan v. Sundholm*, 89 Wn.2d 527, 531-32, 574 P.2d 371 (1978) (identifying the third requirement as "where the investor expects to reap profits from the efforts of the promoter or a third party" or "an expectation by the investor that profits will be gained from the efforts of some other party").

Washington courts also recognize "the definition of security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Cellular Eng'g*, 118 Wn.2d at 25-26 (quoting *Howey*, 328 U.S. at 299). In determining whether a transaction constitutes the sale of a security, substance prevails over form, consistent with the purpose of protecting the investing public. *Id*. at 24-25 (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), and *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)).

/ / /

REPORT AND RECOMMENDATION
PAGE - 13

i.    <u>Investment of money</u>:

Plaintiff invested 225 ETH, valued at $191,250.00, to purchase ATMI tokens.  (FAC, ¶14 and Ex. A.)  He alleges defendants raised some 42,000 ETH in total, including approximately 28,000 ETH from SAFTs and 14,000 ETH from the public sale, amounting to a value of some twenty-five million dollars.  (FAC, ¶¶56-59.)  There is no dispute that, as in other cases involving the use of digital currencies to purchase digital coins or tokens, these purchases constitute an investment of money.  *See, e.g., Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. Mar. 31, 2019); *Solis v. Latium Network, Inc.*, C18-10255, 2018 U.S. Dist. LEXIS 207781 at *5-9 (D. N.J. Dec. 10, 2018); *United States v. Zaslavskiy*, C17-647, 2018 U.S. Dist. LEXIS 156574 at *13-14 (E.D. N.Y. Sept. 11, 2018).  *See also* SEC Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), at 11 ("In determining whether an investment contract exists, the investment of 'money' need not take the form of cash."; concluding with respect to the use of ETH to purchase tokens: "Such investment is the type of contribution of value that can create an investment contract under *Howey*.") (citations omitted), *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

ii.    <u>Common enterprise</u>:

Under the second prong of *Howey*, there must be either a common enterprise between an investor and a seller, promoter, or third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality).  *R.G. Reynolds Enters.*, 952 F.2d at 1130. Horizontal commonality entails the pooling of investor funds and interests, *Brodt v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir. 1978), while "[v]ertical commonality may be established by showing 'that the fortunes of the investors are linked with those of the promoters.'"  *R.G. Reynolds Enters.*, 952 F.2d at 1130 (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th

REPORT AND RECOMMENDATION
PAGE - 14

Cir. 1985)).  *See also Winkler v. Trico Financial Corp.*, 693 F. Supp. 896, 898-99 (W.D. Wash. 1987) (explaining that, because "both the Ninth Circuit and the Washington Supreme Court have established vertical commonality as the test for a common enterprise[,] . . . . an alleged lack of horizontal commonality is irrelevant.") (citing *United States v. Jones*, 712 F.2d 1316, 1321 (9th Cir.1983) (funds of investors need not be pooled); *McClellan*, 89 Wash.2d at 532 (ongoing relationship between company offering silver and purchaser is test of commonality)).

Plaintiff asserts vertical commonality given that plaintiff and the putative class necessarily and collectively had to rely on defendants to write the software code and deliver the ATMI tokens. He asserts horizontal commonality through the pooling of twenty-five million dollars in funds from investors to complete the development of the tokens.

Defendants deny horizontal commonality, contending the purchase of tokens was an individual enterprise, with the purchaser deciding whether to buy, how long to hold the tokens and whether to use or transfer them, and any profits made specific to the buyer.  They state a purchaser's mere expectation of additional applications does not transform the purchase into a common enterprise and that the SAFT terminated as soon as investors received their tokens.  They also deny vertical commonality, stating any purchaser of tokens agreed they were meant for utility, without any promise for future profit (*see* Dkt. 50, Ex. D ("Terms of Token Sale")), and that tokens do not confer any ownership or other rights to Atonomi.  Defendants add that, despite the cryptocurrency market crash, the Atonomi Network remains up and running and the tokens useable for their intended purpose – to validate IoT devices.  (Dkt. 53 (Strickland Decl.), ¶2).

