UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRIS HUNICHEN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | CASE NO. C19-0615-RAJ-SKV |
| v. | |
| ATONOMI LLC, et al., | |
| Defendants. | REPORT AND RECOMMENDATION |
| ATONOMI LLC, | |
| Counterclaimant/Third-Party Plaintiff, | |
| v. | |
| CHRIS HUNICHEN, | |
| Counter-Defendant, | |
| & | |
| DAVID PATRICK PETERS, et al. | |
| Third-Party Defendants. | |

## INTRODUCTION

Plaintiff Chris Hunichen, individually and on behalf of all others similarly situated,

REPORT & RECOMMENDATION
PAGE - 1

pursues a single cause of action alleging violation of the Washington State Securities Act (WSSA), RCW 21.20.010 et seq., through the sale of unregistered, non-exempt securities. Dkt. 137. Defendant Atonomi LLC (Atonomi) filed Counterclaims against Plaintiff and a Third Party Complaint. Dkts. 81-82. The Court's Report and Recommendation that those counterclaims and third party claims be dismissed with prejudice remains outstanding. *See* Dkt. 218.

Plaintiff now proceeds on a Motion for Class Certification. Dkt. 197. He seeks certification pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), his appointment as Class Representative, and the appointment of his legal representatives as Class Counsel pursuant to Rule 23(g). Defendants Atonomi, CENTRI Technology, Inc. (CENTRI), M37 Ventures Inc. (M37), Vaughan Emery, Rob Strickland, Don DeLoach, Wayne Wisehart, Michael Mackey, and James Salter oppose the motion. Dkt. 208. Claims against the remaining Defendants – Launch Capitol LLC (Launch), Steven J. "Woody" Benson, and David Fragale – are the subject of a contemporaneous Report and Recommendation to grant Plaintiff's Motion for Preliminary Approval of a Partial Class-Wide Settlement.[1]

The parties to the current dispute request oral argument. The Court, having considered the motion, opposition, and remainder of the record, finds oral argument unnecessary and recommends the Motion for Class Certification, Dkt. 197, be GRANTED.

BACKGROUND

A.    ATMI Tokens

This matter involves the sale of "ATMI tokens." As previously described by the Court, Defendants maintain the tokens were created for use as a utility on the "Atonomi Network" and

---

[1] For brevity, the Court refers to the Defendants proceeding in opposition to the motion for class certification as "Defendants", rather than "Non-Settling Defendants."

REPORT & RECOMMENDATION
PAGE - 2

sold to fund the network and raise money for the development of blockchain technology. *See* Dkt. 208 at 4 and Dkts. 40 & 86 (providing background information regarding ATMI tokens and associated technology). Plaintiff rejects Defendants' depiction of the tokens as a utility. He posits that CENTRI and other Defendants created Atonomi as a CENTRI subsidiary in order to raise funds to retire a debt owed to Launch and developed the idea of a token sale before conceiving any use or application for a token. Dkt. 197 at 6-7.

B.    Token Sales

In the first half of 2018, Atonomi held a private pre-sale of ATMI tokens which required a purchaser to enter into a Simple Agreement for Future Tokens (SAFT). *See* Dkts. 40, 86 & 137. The SAFT identifies the purchaser as an accredited investor as defined in Rule 501 of Regulation D of the Securities Act. Dkt. 199, Ex. 29 at § 6(b). Defendants sought exemption from registration of the SAFT as a security under Rule 506(b) of Regulation D. Dkt. 86 at 7-8, 12 (citing Dkt. 46, Ex. A (Form D filed with SEC in March 2018)). Eighty people, including Plaintiff, all putative class members, and four current/former Defendants (Emery, Wisehart, De Loach, and Luis Pares), entered into SAFTs. *See* Dkt. 199, Ex. 28. SAFT signatories agreed to purchase tokens in exchange for Ethereum (ETH) cryptocurrency pursuant to a formula laid out in the SAFT and were entitled to additional "bonus" tokens. *Id.*, Ex. 29.

Atonomi subsequently conducted a public sale of tokens that both began and concluded on June 6, 2018 and allowed purchase of tokens without signing a SAFT. *See* Dkts. 40, 86 & 137. Some fourteen thousand people participated in the public sale, which offered a price of 0.00010526316 ETH per ATMI token. *See* Dkt. 199, Ex. 16 at 3 and Ex. 31 at 14. Each public sale participant was required to register and agreed to be bound to Atonomi's "Terms of Token Sale", which included a binding arbitration clause. *Id.*, Ex. 31 at 1-2.

REPORT & RECOMMENDATION
PAGE - 3

Atonomi made 135,000,000 ATMI tokens available for sale to the public and planned to deliver 365,000,000 tokens to SAFT purchasers. *Id*. at 14. It released and delivered tokens to both the private and public sale participants on July 12, 2018 and delivered bonus tokens on September 7, 2018. Dkt. 198, ¶7. The ATMI token "crashed" shortly after delivery. *See* Dkt. 197 at 12; Dkt. 208 at 15.

C.    Allegations Relevant to Certification

Plaintiff deems the ATMI token a "'dead' coin", with no demand, trading, or worth. Dkt. 137, ¶163; Dkt. 197 at 12. He contends the two-stage "Initial Coin Offering" or "ICO" described above comprised a single "integrated" offering. *See* Dkts. 137 & 197-98. He alleges he and other putative class members purchased ATMI tokens as an investment, that the tokens are now worthless, and that Defendants, who raised some $25 million in the token sales, are liable for the sale of unregistered, non-exempt securities in violation of the WSSA. Dkt. 137.