The evidence presented by plaintiff supports a finding of horizontal commonality.  That is, the evidence shows millions in investor funds pooled together so that defendants could develop blockchain technology, issue tokens, and develop and expand the Atonomi Network, and the

fortunes of investors tied together in the pursuit of those goals. *See Balestra*, 380 F. Supp. 3d at 352-53 (finding plaintiff stated a claim of horizontal commonality where defendants essentially "encouraged investors to purchase ATB Coins based on the claim that the speed and efficiency of the ATB Blockchain would result in an increase in the coins' value[,]" and the value of the coins "was dictated by the success of the . . . enterprise as a whole"); *Solis*, 2018 U.S. Dist. LEXIS 207781 at *6 (finding sufficient pleading of commonality in allegation that funds raised through ICO were pooled to develop and maintain a blockchain-based tasking platform and that an investor's return on an ICO investment was directly proportional to the investor's financial stake and the numbers of tokens owned); *Zaslavskiy*, C17-647, 2018 U.S. Dist. LEXIS 156574 at *18 ("[I]t can readily be inferred from the facts alleged that the REcoin and Diamond investment strategies depended upon the pooling of investor assets to purchase real estate and diamonds. . . . It can also be inferred that investors' fortunes were necessarily tied together through the pooling of their investments.") *See also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (defining horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets[.]")

Neither a focus on language in the SAFT or public sale terms, nor the attempt to separate the SAFT from the public sale or the ATMI token itself undermines the evidence of horizontal commonality. As stated above, substance prevails over form. *Cellular Eng'g*, 118 Wn.2d at 24-25. The Court looks to the "economic realities underlying a transaction, and not on the name appended thereto." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838, 849 (1975). *See also Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574 at *13-14 ("Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry. This is especially true in the context of 'relatively new, hybrid vehicle[s],' which require 'case-by-case analysis into

the economic realities of the underlying transaction[s].'") (quoted and cited cases omitted).  Here,

the economic reality shows a pooling of funds from the SAFTs and public sale, with the purchasers

in each instance and together having a common and continuing purpose.  As recently found in a

case in which a court granted preliminary injunctive relief to the SEC:

> . . . Telegram pooled the money received from the Initial
> Purchasers [of "Gram Purchase Agreements"] and used it to develop
> the TON Blockchain as well as to maintain and expand Messenger
> [(Telegram's messaging app)]. The ability of each Initial Purchaser
> to profit was entirely dependent on the successful launch of the TON
> Blockchain. If the TON Blockchain's development failed prior to
> launch, all Initial Purchasers would be equally affected as all would
> lose their opportunity to profit, thereby establishing horizontal
> commonality at the time of 2018 Sales.
>
> Further, horizontal commonality exists after the launch of
> the TON Blockchain. The plain economic reality is that, post-
> launch, the Grams themselves continue to represent the Initial
> Purchasers' pooled funds. [*Balestra*], 380 F. Supp. 3d at 354
> (finding a pooling of assets in a post-launch digital asset). Post-
> launch, the fortunes of the Initial Purchasers will also remain tied to
> each other's fortunes as well as to the fortunes of the TON
> Blockchain. Upon delivery of the Grams, Round Two Purchasers
> [(who did not have a lockup provision)] will possess an identical
> instrument, the value of which is entirely dependent on the success
> or failure of the TON Blockchain as well as on Telegram's
> enforcement of the lockup provisions on Round One Purchasers. All
> Initial Purchasers, Round One and Round Two, were dependent
> upon the success of the TON Blockchain software and, if it failed,
> all Initial Purchasers would suffer a diminution in the value of their
> Grams. The investors' fortunes are directly tied to the success of the
> TON Blockchain as a whole. *Id.* (holding that "the value of [a post-
> launch digital asset] was dictated by the success of the [blockchain]
> enterprise   as   a   whole,   thereby   establishing   horizontal
> commonality"). The Court finds that the SEC has made the required
> showing   of   horizontal   commonality   because   the   record
> demonstrates that there was a pooling of assets and that the fortunes
> of investors were tied to the success of the enterprise as well as to
> the fortunes of other investors both before and after launch.