Defendants maintain the alleged "ICO" inaccurately describes its "Public Token Sale." Dkt. 208 at 6 & n.4. They deny violation of the WSSA, contending the SAFT was exempt from registration and that the tokens are not securities. *See* Dkts. 40, 86 & 208. Defendants also contend Plaintiff/Counter-Defendant and the Third Party Defendants violated the terms of the SAFT by "dumping" tokens shortly after they were unlocked, causing a chain reaction and the value of the tokens to crash. *See* Dkt. 208. The Court has recommended these counterclaims and the Third Party Complaint be dismissed. Dkt. 218.

D.    Proposed Class, Class Representative, and Class Counsel

Plaintiff seeks to certify a class defined as follows:

> All persons who purchased ATMI tokens via a Series 1 or Series 2 SAFT with Atonomi, LLC in 2018.

REPORT & RECOMMENDATION
PAGE - 4

> Excluded from the Class are Defendants and persons or entities
> directly affiliated with any Defendant, and persons who
> affirmatively assented to the Atonomi "Terms of Token Sale."

Dkt. 197 at 5.  The SAFTs signed by Plaintiff and all proposed class members are identical in all material respects except as to the "specific information pertaining to [the investor] including [their] investment amount."  Dkt. 81, ¶¶15-20; Dkt. 82, ¶¶14-19.

Plaintiff and proposed class representative Chris Hunichen signed a SAFT reflecting his payment of 225 ETH, a cryptocurrency amount then valued at $191,250.00. Dkt. 198, ¶6; Dkt. 199, Ex. 29 at 2.  He received 2,137,500 ATMI tokens on their release, followed by 534,375 bonus tokens.  Dkt. 198, ¶7.  In subsequent transfers and sales, Plaintiff received the equivalent of over $29,000 in ETH and asserts a total minimum dollar loss of $161,514.99.  *Id.*, ¶¶8-15. Plaintiff signed the SAFT while residing in Costa Rica, but currently resides in and is a permanent resident of Nevada.  *Id.*, ¶2; Dkt. 199, ¶30 & Ex. 29.  Other putative class members likewise signed SAFTS in other countries and in some cases reside in other countries and/or were not United States residents at the time of signing.  *See* Dkt. 199, Ex. 28.

Counsel for Plaintiff attest to their expertise in securities litigation, class actions, and other complex litigation.  Dkt. 199, Exs. 50-52.

## DISCUSSION

A.    Legal Standard

The class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individually named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Under Rule 23(a), a court may certify a class only if:  (1) the class is so numerous joinder of all members is impracticable; (2) questions of law or fact are common to the class; (3) a representative party's

claims or defenses are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  The court must also find satisfaction of at least one of three alternative conditions set forth in Rule 23(b), including, as relevant to this case: (1) that questions of law or fact common to members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

The party seeking certification bears the burden of demonstrating satisfaction of Rule 23(a) and Rule 23(b).  *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).  The Court's decision to certify a class is discretionary, but guided by Rule 23.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  The Court must undertake a "rigorous analysis" to determine whether the party seeking certification satisfies the Rule 23 prerequisites.  *Dukes*, 564 U.S. at 351.

The Court accepts the allegations in the complaint as true so long as they are sufficiently specific to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied.  *Blackie v. Barrack*, 524 F.2d 891, 901 & n.17 (9th Cir. 1975).  The merits of the substantive claims are not, as a general matter, relevant to this inquiry.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013) (citations omitted).

/ / /

/ / /

REPORT & RECOMMENDATION
PAGE - 6

B.    Rule 23 Analysis

Plaintiff argues the proposed class satisfies the above-described numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3).  Defendants disagree on all counts.  The Court finds both Rule 23(a) and Rule 23(b)(3) satisfied and certification of a class warranted.

1.    Numerosity and Superiority:

Plaintiff identifies seventy-six SAFT signatories as members of the proposed class, a number including all but the four Defendants who entered into SAFTs.  Defendants raise a challenge to the proposed class implicating both the numerosity and superiority requirements, as discussed below.

a.    Numerosity standard:

Numerosity exists when "the class is so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  "It is a long-standing rule that 'impractical' does not mean 'impossible' rather, impracticability means only 'the difficulty or inconvenience of joining all members of the class.'"  *McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)).  Factors pertinent to this determination include judicial economy, geographical diversity of class members, the ability of individual claimants to institute separate suits, and the pursuit of injunctive or declaratory relief.  *See, e.g.*, *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326-27 (W.D. Wash. 2015); *McCluskey*, 268 F.R.D. at 674-76.  Courts generally find forty or more class members to satisfy the numerosity requirement.  *Id*.  However, this prerequisite to certification "requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity*

*Comm'n*, 446 U.S. 318, 330 (1980).  *See also McCluskey*, 268 F.R.D. at 673-76 (certifying a class of 27, citing cases certifying classes ranging from 7 to 35 class members, and quoting another district court as observing, "[g]enerally, courts will find that the numerosity requirement has been satisfied when the class compromises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer.") (citations omitted).

  b.  Superiority standard:

  Superiority exists where a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  In making this determination, the Court must consider the four factors of Rule 23(b)(3):  (A) class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any already existing litigation concerning the controversy by or against class members; (C) the desirability or undesirability of concentrating the litigation in a particular forum; and (D) likely difficulties in managing a class action.  *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), *as amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).  The Court's superiority inquiry includes consideration of "whether the objectives of the particular class action procedure will be achieved in the particular case[,]" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (cited source omitted), *overruled on other grounds by Dukes*, 564 U.S. 338.

  c.  Numerosity and superiority in relation to the proposed class:

  Plaintiff posits that the seventy-six member class clearly satisfies the numerosity requirement in that it well exceeds the recognized threshold and because joinder of that number of plaintiffs would be impracticable.  Plaintiff also asserts superiority.  He argues that, although

many members of the class have significant damages, the additional trouble and expense of individual adjudication is overwhelming considering the identical factual and legal claims, the fact no other individual has filed an action and any such litigation would almost certainly occur in this forum, and the absence of any serious manageability issues given the class size, known class members, and the simple damage calculations.