*SEC v. Telegram Group Inc.*, C19-9439, 2020 U.S. Dist. LEXIS 53846 at *31-33 (S.D.N.Y. Mar.

REPORT AND RECOMMENDATION
PAGE - 17

24, 2020).  The evidence here suggests a common enterprise through the pooled funds of all

purchasers of ATMI tokens.[2]

The evidence also supports a finding of vertical commonality.  Defendants sought to build

the Atonomi Network through the development of blockchain technology and issuing ATMI

tokens for use in the network, and plaintiff and the putative class were necessarily reliant on

defendants to write the software code and deliver the tokens.  Their fortunes were linked, providing

for vertical commonality.  *See, e.g., id.* at *33-34 (finding strict vertical commonality where

investors' "anticipated profits were directly dependent on Telegram's success in developing and

launching the TON Blockchain[]" and Telegram was similarly dependent on the launch to avoid

financial and reputational harm and to obtain funds to meet expenses and to expand and maintain

its product); *SEC v. Alpha Telcom, Inc.*, 187 F. Supp. 2d 1250, 1260 (D. Or. 2002) (finding vertical

commonality where investors relied on expertise of phone-related business to negotiate lease sites,

establish service lines, and make all business decisions, as well as to service and maintain the

phones, "which was important to these investors who had no expertise in the workings of

telephones and no desire to maintain or service the phones.")

iii.    Expectation of profits:

The third and final element is the expectation of profits produced by the efforts of others.

*R.G. Reynolds Enters.*, 952 F.2d at 1130. "By contrast, when a purchaser is motivated by a desire

to use or consume the item purchased . . .  the securities laws do not apply."  *United Housing*

*Found., Inc*, 421 U.S. at 852-53.  The third *Howey* requirement is met when "the efforts made by

those other than the investor are the undeniably significant ones, those essential managerial efforts

---

[2] For these same reasons, defendants do not demonstrate plaintiff lacks standing in relation to the
public sale or is unlikely to succeed on the merits of a class claim.

REPORT AND RECOMMENDATION
PAGE - 18

which affect the failure or success of the enterprise." *R.G. Reynolds Enters.*, 952 F.2d at 1130 (internal quotation marks and quoted sources omitted).

Defendants maintain they have "always been clear that the ATMI Tokens were developed and marketed principally as a type of utility token for use on the Atonomi Network – i.e., for their consumptive utility and as a medium for exchange for the IoT devices to work." (Dkt. 49 at 20.) They point to language reflecting as such in terms associated with the public token sale. (Dkt. 50, Ex. D ("You are purchasing ATMI solely for use in connection with Token Utility and are not purchasing ATMI for any other purposes, including, but not limited to, any investment, speculative or other financial purpose.")) Defendants deny it would be reasonable for any purchaser to have an expectation of profit.

Plaintiff asserts no reason to invest in the ICO except to benefit from appreciation in the value of ATMI tokens purchased. He denies the tokens have any intrinsic value, contending any value resulted solely from defendants' efforts to create a blockchain and corresponding network, the very project he was funding with his investment. He points to evidence showing defendants described transfers of funds as investments (*see* Dkt. 46, Ex. C and Dkt. 60, Ex. I), observes that no tokens, blockchain, or network existed at the time of his investment, and asserts that, instead of developing blockchain technology, defendants released the tokens for trading on the Ethereum network shortly after the public sale. Plaintiff maintains reasonable investors would assume defendants' efforts would drive up the demand and market value of ATMI tokens.