Defendants deny superiority due to an absence of evidence a judgment or court-approved settlement in this matter would be given preclusive effect in the countries of forty-five putative class members who were not United States residents at the time they entered into SAFTs. *See* Dkt. 199, Ex. 28 (identifying signatories from twenty-five different countries). That is, Defendants contend the possibility that foreign putative class members could seek to file suit against Defendants in jurisdictions that would not recognize the *res judicata* effect of a judgment in this case undermines the superiority of the proposed class action. *See, e.g., Willcox v. Lloyds TSB Bank, PLC*, C13-0508, 2016 WL 8679353, at *9 (D. Haw. Jan. 8, 2016) ("The *res judicata* concerns for [a] transnational class action . . . are twofold: first, a foreign plaintiff may get a second bite at the apple through subsequent litigation in her home forum, and second, a foreign court may not honor a domestic class judgment in a defendant's favor.") (citations omitted). Defendants argue the exclusion of foreign SAFT signatories destroys numerosity by leaving only a thirty-one member class.

Courts have considered *res judicata* concerns when evaluating the superiority requirement and have excluded foreign putative class members on this basis. *See, e.g., In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 263-64 (2d Cir. 2016) (plaintiffs failed to identify any evidence suggesting foreign courts in certain countries would grant preclusive effect to a class judgment); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 282-84 (S.D.N.Y. 2008) (excluding

French investors from proposed class where plaintiffs failed to demonstrate "French courts would more likely than not recognize and give preclusive effect to any judgment rendered" and defendant's organizational documents vested exclusive jurisdiction over disputes in a French court).  Although not yet addressed by the Ninth Circuit, a district court within this circuit explained:

> The trending approach of federal courts nationwide appears to be evaluating the *res judicata* effects of class judgments with respect to groups of foreign plaintiffs and then excluding from the class those whose home countries would not honor a class judgment from the United States.  Such exclusions have occurred notwithstanding these courts' recognition that class manageability is only one of multiple factors to be considered under Rule 23(b)(3), and that *res judicata* risks as to foreign plaintiffs should be evaluated "along a continuum." These courts have also clarified that it is plaintiffs' burden to "demonstrat[e] that 'foreign court recognition is more likely than not'" as to a U.S. class judgment.

*Willcox*, 2016 WL 8679353, at *9 (internal and other case citations omitted).

Defendants criticize the country-by-country case law analysis provided by Plaintiff, *see* Dkt. 197 at 21-23 & Appx. A, asserting he merely cites to non-precedential authority and no more than conjectures that a judgment would be enforced in Hungary, Russia, Czech Republic, Romania, Dubai, Germany, Croatia, India, Hong Kong, Switzerland, the United Kingdom, and Singapore; does not address Costa Rica or Australia; and fails to acknowledge contrary conclusions in regard to Hungary, Switzerland, Pakistan, and Russia.  *See* Dkt. 208 at 12-13. Defendants assert the need for expert testimony, as well as counsels' lack of relevant expertise.

Defendants contend the small remaining class of United States residents does not satisfy the numerosity requirement.  They note that no other SAFT signatory has threatened a lawsuit and argue the signatories' status as accredited investors shows they are financially and otherwise capable of bringing individual lawsuits.

REPORT & RECOMMENDATION
PAGE - 10

The Court is not persuaded that inclusion of foreign putative class members defeats the superiority or numerosity requirements. The Court, instead, agrees with Plaintiff that Defendants rely on distinguishable case law and that the analysis is properly focused in a different direction.

Plaintiff's lawsuit is brought under a Washington law, against Washington defendants, and challenges a Washington ICO. Courts have, in similar circumstances, certified classes including foreign putative class members. For example, in *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 489 n. 7 (E.D. Pa. 2007), the court found inclusion of some foreign investors did not affect superiority because the "alleged wrongdoing by American defendants" took place in and involved stock traded in the United States, and it was "unclear that any foreign class members would even have recourse in their home countries[.]" The court distinguished cases involving foreign defendants and activity, such as the French defendant and activity in *In re Vivendi* and found it "far from clear" how the Austrian courts allegedly at issue in its case "would even have jurisdiction over a suit" alleging fraud under United States securities laws. *Id.* at 486.

More recently, in *Audet v. Fraser*, 332 F.R.D. 53, 84-85 (D. Conn. 2019), the court found *res judicata* case law distinguishable and the decision in *Marsden* to provide a better path for consideration of a cryptocurrency case and class involving foreign putative class members. The lawsuit involved a U.S. company, controlled by individuals living in the U.S. and their conduct in this country. The court found the superiority requirement satisfied, explaining:

> By itself, the existence of some foreign putative class members does not weigh against superiority as Fraser has not pointed to evidence or legal authority suggesting that any foreign courts would have jurisdiction over him or any other defendants. Fraser has pointed to no authority declining to certify a class on this basis in a case involving class members from inside and outside the United States and defendants whose conduct took place exclusively within the United States. While Plaintiffs bear the burden of establishing each element of Rule 23, they need not

1                    rebut objections to class certification that rest on speculative
2                    scenarios.