The evidence shows a substantial investment of funds for the future development of blockchain technology and tokens, and significant efforts by defendants to secure those investments and provide for speculative trading. This evidence supports the conclusion investors had a reasonable expectation of profits to be derived from the efforts of others. (*See, e.g.*, Dkt. 46,

Ex. F ("[Q] *Do you seriously believe those who participated in the private round did so for using the tokens on the platform?  Not an investment opportunity*? . . .  [A] The private sale involved investment by accredited investors only.  It is well understood these investors had an investment opportunity in mind, and therefore would not be using the token on the platform.") (emphasis in original).  *See also* SEC release No. 10608, *In re Gladius Network LLC*, Order Instituting Cease-and-Desist Proceedings (Feb. 20, 2019) (stating with respect to ICO offering tokens to be issued on blockchain and serve as "currency" within the "Gladius Network": "A purchaser in the offering of GLA Tokens would have had a reasonable expectation of obtaining a future profit based upon Gladius's efforts to create a 'marketplace' using the proceeds from the sale of GLA Tokens and to provide investors with liquidity by making GLA Tokens tradeable on secondary markets."), *available at* https://www.sec.gov/litigation/admin/2019/33-10608.pdf; SEC Release No. 10574, *In re Paragon Coin, Inc.*, Order Instituting Cease-and-Desist Proceedings (Nov. 16, 2018) (stating with respect to sale of tokens to raise capital to develop and implement blockchain technology: "A purchaser in the offering of PRG tokens would have had a reasonable expectation of obtaining a future profit based upon Paragon's efforts, including to develop Paragon's 'ecosystem' using the proceeds from the sale of PRG tokens, and to take steps to control and increase the value of PRG."), *available at* https://www.sec.gov/litigation/admin/2018/33-10574. pdf.[3]  Defendants, in relying on

---

[3] *See also Balestra*, 380 F. Supp. 3d at 355-57 (plaintiff's allegations withstood motion to dismiss where they established "the purchasers of ATB Coins reasonably believed that these coins would increase in value based primarily on Defendants' entrepreneurial and managerial efforts."; further finding satisfactory pleading "[g]iven the content of Defendants' marketing materials and their sole responsibility for developing and launching the ATB Blockchain – the performance of which largely dictated the value of ATB Coins[.]"); *Solis*, 2018 U.S. Dist. LEXIS 207781 at *7-8 (factual allegations, including promotional and other materials promoting investment opportunity and the fact the blockchain-based tasking platform had only limited functionality and had not yet been launched, supported inference plaintiff purchased tokens "with expectation of profit rather than as a means of using the tasking platform."); and *Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574 at *19-22 (investors in cryptocurrency tokens or coins "undoubtedly expected to

disclaimers and statements as to the consumptive utility of the tokens, do not negate the significant evidence purchasers nonetheless had a reasonable expectation of profit. *SEC v. Telegram Group Inc.*, 2020 U.S. Dist. LEXIS 53846 at *46-47.  Plaintiff therefore demonstrates a likelihood of success on the merits in relation to the ATMI tokens.

2.  <u>Irreparable Harm</u>:

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting preliminary relief.  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.* (citations omitted; emphasis in original).  Where seeking to freeze an opponent's assets, a party "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson*, 572 F.3d at 1085 (affirming asset freeze and an accounting where defendant's "own prior conduct establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed.")

Plaintiff seeks the return of his own and putative class members' investments in the Atonomi ICO.  (FAC, ¶1.)  In arguing irreparable harm in the absence of preliminary injunctive relief, he points to evidence showing defendants already used ICO proceeds to pay CENTRI's bills.  (Dkt. 60, Ex. H (Fragale statements described *supra*); Dkt. 46, Ex. I (statements attributed to former Atonomi employee Grant Fjermedal:  "The venture capital firm that had been funding

receive profits on their investments" and could have reasonably expected profits to be derived primarily from managerial efforts of defendants).