*Id*. at 85 (internal citation omitted).  *See also Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 217-18 (S.D.N.Y. 2012) ("The foreign identity of prospective class members is a factor which can 'counsel[ ] against a finding that the class action is superior to other forms of litigation,' but it is 'not dispositive.'  Where, as here, unique issues of foreign law involving foreign investors are minor or non-existent, superiority is not defeated.") (quoting *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 116–17 (S.D.N.Y. 1998)).

      Also, in *Moomjy v. HQ Sustainable Mar. Indus., Inc.*, C11-0726-RSL, 2011 WL 4048796, at *2-3 (W.D. Wash. Sept. 12, 2011) (cleaned up), this Court noted that "courts routinely appoint foreign investors as lead plaintiffs" and found the argument an Estonian court might not recognize the judgment, raising *res judicata* concerns, "speculative and insufficient" to support a challenge to the adequacy of an Estonian investor as a lead plaintiff.  The Court added that, while it would not appoint a lead plaintiff likely to be later excluded, the possibility was speculative and appeared unlikely where the Estonian lead plaintiff purchased its shares domestically, had agreed to be bound by any judgment from the court, Estonia recognizes foreign judgments, and objecting parties did not argue the lead plaintiff "could, as a practical matter, pursue its claim in Estonia."  *Id*. (citing *Marsden*, 246 F.R.D. at 486).

      Defendants here offer no more than bare and speculative *res judicata* concerns in relation to foreign putative class members.  They do not identify acts or events that could give rise to jurisdiction in a foreign court or dispute that the conduct at issue occurred within the United States.  A foreign court's jurisdiction over Defendants appears unlikely.[2]

---

     [2] Defendants also cite to inapposite cases relating to the extraterritorial application of United States law.  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) (Securities Exchange Act

REPORT & RECOMMENDATION
PAGE - 12

Plaintiff satisfies the superiority requirement. He proposes a single action in this forum, where the corporate and many of the individual defendants are based, state law governs the controversy, and the class includes a number of far-flung individual members. It appears no other SAFT signatory has expressed interest in controlling litigation against Defendants, a class would avoid the difficulty and expense of adjudicating up to seventy-six individual lawsuits, and the relatively small size of the proposed class is manageable.

Numerosity is likewise satisfied. The proposed seventy-six member class well exceeds the standard numerosity threshold. Also, while the other SAFT signatories may be capable of pursuing individual lawsuits, their geographical diversity and interests of judicial economy strongly favor adjudication as a class.

The Court would, moreover, find sufficient superiority and numerosity with only limited consideration of Defendants' *res judicata*-based challenge. For instance, because Plaintiff is a permanent resident of and currently resides in Nevada, Defendants do not identify a realistic concern as to the laws of Costa Rica. Nor does it appear there would be any serious concern with respect to, at least, the nine putative class members residing in the United Kingdom and Canada. *See, e.g., Willcox*, 2016 WL 8679353, at *13 (Canadian courts "'would more likely than not recognize and give preclusive effect to a judgment rendered' by a U.S. court.") (citations omitted); *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105, 115-17 (S.D.N.Y. 2013)

---

applies only to the "purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."); *Barron v. Helbiz Inc.*, C20-4703, 2021 WL 229609, at *6 (S.D.N.Y. Jan. 22, 2021) (dismissing claims without prejudice to renewal in other jurisdictions where an ICO for a token "was of a security which was not listed on a United States exchange or purchased in the United States.") Those cases do not preclude the inclusion of foreign investors in a class raising a challenge to a domestic law. *See, e.g., Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 575 (C.D. Cal. 2012) ("[T]his case is about federal securities laws, and even if the case 'can essentially include individuals from all over the world,' Section 10(b) of the Securities Exchange Act applies to securities bought from an American stock exchange, regardless of the location of the investor.") (citations omitted).

REPORT & RECOMMENDATION
PAGE - 13

("[T]he courts of the United Kingdom, Canada, and other common law countries would more likely than not recognize, enforce, and give preclusive effect to any judgment rendered in this case[.]"), *vacated and remanded on other grounds sub nom. St. Stephen's Sch. v. PricewaterhouseCoopers Accts. N.V.*, 570 F. App'x 37 (2d Cir. 2014); *In re Alstom SA Sec. Litig.*, 253 F.R.D. at 282 (certifying class as to English, Dutch, and Canadian but not French putative class members); *In re Vivendi Universal*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007) (certifying class as to French, English, and Dutch but not German or Austrian putative class members). Contrary to Defendants' contention that such a finding necessitates consideration of expert testimony, "[w]hen determining foreign law, courts 'may consider any relevant material or source,' including determinations by other courts." *Wilcox*, 2016 WL 8679353, at *13 (quoting Fed. R. Civ. P. 44.1). *Accord In re Alstom SA Sec. Litig.*, 253 F.R.D. at 291 (although often submitted, expert declarations "are not necessary for plaintiffs to carry their burden of establishing aspects of foreign law.") Considered as such, the proposed class would properly include and satisfy both the superiority and numerosity requirements with, at a minimum, forty-one members. *See* Dkt. 199, Ex. 28.

        2.   <u>Commonality and Predominance</u>:

        Under Rule 23(a), there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Class members' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The Court looks to "'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id*. (quoted source omitted).