Centri for some years was eager to get something back from their investment. They had continued funding Centri as Atonomi was created.")) He asserts the use of remaining proceeds for frivolous events, such as a March 2019 trip to host a "VIP event" in Barcelona. (*See* Dkt. 46, Ex. J.) He depicts the ATMI token as essentially worthless, with the trading price collapsed over ninety-nine percent since release, no current demand, and almost no trading. (Dkt. 44 at 19; Dkt. 46, Ex. H.) Plaintiff also rejects assertions of the continuing functioning of Atonomi and CENTRI, pointing to, for example, LinkedIn profiles showing defendants Fragale, Emery, Mackey, and Strickland work elsewhere and the company websites as revealing neither Atonomi, nor CENTRI has any employees. (*See* Dkt. 60, Ex. F and *compare* Dkt. 60, Ex. G, *with* Dkt. 15, Exs. H-I.)

Defendants deny plaintiff has suffered or will suffer harm, stating plaintiff received the tokens purchased and had no promise of future profit. Emery states plaintiff transferred many of his tokens shortly after receipt. (Dkt. 50, ¶100). Defendants maintain Atonomi's secure network is up and running, with utility tokens still available to use to validate IoT devices. They deny any improper use of funds, including the Barcelona event where they held meetings with potential customers (Dkt. 53, ¶3), or the use of funds to complete the network, pay overhead and their employees, and "attempt to do so at a profit." (Dkt. 49 at 7.) Defendants also contend the owners of ATMI tokens would suffer harm from an asset freeze, leaving Atonomi unable to pay for server upkeep and rendering its network and the tokens unavailable for their intended purpose.

The parties present starkly different depictions of the current status of Atonomi and ATMI tokens. However, while maintaining the continued utility of the tokens in relation to IoT devices, defendants do not dispute plaintiff's allegation of the substantial, if not complete, dissipation of funds from their sale. Defendants' arguments also rely on their contention the ATMI token is not a security, in contrast to the evidence discussed above. Defendants further fail to provide sufficient

REPORT AND RECOMMENDATION
PAGE - 22

detail or any support for their contentions regarding plaintiff's transfer of tokens or the alleged harm to owners of ATMI tokens with an asset freeze. The Court, for these reasons, finds plaintiff shows a likelihood of irreparable harm through the loss of any remaining funds absent injunctive relief, with the balance tipping sharply in plaintiff's favor.

3.    <u>Balance of Equities</u>:

Again, plaintiff asserts the evidence suggests defendants have abandoned the ATMI project, with no developments since May 2019. (*See* Dkt. 46, Ex. K.) He argues the counting of ICO proceeds as "revenue" reveals defendants feel no need to continue developing the product. (*See* FAC, ¶161 and Ex. B (attributing the following statements to Fragale on or about February 14, 2019: ". . . Centri sees this as a product sale so it's revenue and they can use it however they want. . . . they did it to raise money for centri. They've used it to try and find a buyer for centri. But no one will buy it. Vaughan lied to me about building blockchain. It was scam from the beginning.")) Plaintiff asserts the absence of any continued speculation or trading. He argues no hardship to defendants with the requested injunctive relief, as compared to the possible inability to recover for himself and other investors. Defendants, in arguing the balance of equities tip in their favor, depict the requested relief as exceedingly vague and overbroad, seeking a freeze of all assets of all defendants, including individuals no longer employed by Atonomi or CENTRI, and no clarity as to what would constitute assets derived from or traceable to the Atonomi ICO.[4]

The Court agrees with both plaintiff and defendants in part. That is, the Court finds the balance of equities to support injunctive relief, with modifications to the relief requested as reflected below. However, in finding relief warranted, plaintiff satisfies the requirement to show

---

[4] Defendants also reiterate their position the alleged "ICO" incorporated only the "PST", in which plaintiff did not participate, which the Court rejects for the reasons stated above.

REPORT AND RECOMMENDATION
PAGE - 23

1   the balance of equities falls in his favor.