The Rule 23(a)(2) test of commonality is generally subsumed by the predominance requirement under Rule 23(b)(3). *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). *See also Hanlon*, 150 F.3d at 1022 (the predominance analysis presumes the existence of common issues of fact or law under Rule 23(a)(3)). Predominance requires a showing "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This factor "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.*, 521 U.S. at 623. A central concern is "whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole*, 571 F.3d at 944 (quoting *Zinser*, 253 F.3d at 1189).

In considering predominance, the Court must carefully scrutinize the relationship between common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id*. (quoted source omitted).

The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). *Accord Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) ("Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised.") "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Ruiz Torres v. Mercer*

*Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).   When common questions present a

"'significant aspect'" of class members' claims and allow for resolution in a single adjudication,

there is "'clear justification'" for class treatment.   *Hanlon*, 150 F.3d at 1022 (quoted source

omitted).

Plaintiff pursues a claim under the WSSA.  The WSSA makes it unlawful for any person

to offer or sell a security unless it is registered or exempt.  RCW 21.20.140.  It imposes strict

liability on any person who "offers or sells" unregistered, non-exempt securities, RCW

21.20.430(1), and on any person who "directly or indirectly controls a seller", "every partner,

officer, director or person who occupies a similar status or performs a similar function", and any

employees "who materially aid[] in the transaction," unless they can show they did not know and

with exercise of reasonable care could not have known the facts giving rise to liability, RCW

21.20.430(3).  *See also In re Jensen-Ames*, 2011 WL 1238929, at *9 (Bankr. W.D. Wash. Mar.

30, 2011) ("Washington law provides for strict liability where a person offers or sells a security

without registration and in violation of RCW 21.20.140. RCW 21.20.430(1).")

Plaintiff argues that, given strict liability under the WSSA, common questions and

answers predominate in this matter.  The SAFTs signed by all putative class members were

materially identical except for the date and value of investment and explicitly state that the SAFT

is a security and has not been registered.  *See, e.g.*, Dkt. 199, Ex. 29.  Plaintiff intends to present

evidence contradicting alleged exemptions under SEC Rules 506(b) and (c), *see* 17 C.F.R. §§

230.502(c) and 230.506(b)-(c), reflecting Defendants' communications and behavior, and

answering questions common to the class.  Likewise, for each individual Defendant, an

affirmative defense would depend on that Defendant's actions, status, control, or constructive

knowledge, and would concern his or her conduct with regard to the class as a whole.  *See also*

*Go2Net, Inc. v. Freeyellow.com, Inc.*, 126 Wn. App. 769, 782-83 109 P.3d 875 (2005) (equitable

defenses are not available under the WSSA), *aff'd*, 158 Wash. 2d 247, 143 P.3d 590 (2006).

Plaintiff asserts the simplicity of calculating damages under RCW 21.20.430 as the cost

of the ATMI tokens minus any offsetting remuneration, plus interest.  He, finally, points to

caselaw as reflecting application of the WSSA regardless of where purchasers reside, *see, e.g.,*

*Ito Int'l Corp. v. Prescott, Inc.*, 83 Wn. App. 282, 289-90, 921 P.2d 566 (1996), thus avoiding

any choice of law issue undermining predominance.  *See Peterson v. Graoch Assocs. No. 111*

*Ltd. P'ship*, No. C11-5069-BHS, 2012 WL 254264, at *3 (W.D. Wash. Jan. 26, 2012) (denying

motion to dismiss WSSA claim based on extraterritorial transactions and observing that "public

policy favors the application of Washington law to ensure that Washington corporate entities

behave responsibly.")

Defendants argue individualized issues overwhelm any common issues and preclude

findings of commonality and predominance, including:  whether putative class members

consented to binding arbitration through the Terms of Token Sale (hereinafter "Terms"); whether

some SAFT signatories lack standing because they purchased ATMI tokens as a utility and

therefore do not claim injury; whether a judgment in this matter would be enforceable in

countries where the class members resided at the time they executed SAFTs; and consideration

of Defendants' fact-based affirmative defenses.  The Court disagrees with Defendants.

a.    Arbitration:

Under Washington law, the existence of an agreement to arbitrate requires an objective

manifestation of mutual assent.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016)

(citations omitted).  The party seeking to compel arbitration "bears 'the burden of proving the

existence of an agreement to arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecomm. Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoted source omitted).

In April 2020, the Court denied Defendants' motion to compel arbitration.  Dkts. 40 & 66.  The Court rejected the contention Plaintiff had actual or constructive notice of an arbitration agreement in the Terms merely because Defendants, months *after* Plaintiff entered into the SAFT, delivered an email containing a link to the Terms, or that Plaintiff assented to the Terms upon the later delivery of tokens.  *See* Dkt. 40 at 18-22.  There was no evidence Plaintiff opened the email and its attachment or did anything whatsoever after he signed the SAFT.  Also, language in the Terms raised questions as to their applicability to SAFT investors.  *Id.*

Defendants now suggest other SAFT signatories could have assented to the Terms.  They point to Ninth Circuit law as precluding certification where class members executed potentially valid arbitration agreements or class action waivers.  *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094-95 (9th Cir. 2018) (reversing certification orders premised on a district court's finding that arbitration agreements were not enforceable following a ruling that the question of arbitrability was designated to the arbitrator).  They identify necessary individualized inquiries into assent as including a class member's sophistication, when they received the Terms, and whether they opened the email and clicked on the link to the Terms.