2          4.    Public Interest:

3          Plaintiff notes the enforcement of securities laws is in the public interest, points to the

4   evidence showing defendants knew his investment constituted a security but failed to abide by the

5   rules necessary for exemption, and argues particular impact to the public given his desire to sue

6   on behalf of other investors.  Defendants, in denying an asset freeze would be in the public interest,

7   again contend plaintiff has no rights beyond the utility of the ATMI tokens purchased, the

8   continuing viability of the tokens, and harm to all token owners with a shut down of the Atonomi

9   Network resulting from an asset freeze.   The Court, finding an absence of evidence presented to

10  support defendants' contentions, concludes the public interest favors a grant of preliminary

11  injunctive relief for the reasons proffered by plaintiff.

12  D.    Preliminary Injunctive Relief

13         Plaintiff establishes his entitlement to injunctive relief from defendants Atonomi and

14  CENTRI in the form of a freeze and accounting of assets derived from or traceable to the Atonomi

15  ICO.  However, plaintiff does not present evidence associated with or even mention a number of

16  the individuals named as defendants in this matter.  He also presents evidence raising questions as

17  to defendant Fragale's involvement in the decisions and events associated with his claim.  (*See,*

18  *e.g.*, Dkt. 60, Ex. H.)  Finally, unlike Atonomi and CENTRI, plaintiff does not specifically address

19  or set forth evidence showing a likelihood of dissipation of claimed assets or other inability to

20  recover damages from any individual defendant, including those he does discuss within the motion

21  and documents filed in support.  The undersigned therefore finds insufficient support shown for

22  extending the injunctive relief to the individual defendants.  *See, e.g., SEC v. ABS Manager, LLC*,

23  No. 13-319, 2013 U.S. Dist. LEXIS 39098 at *16-17 (S.D. Cal. Mar. 20, 2013) (granting order

partially freezing assets for incorporated entities, but denying asset freeze for individual defendant where plaintiff "offered no evidence [the individual] will likely dissipate his own personal assets or the corporate assets.") *Cf. Johnson*, 572 F.3d at 1085 (finding likelihood of dissipation of assets where defendant had convinced his fellow directors and trustees to consent to diverting nearly $35 million from the company's account into his personal bank account); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236-37 (9th Cir. 1999) ("Given the Andersons' history of spiriting their commissions away to a Cook Islands trust, which was intentionally designed to frustrate United States courts' powers to grant effective relief to prevailing parties, the district court's finding regarding the likelihood of dissipation is far from clearly erroneous.")

The undersigned further recommends the Court issue an order limited to defendants Atonomi and CENTRI and (1) preliminarily enjoining these defendants, and their agents, from dissipating any assets derived from or traceable to the Atonomi ICO and opening, closing, or modifying any associated accounts; (2) preliminarily ordering an asset freeze on all proceeds derived from or traceable to the ICO in all financial institutions which receive actual notice of the asset freeze; (3) authorizing plaintiff and his attorneys to notify any financial institution of the injunction and asset freeze; and (4) ordering defendants Atonomi and CENTRI to prepare and file with the Court a detailed and complete schedule of all assets derived from or traceable to the ICO. Because it appears a more detailed order outlining the preliminary injunction would be appropriate (*see, e.g.*, Dkt. 44-1), plaintiff should submit a revised proposed order consistent with this Report and Recommendation.

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction (Dkt. 44) should be GRANTED in part and DENIED in part, and plaintiff granted preliminary injunctive relief through an asset freeze and

REPORT AND RECOMMENDATION
PAGE - 25

accounting specific to defendants Atonomi and CENTRI.  A revised proposed Order consistent with this Report and Recommendation should be submitted to the Honorable Richard A. Jones within **ten (10) days** of this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and NHBM,Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are file'd, the matter will be ready for consideration by the District Judge on **<u>June 19, 2010</u>**.

DATED this <u>2nd</u> day of June, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 26