Plaintiff proposes certification of a class that excludes anyone who "affirmatively assented" to the Terms.  To the extent SAFT signatories affirmatively assented to the Terms, they are by definition not a part of the proposed class.

Defendants now reiterate their theory of manifestation of assent through actual or constructive notice of an arbitration clause upon the delivery of an email *after* class members entered into SAFTs.  They do not identify evidence a SAFT signatory manifested assent in this

1    or in any other manner, and Plaintiff attests Defendants produced no such evidence in response

2    to discovery requests.  *See* Dkt. 219 at 5-6 (citing Dkt. 220, Exs. B-D).  There is, in other words,

3    no evidence any member of the proposed class assented to arbitration and no more than

4    speculation that evidence of actual or constructive notice of an arbitration clause could be found

5    and could support the existence of a binding agreement to arbitrate.

6    Mere speculation does not suffice to defeat class certification.  *Agne v. Papa John's Int'l,*

7    *Inc.*, 286 F.R.D. 559, 567-568 (W.D. Wash. 2012).  Because there is no evidence any SAFT

8    signatory entered into a binding arbitration agreement, this matter bears no resemblance to cases

9    in which Courts have found executed arbitration agreements to preclude class certification.  *See,*

10   *e.g., Lawson v. Grubhub, Inc.*, No. 18-15386, __ F.4th __, 2021 WL 4258826, at *5 (9th Cir.

11   Sept. 20, 2021) (affirming denial of certification where all class members except the lead

12   plaintiff and one other person entered into arbitration agreements and class action waivers, and

13   the record was clear class members "waived the right 'to have any dispute or claim brought

14   between or among them, [or] heard or arbitrated as a class action.'"); *O'Connor*, 904 F.3d at

15   1093-95 (addressing arbitration agreements plaintiff alleged were unenforceable based on opt out

16   provisions and the legality of class action waivers); *Renton v. Kaiser Found. Health Plan, Inc.*,

17   C00-5370-RJB, 2001 WL 1218773, at *5 (W.D. Wash. Sept. 24, 2001) (finding argument that

18   arbitration agreements of some "three-fourths of [] eight million" putative class members were

19   not valid or enforceable "an unresolved issue whose determination may vary from state to state

20   and from district to district.")  *See also Andersen v. Briad Rest. Grp., LLC*, 333 F.R.D. 194, 207

21   (D. Nev. 2019) (plaintiff did not deny over half of potential class members were "likely subject

22   to arbitration" and instead defined the class to exclude those who "'executed enforceable

23

REPORT & RECOMMENDATION
PAGE - 19

1    arbitration agreements.'"; court modified class definition by removing the term "enforceable"

2    and thereby avoided the need for individualized mini-trials on enforceability).

3           b.    <u>Purpose of ATMI tokens</u>:

4           Defendants maintain a SAFT signatory's understanding or intent with regard to the

5    purpose of ATMI tokens presents the need for individualized inquiry.  To the contrary, because

6    the WSSA imposes strict liability for the sale of unregistered, non-exempt securities, a showing

7    that Defendants violated the statute would determine liability and compel restitution as to the

8    entire class, regardless of whether any individual considered the token to have use as a utility.

9           c.    <u>Enforceability of a judgment</u>:

10          Defendants assert the need to conduct a "case-by-case analysis" of the enforceability of a

11   judgment from this Court for each country where class members resided when they executed

12   SAFTs.  Dkt. 208 at 17.  The Court finds this inquiry unnecessary for the reasons discussed

13   above.  It also appears to be undisputed that, if found liable under the WSSA, the judgment

14   would be enforceable against Defendants regardless of where class members resided when they

15   entered into SAFTs.  *Peterson*, 2012 WL 254264, at *3; *Ito Int'l Corp.*, 83 Wn. App. at 289-90.

16          d.    <u>Affirmative defenses</u>:

17          Defendants argue individualized analyses of their fact-based affirmative defenses will

18   overwhelm any common issues.  Specifically, they assert the need to evaluate accredited investor

19   status and factual circumstances of accreditation, knowledge, and experience for each SAFT

20   signatory in order to determine whether a Rule 506(b) or (c) exemption applies.

21          "Defenses that must be litigated on an individual basis can defeat class certification."

22   *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018).  But

23   "'[w]hen one or more of the central issues in the action are common to the class and can be said

1    to predominate, the action may be considered proper under Rule 23(b)(3) even though other

2    important matters will have to be tried separately, such as damages or some affirmative defenses

3    peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453 (quoted source

4    omitted). *See also* 2 Newberg on Class Actions § 4:55 (5th ed.) ("'[C]ourts traditionally have

5    been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative

6    defenses may be available against individual members.'") (quoted sources omitted). When

7    analyzing whether an affirmative defense must be litigated on an individual basis, the Court

8    considers the affirmative defenses the Defendants have "actually advanced and for which it has

9    presented evidence." *True Health Chiropractic, Inc.*, 896 F.3d at 931. The Court here agrees

10   with Plaintiff that individualized, exemption-based inquiries into the status of each SAFT

11   investor will not be necessary.

12                           i.      Rule 506(b):

13          Rule 506(b) exempts securities where "[e]ach purchaser who is not an accredited investor

14   . . . has such knowledge and experience in financial and business matters that he is capable of

15   evaluating the merits and risks of the prospective investment, or the issuer reasonably believes

16   immediately prior to making any sale that such purchaser comes within this description." 17

17   C.F.R. § 230.506(b). To have "safe harbor" under Rule 506(b), "neither the issuer nor any

18   person acting on its behalf shall offer or sell the securities by any form of general solicitation or

19   general advertising[.]" 17 C.F.R. § 230.502(c). Plaintiff points to the evidence as showing

20   Defendants publicly and widely advertised and solicited investors for both the SAFT and public

21   sale stages of the ICO, *see* Dkt. 197 at 4-6, 16, rendering the Rule 506(b) exemption

22   inapplicable. As Plaintiff observes, regardless of whether the evidence establishes general

23   solicitation or advertising as a matter of law, the answer to this question will be common to the

1    class.

2         In addition, and as discussed below, Plaintiff maintains the two-part ICO was an

3    integrated offering, a showing of which would necessarily preclude exemption under Regulation

4    D.  Defendants also acknowledge "[e]very prospective investor completed an 'Investor

5    Questionnaire' to attest to their accreditation status and financial sophistication[,]" and that a

6    third party "conducted a robust accreditation verification process that included authentication of

7    all documents provided by prospective investors, facial recognition, and watch list database

8    searches."  Dkt. 208 at 4-5 (citing Dkt. 50-2, Ex. B, and Dkt. 50, ¶31).  This undermines

9    Defendants' contention individualized inquiries will necessarily be required for each class

10   member.  Even if *some* inquiry in relation to *some* investors is required, there is no basis for

11   concluding it would override the common questions and answers that predominate in this matter.

12   The Court's conclusion regarding predominance thus remains the same even assuming Plaintiff

13   fails to establish general solicitation or advertising.

14              ii.    Rule 506(c):

15        Rule 506(c) exempts securities from registration if all purchasers are accredited investors,

16   the issuer takes reasonable steps to verify purchasers' accredited investor status, the issuer does

17   not have knowledge that any purchaser is not an accredited investor, and the issuer meets other

18   requirements, including Rule 502(d)'s requirement to exercise reasonable care to ensure

19   purchasers are not underwriters.  17 C.F.R. § 203.506(c).  Plaintiff contends that, as recently

20   found in a similar case involving a SAFT and public sale of tokens, the SAFT and public sale in

21   this case were sub-parts of a single "integrated offering" and that the sale of securities to 14,000

22   unaccredited investors necessarily removes the SAFT from any safe harbor.  *U.S. Sec. & Exch.*

23   *Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 181-82 (S.D.N.Y. 2020) (if the private pre-

sale and the public sales "are considered part of the same offering, the [p]re-Sale does not qualify

for an exemption under [Rule 506(c)] of Regulation D.")  *See also SEC v. Telegram Grp. Inc.*,

448 F. Supp. 3d 352, 367-68 (S.D.N.Y. 2020) (rejecting depiction of two distinct sets of

transactions, first through allegedly exempt token "Purchase Agreements", followed by sale of

the tokens themselves), *request for clarification denied*, 2020 WL 1547383, at * 1 (S.D.N.Y.

Apr. 1, 2020) ("[T]he 'security' was neither the Gram Purchase Agreement nor the Gram but the

entire scheme that comprised the Gram Purchase Agreements and the accompanying

understandings and undertakings made by Telegram[.]"), *appeal withdrawn* at 2020 WL

3467671 (2d Cir. May 22, 2020).

Factors relevant to finding an integrated offering include whether the sales were part of a

single plan of financing, involved issuance of the same class of securities, were made at or about

the same time, entailed receipt of the same type of consideration, and were made for the same

general purpose.  *Kik Interactive Inc.*, 492 F. Supp. 3d at 181 (while different forms of

consideration were received, the private and public sales were part of a single financing plan,

proceeds went to the same purpose, the seller did not differentiate between funds raised, private

sale participants could receive tokens only with a successful public sale, all purchasers received

fungible tokens equal in value, the pre-sale ended the day before the public sale, and tokens were

distributed at the same time).  Plaintiff points to the record in this case as containing evidence of

an integrated offering similar to that in *Kik Interactive Inc.* and focusing on Defendants' acts and

behavior.  *See* Dkt. 197 at 17 (evidence showing internal consideration of the ICO as a single

fundraising event, that both segments sold ATMI tokens, that the public sale occurred shortly

after execution of the second round of SAFTs, and that both segments sold tokens for ETH).  A

REPORT & RECOMMENDATION
PAGE - 23

finding in Plaintiff's favor on this issue would apply equally to the entire class and preclude safe harbor under Rule 506(c).

Predominance would also exist even assuming the absence of an integrated offering. Safe harbor under Rule 506(c) requires that *all* purchasers are accredited investors, reasonable steps to verify accreditation, and that the issuer had no knowledge an investor was not accredited.  17 C.F.R. § 203.506(c).  Plaintiff points to the record as showing Defendants knew "'syndicates'" or groups were investing through a SAFT by filling out a single accreditation questionnaire and without proper verification by Defendants.  *See* Dkt. 219 at 8 (citing Dkt. 220, Ex. A at 1; Dkt. 59 at 7:5-12; Dkt. 96 at 4:2-11).  Because all investors must be accredited, a showing that even one SAFT signatory was not accredited would preclude exemption under Rule 506(c).  The Court, as such, rejects the contention individualized Rule 506(c) inquiries would overwhelm questions common to the class.

         e.      <u>Common questions predominate</u>:

The proposed class signed the same SAFT and their claims involve the common questions of whether the SAFT is a security, was not registered, does not satisfy an exemption, and was part of an integrated offering with another non-exempt, unregistered security.  If Plaintiff succeeds in showing Defendants sold unregistered, non-exempt securities and are therefore jointly and severally liable under the WSSA, each class member will have suffered the same type of injury, caused by the same course of conduct.  Also, to the extent any individual Defendant seeks to show he or she did not know and with exercise of reasonable care could not have known facts giving rise to liability, *see* RCW 21.20.430(3), the resulting answer will depend on that individual's actions, status, control, or constructive knowledge and the determination of liability will be common to all class members.  Nor do Defendants refute

1   Plaintiff's contention of the simplicity of calculating damages for each class member.  The

2   Court, for these reasons and for the reasons stated above, concludes that questions common to

3   class members predominate over any individualized inquiries.

4       3.      Typicality:

5       The typicality requirement is met if the named plaintiff's "claims or defenses  . . . are

6   typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  This requirement serves

7   to "assure that the interest of the named representative aligns with the interests of the class."

8   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Representative claims need

9   only be "reasonably co-extensive with those of the absent class members; they need not be

10  substantially identical."  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other

11  members have the same or similar injury, whether the action is based on conduct which is not

12  unique to the named plaintiffs, and whether other class members have been injured by the same

13  course of conduct."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (cleaned

14  up and citations omitted).  "Typicality refers to the nature of the claim or defense . . . not to the

15  specific facts from which it arose or the relief sought."  *Id.*

16      Defendants assert Plaintiff is not typical of the class to the extent other class members

17  may have assented to the Terms and are bound to an arbitration clause and class action waiver.

18  This argument fails for the reasons discussed above in relation to predominance.   Defendants

19  also assert their counterclaims make Plaintiff unfit to represent other class members' interests.

20  Because the Court finds those counterclaims should be dismissed, *see* Dkt. 218, this argument

21  similarly fails to preclude a finding of typicality.  The counterclaims would not, in any event,

22  preclude strict liability under the WSSA to both Plaintiff and the class.

23      Plaintiff, like all putative class members, signed a standardized SAFT prepared by

1   Atonomi, paid ETH in exchange for ATMI tokens, and alleges joint and several liability of

2   Defendants for the sale of unregistered, non-exempt securities in violation of the WSSA.

3   Plaintiff is typical of the class in suffering the same type of injury, based on the same course of

4   conduct, and alleging the same basis for liability.

5           4.      Adequacy:

6           The adequacy requirement asks whether the class representative "will fairly and

7   adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  It serves to uncover

8   conflicts of interest between named parties and the class they seek to represent.  *Windsor*, 521

9   U.S. at 625 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-58 n.13 (1982)).  A finding

10  of adequacy requires resolution of two questions:  "'(1) do the named plaintiffs and their counsel

11  have any conflicts of interest with other class members and (2) will the named plaintiffs and their

12  counsel prosecute the action vigorously on behalf of the class?'"  *In re Hyundai & Kia Fuel*

13  *Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (quoted source omitted).

14          Defendants point to their counterclaims as preventing a finding of adequacy.  They assert

15  Plaintiff's alleged breach of the SAFT, and the resulting counterclaims, constitute a clear and

16  disqualifying conflict of interest with the class that necessarily precludes certification.  *See, e.g.,*

17  *Knudsvig v. Espresso Stop, Inc.*, C06-1559-RSM, 2007 WL 2253371, at *2 (W.D. Wash. Aug. 1,

18  2007) (finding no typicality with defendants' showing the named plaintiffs would be

19  "substantially preoccupied with their defenses to counterclaims, which are unique to them[]" and

20  would divert their focus from the claims of the class); *Grace v. Perception Tech. Corp.*, 128

21  F.R.D. 165, 170 (D. Mass. 1989) (finding no adequacy where defendants' counterclaim could

22  make the named plaintiffs liable to class members for part of the losses, went to the subject

23  matter of the suit, and was an immediate and obvious substantial conflict of interest).

Class certification may be precluded where the "named plaintiff is subject to unique defenses that will be a major focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[t]he mere existence of a counterclaim does not preclude class certification." *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 595 (E.D. Cal. 1999). "It is only where a counterclaim raises a conflict between the interests of the named plaintiff and the absent class members that causes adequacy of representation to be lacking." *Id*. at 596. If otherwise, every motion for class certification would be defeated simply by the filing of a counterclaim. *Id*. at 595-96.

In this case, the Court has recommended dismissal of the counterclaims. Given that recommendation, and the absence of any showing as to a real and substantial conflict of interest between Plaintiff and the proposed class, the counterclaims do not undermine adequacy.

The Court finds Plaintiff, as an individual who signed a SAFT, paid ETH valued at $191,250 for ATMI tokens, and seeks damages for his losses, to have interests properly aligned with the class and motivated to establish liability and obtain maximum recovery. Plaintiff's representatives, who have actively prosecuted this matter since April 2019, negotiated a class-wide settlement with three named Defendants, *see* Dkts. 190 & 205, and have the pertinent expertise, Dkt. 199, Exs. 50-52, lack any apparent conflict of interest and have demonstrated their willingness to vigorously prosecute this action on behalf of the class. Plaintiff, accordingly, also satisfies the adequacy requirement.

## CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Class Certification, Dkt. 197, should be GRANTED. The Court should certify the proposed class and appoint Plaintiff as Class Representative and his representatives as Class Counsel. A proposed order accompanies this Report and Recommendation.

<u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 3, 2021**.

DATED this 12th day of November, 2021.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT & RECOMMENDATION
PAGE - 28