1

2

3

4

5              UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
6                      AT SEATTLE

7    CHRIS HUNICHEN, individually and on
     behalf of all others similarly situated,
8                                                CASE NO. C19-0615-RAJ-SKV
                        Plaintiff,
9
             v.
10
     ATONOMI LLC, et al.,
11
                        Defendants.             REPORT AND RECOMMENDATION
12

13   ATONOMI LLC,

14                      Counterclaimant/Third-
                        Party Plaintiff,
15           v.

16   CHRIS HUNICHEN,

17                      Counter-Defendant,

18           &

19
     DAVID PATRICK PETERS, et al.
20
                        Third-Party Defendants.
21

22                     <u>INTRODUCTION</u>

23       This lawsuit began with Plaintiff and Class Representative Chris Hunichen's claim

REPORT & RECOMMENDATION
PAGE - 1

alleging violation of the Washington State Securities Act (WSSA), RCW 21.20.010 et seq., through the sale of unregistered, non-exempt securities. Dkts. 1 & 137. While the Court has approved a settlement with "Settling Defendants" Launch Capitol LLC (Launch), Steven J. "Woody" Benson, and David Fragale, *see* Dkt. 318, the WSSA claim remains pending on behalf of Plaintiff and a certified class against Defendants Atonomi LLC (Atonomi), CENTRI Technology, Inc. (CENTRI), Vaughan Emery, Rob Strickland, Don DeLoach, Wayne Wisehart, Michael Mackey, and James Salter.[1] Atonomi's counterclaims/third party claims against Hunichen and Third Party Defendants (TPDs) David Patrick Peters, Sean Getzwiller, David Cutler, Chance Kornuth, and Dennis Samuel Blieden for breach of contract and civil conspiracy to commit breach of contract also remain pending. Dkts. 81-82.

The parties now move for summary judgment. *See* Dkts. 257, 265, 268-70. The motions are opposed. Having considered the motions, all documents filed in support and opposition, and the remainder of the record,[2] the Court herein recommends: (1) Plaintiff's Motion for Summary Judgment, Dkt. 265, be DENIED; (2) Atonomi and CENTRI's Motion for Summary Judgment, Dkt. 268, be DENIED; (3) Vaughan Emery's Motion for Summary Judgment, Dkt. 270, be DENIED; (4) the Motion for Summary Judgment filed by Rob Strickland, Don DeLoach, Wayne Wisehart, Michael Mackey, and James Salter (hereinafter collectively "Individual Defendants"), Dkt. 269, be GRANTED in part and DENIED in part, and Plaintiff's claims against Mackey be

---

[1] Plaintiff voluntarily dismissed the claim against three other Defendants – Kyle Strickland, Luis Paris, and M37 Ventures Inc. Dkts. 185 & 256.

[2] The parties' requests for oral argument are DENIED. The Court finds that oral argument is unnecessary because it is able to decide the motions on the papers before the Court. *See Murcia v. Godfrey*, No. 19-0587-JLR-BAT, 2019 WL 3504124, at *1, n.1 (W.D. Wash. Aug. 1, 2019) (citing *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (district court may decide summary judgment without oral argument where the parties were provided the opportunity to "submit their papers to the court")). *See also* LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.")

DISMISSED; and (5) the Counterclaim and TPD's Motion for Summary Judgment, Dkt. 257, be

GRANTED and the counterclaims and third party claims be DISMISSED.

BACKGROUND

A.    CENTRI, Atonomi, and ATMI Tokens

As previously described by the Court:

CENTRI describes itself as a Seattle-based software company that builds
technology to protect data that is stored and transmitted between Internet-of-
Things (IoT) devices.  An IoT device is a physical object with embedded
microchips, sensors, and communications capabilities that connect through the
Internet, such as smart appliances, thermostats, lighting systems, vehicles, and
activity trackers.  CENTRI formed Atonomi, a wholly owned subsidiary, to build
the "Atonomi Network" and enable interoperability and security for IoT devices
using "blockchain" technology.

Blockchain is an electronic distributed ledger or list of entries maintained
in a network of computers, using cryptography to process and verify transactions
on the ledger, and providing comfort to users and potential users of the blockchain
that entries are secure.  Blockchain technologies include, for example, Bitcoin and
Ethereum virtual currencies.  Creators of blockchain technologies may create and
disseminate "crypto-securities" in the form of virtual "tokens" or "coins."  A
token or coin may provide certain rights, such as the right to use services provided
by the issuer, and may be traded on online exchanges, in exchange for virtual or
fiat currencies, and through convertibility into other tokens.

This matter involves the sale of "ATMI tokens."  Atonomi asserts it
created ATMI tokens as a "utility" token for uses and services within the Atonomi
Network and intended the network and tokens to provide device identity
registration, activation, validation, and reputation to secure the rapidly growing
IoT.  Plaintiff maintains Atonomi sold ATMI tokens to raise investment capitol to
develop blockchain technology and issue future tokens, and that he and other
investors who bought the tokens had a reasonable expectation of profits.

Dkt. 86 at 2-3 (cleaned up and citations omitted).

The ATMI tokens were "mandatory to the use of the Atonomi Network."  Dkt. 275, ¶12.

One token was needed to both register and activate an IoT device on the network, and the

network could not be utilized unless the tokens were available for use.  *Id*., ¶¶12-13.

REPORT & RECOMMENDATION
PAGE - 3

B.    Other Defendants and Relevant Entities

Vaughan Emery is the co-founder and former Chief Executive Officer (CEO) of Atonomi and founder and former CEO of CENTRI.  Dkt. 271, ¶1.  Rob Strickland served on the CENTRI Board of Directors and as CENTRI's interim CEO beginning on or around July 2018, after Emery stepped down as CEO.  Dkt. 272, ¶¶3, 10.   Don DeLoach served on the CENTRI Board of Directors and, beginning March 2018, as President and Chief Operating Officer of CENTRI. Dkt. 274, ¶¶3, 5-6.  Wayne Wisehart served on the CENTRI Board of Directors.  Dkt. 273, ¶3. Michael Mackey was CENTRI's Vice President of Engineering and then Chief Technology Officer and, in those roles, oversaw the team that built the Atonomi Network.  Dkt. 275, ¶¶3, 6, 9.  James Salter was CENTRI's Director of Marketing and, beginning in or around August 2017, also handled marketing for Atonomi.  Dkt. 276, ¶¶2-3.

Launch, a venture capital firm and the majority shareholder in CENTRI, the other Settling Defendants, Deloitte US (Deloitte), and Perkins Coie LLP (Perkins Coie) were involved in the process of "navigating blockchain technology and token sales."  Dkt. 272, ¶¶4-7. According to Defendants,[3] Launch dictated the business decisions of CENTRI and Atonomi and "controlled the execution of the Atonomi project, with the guidance of [Deloitte] as advisers and [Perkins Coie] as counsel."  Dkt. 270 at 4-6.  *See also* Dkts. 271-76.

C.    Sale of ATMI Tokens

Atonomi first conducted a private "pre-sale" of ATMI tokens effectuated through a Simple Agreement for Future Tokens (SAFT).  *See* Dkt. 137 and Dkt. 290, Ex. 35.  In February and April 2018, Atonomi entered into SAFTs with eighty individuals, including some of the

---

[3] As utilized herein, "Defendants" excludes the above-described "Settling Defendants" and includes Atonomi, CENTRI, Emery, and the Individual Defendants.

Defendants and each member of the class. Dkt. 266, ¶¶2-4, Exs. A-C. Plaintiff, for example, participated in the pre-sale by signing a SAFT in February 2018 and paying 225 Ethereum (ETH), a cryptocurrency amount valued at $191,250.00. *Id.*, Ex. 1.

The SAFTs are identical except for the names of the investors, dates, and investment amounts. The SAFTs provided the right to purchase the agreed upon value of ATMI tokens, provided for delivery of bonus tokens, and clarified there was "no guarantee that the distribution of the Tokens will occur at any particular time or at all." *Id*. at 3, 8 (¶ 6(k)). SAFT purchasers agreed they were "accredited investor[s]," with adequate knowledge and experience on which to base their decision to purchase tokens through the SAFT. *Id*. at 6-7 (¶ 6(b)). Prior to entering into the SAFT, each SAFT signatory completed an "Investor Questionnaire" and were thereafter verified as an accredited investor by a third party. *See* Dkt. 50, ¶¶22-32, Ex. B. The SAFT stated on its face that it had not been registered as a security. *See* Dkt. 266, Ex. 1 at 2 ("THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933[.]") On March 20, 2018, Atonomi sought exemption from registration by filing a United States Securities and Exchange Commission (SEC) "Form D", citing Rule 506(b) of Regulation D of the Securities Act of 1933 (Securities Act). Dkt. 279, ¶3, Ex. C.

Atonomi launched the Atonomi Network in May 2018, accompanied by a software development kit, guide, and "smart contracts" to tie the network to the Ethereum blockchain. Dkt. 275, ¶9. Mackey attests that the ATMI token was, at that time, functional and integrated within the Atonomi Network. *Id*.

Atonomi held a public sale of tokens that both began and concluded on June 6, 2018 and allowed for the purchase of tokens without signing a SAFT. *See* Dkt. 290, Ex. 23 at 1, 14. Each

public sale purchaser could buy only one ETH worth of ATMI Tokens, which at the time amounted to approximately $520.00.  Purchasers in the public sale agreed to the "Terms of Token Sale."  *Id.*, Ex. 23.  The terms stated:  "You are purchasing ATMI solely for use in connection with Token Utility and are not purchasing ATMI for any other purposes, including, but not limited to, any investment, speculative or other financial purposes."  *Id.* at ¶ 10(f).

Through the SAFT, Atonomi raised approximately 31,500 ETH, estimated by Atonomi as worth, at that time, approximately $26.8 million.  Dkt. 278, ¶7.  In the public sale, Atonomi sold tokens to at least 14,000 investors, raising approximately 14,000 ETH, estimated by Atonomi as worth, at that time, approximately $7.3 million.  *See id.*, ¶8; Dkt. 290, Ex. 25 at 3.

Plaintiff depicts the pre-sale and public sale of tokens as an integrated "Initial Coin Offering" or "ICO."  Dkt. 288.  Defendants deny the SAFT and public sale are properly considered an integrated offering.  Dkt. 299.

D.    Delivery of ATMI Tokens and Subsequent Events

On July 2, 2018, Atonomi delivered the ATMI tokens purchased by the SAFT investors and the participants in the public sale.  *See* Dkt. 158 at Counterclaims, ¶27 (also noting bonus tokens were delivered to SAFT investors on or around September 9, 2018); *accord* Dkt. 278, ¶6.  On July 12, 2018, Atonomi "unlocked" and "released" the tokens.  Dkt. 158, ¶28; Dkt. 264, Ex. E ("Atonomi Tokens Update" by the "Atonomi Team" posted at https://atonomi.io/news/ atonomi-tokens-update and stating:  "The ATMI token was unlocked and released to clear buyers on Thursday July 12th at 2 pm UTC, after we completed the final security and audit tasks to clear the tokens for release.")  As of that same date, the tokens had been listed on at least six

exchanges.  *See* Dkt. 264, Ex. F at 1.[4]

A wave of selling and plummeting value followed the release of the tokens.  As alleged by Atonomi and CENTRI (hereinafter collectively "Atonomi Defendants"), several SAFT investors violated the terms of the SAFT and "dumped" ATMI tokens upon their release, leading others to believe Atonomi was behaving similarly and harming the project.  Dkt. 268 at 11 (citing Dkt. 277, ¶3, Ex. 4 at 120:15-124:23).  The project was also "ill-timed" in that the Ethereum market crashed in late 2018.  *Id*. (citing Dkt. 272, ¶11 & Dkt. 50, ¶¶93-95).  Atonomi Defendants assert that, while technically worth little in terms of ETH or dollars, the ATMI tokens retained their worth as a utility token on the Atonomi Network.  *Id*. (citing Dkt. 272, ¶12).  At some point, however, Atonomi Defendants went out of business.  *See* Dkt. 275, ¶16.

Plaintiff denies the allegation of dumping or any violation of the SAFT.  *See* Dkts. 257-64.  He compares the minimal number of transfers or sales of tokens by himself and the TPDs, with the millions of tokens immediately dumped by DNA Fund, an entity closely associated with Atonomi.  *See id*.  He asserts that Defendants chose not to impose token "lockups" that would have avoided dumping, and that Defendants continued to seek additional exchanges for listing tokens even after the wave of token sales and loss of value.  *See id*.

E.    Lawsuit and Certified Class

Plaintiff initiated this lawsuit in April 2019 and Atonomi brought counterclaims and third party claims against Hunichen and the TPDs in May 2020.  *See* Dkts. 1, 81-82.  The Court, by Order dated August 8, 2022, certified this matter as a class action and defined the class as

---

[4] As explained by Plaintiff, this exhibit and others discussed herein show Telegram accounts previously identified as belonging to Emery and other individuals as "Deleted" accounts due to a sustained period of these individuals' inactivity on the platform.  Dkt. 297 at 11-13.  Plaintiff contends this reflects the spoliation of evidence by Defendants and provides comparisons of exhibits with earlier downloaded screenshots showing the ownership of the accounts.  *See, e.g.*, Dkt. 264, ¶8, Ex. G.

REPORT & RECOMMENDATION
PAGE - 7

follows: "All persons who purchased ATMI tokens via a Series 1 or Series 2 SAFT with Atonomi, LLC in 2018. Excluded from the Class are Defendants and persons or entities directly affiliated with any Defendant, and persons who affirmatively assented to the Atonomi 'Terms of Token Sale.'" Dkt. 246 at 2. The Court appointed Hunichen as Class Representative. *Id.*

<u>LEGAL STANDARD</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law as to a claim or defense. Fed. R. Civ. P. 56(a). A party seeking summary judgment must inform the Court of the basis for its motion and must identify the portions of the pleadings, discovery responses, or other materials that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof at trial, the moving party can carry its initial burden merely by "pointing out" that there is an absence of evidence to support the nonmoving party's case. *Id.* (citing *Celotex Corp.*, 477 U.S. at 323, 325). *See also James River Ins. Co. v. Herbert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir. 2008) (burden can be met by either producing evidence that negates an essential element of the non-moving party's claim or by establishing the absence of evidence to support an essential element of the non-moving party's claim) (citing *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

DISCUSSION

Under the WSSA, it is unlawful to offer or sell a "security" unless it is registered, exempt, or a federal covered security. RCW 21.20.140. *See also* 15 U.S.C. § 77e (prohibiting sale or delivery of unregistered securities). The WSSA imposes strict liability on any person who "offers or sells" unregistered, non-exempt securities. RCW 21.20.430(1). *See also In re Jensen-Ames*, No. ADV 10-01684, 2011 WL 1238929, at *9 (Bankr. W.D. Wash. Mar. 30, 2011) ("Washington law provides for strict liability where a person offers or sells a security without registration and in violation of RCW 21.20.140. RCW 21.20.430(1).") It also imposes joint and several liability, with and to the same extent as the seller, on any person who "directly or indirectly controls a seller", "every partner, officer, director or person who occupies a similar status or performs a similar function of such seller", and any employee of such seller "who materially aids in the transaction," unless such persons can show they did not know and with exercise of reasonable care could not have known the facts giving rise to liability. RCW 21.20.430(3).

The WSSA is modeled on the Securities Act and provides that it "'shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to

coordinate the interpretation and administration of this chapter with the related federal regulation.'" *Haberman v. Washington Pub. Power Supply Sys.*, 109 Wn. 2d 107, 125, 744 P.2d 1032 (1987) (quoting RCW 21.20.900), *amended*, 109 Wash. 2d 107, 750 P.2d 254 (1988).  This provision is interpreted "to require harmony but not exact parallelism with other states' and federal law." *Id*.  Because the WSSA was enacted to protect the public, it is broadly construed to effectuate that purpose.  *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC*, 194 Wn. 2d 253, 259, 449 P.3d 1019 (2019) (citation omitted).

In this lawsuit, Plaintiff alleges Defendants violated the WSSA through the sale of unregistered, non-exempt securities.  Specifically, Plaintiff alleges the SAFT and ATMI tokens were securities sold through a two-stage, six-month long ICO, and that neither the SAFT, nor the tokens were registered with the SEC or exempt from registration.  *See* Dkt. 137.  Plaintiff asserts joint and several liability, with Atonomi liable as a seller, CENTRI liable as a seller or through its direct or indirect control over Atonomi, and Emery and the Individual Defendants liable as Atonomi's officers, directors, and/or employees.  *See* Dkt. 265 at 7-13, 18-21.  Atonomi brings counterclaims against Plaintiff and third party claims against the TPDs based on alleged contractual violations of the SAFT.

A.      Plaintiff's Motion for Summary Judgment

It is undisputed that neither the SAFT, nor the ATMI tokens were registered.  *See, e.g.*, Dkt. 137, Ex. A at 1 and ¶ 6(b).  In seeking summary judgment, Plaintiff asserts that Defendants are strictly liable for the sale of unregistered securities and that, in their Answers to the Second Amended Complaint (SAC), Defendants abandoned and are now precluded from pursuing an affirmative defense that the SAFT was exempt from registration.

Under the WSSA, "exemptions are an affirmative defense that must be proven by the party advocating them." *Freeman v. Seneca Ventures, LLC*, 16 Wn. App. 2d 1035, 2021 WL 423135, at *6 (2021) (citing *State v. Mahmood*, 45 Wn. App. 200, 210-11, 724 P.2d 1021 (1986), and RCW 21.20.540 ("In any proceeding under this chapter, the burden of proving an exemption, an exception from a definition, or a preemption of a provision of this chapter is upon the person claiming it.")) *Accord Robinson v. Conner*, No. C10-0224-JCC, 2010 WL 11565185, at *3 (W.D. Wash. June 15, 2010). *See also SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable.") The exemptions at issue in this case include those set forth in Rule 506(b) and Rule 506(c) to Regulation D of the Securities Act.[5]

The Federal Rules of Civil Procedure require that a party responding to a pleading "affirmatively state" any affirmative defense. Fed. R. Civ. P. 8(c)(1). As a general matter, a failure to plead an affirmative defense results in the waiver of that defense. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118-19 (9th Cir. 2022) (citing *In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007) and Fed. R. Civ. Pro. 8(c)).

In this case, in answering the First Amended Complaint (FAC), Defendants included exemption from registration under Regulation D of the Securities Act as an affirmative defense. Dkts. 72-75, 77-78, 80-80 at Aff. Defenses, ¶14 ("The SAFTs were exempt from registration under Rule 506(b) of Regulation D of the Securities Act.") and ¶36 ("The named Plaintiff's

---

[5] While Plaintiff alleges violation of the WSSA, the National Securities Markets Improvement Act "prohibits states from requiring registration of a 'covered security' including securities exempt from registration pursuant to SEC rules or regulations." *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1249 (N.D. Cal. 2014) (citing, *inter alia*, 15 U.S.C. § 77r).

REPORT & RECOMMENDATION
PAGE - 11

claim is barred in whole or in part because the SAFT complied with the requirements of Rule 506(b) of Regulation D of the Securities Act.")  Subsequently, in both initial and amended responsive pleadings to the SAC, Defendants omitted exemption and many other affirmative defenses included in answers to the FAC.  *See* Dkts. 158-60, 163-66, 168 (including affirmative defenses only for equitable estoppel, unclean hands, promissory estoppel, unjust enrichment, waiver, assumption of the risk, and failure to mitigate damages), and Dkts. 170-1 – 170-3, 170-7 – 170-9, and 170-11 (adding two WSSA-related affirmative defenses).[6]  However, for the reasons discussed below, the omission of exemption from the list of affirmative defenses does not resolve the issue before the Court.

"The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense."  *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) (citations omitted).  *Accord Shackelford v. W. Coast Freightline, LLC*, No. C20-5492-BHS, 2020 WL 5877579, at *1-2 (W.D. Wash. Oct. 2, 2020).  As stated by this Court, "[a]n affirmative defense must merely describe the affirmative defense in 'general terms,' and provide the plaintiff with 'fair notice' of the defense asserted."  *Pengbo Xiao v. Feast Buffet, Inc.*, 387 F. Supp. 3d 1181, 1187 (W.D. Wash. 2019) (quoting, respectively, *Kohler v. Flava Enterprises, Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015), and *California Expanded Metal Prod. Co. v. Klein*, No. C18-0659-JLR, 2018 WL 6249793, at *3 (W.D. Wash. Nov. 29, 2018)).

It is also true that, absent a showing of prejudice, "an affirmative defense may be raised for the first time at summary judgment."  *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.

---

[6] Defendants assert they are "not liable under RCW 21.20.430 in 'that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.'" Dkt. 170-1 at Aff. Defenses, ¶8.  They also assert Plaintiff was "not entitled to any recovery from Defendants under WSSA Section [21.20.430] because Plaintiff has failed to properly allege the requisite control or the occurrence of a primary violation under WSSA Sections 21.20.010 and 21.20.430(1)." *Id.* at Aff. Defenses, ¶9.

REPORT & RECOMMENDATION
PAGE - 12

1993) (citation omitted). "A party must point to a 'tangible way in which it was prejudiced by the delay.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1008-09 (9th Cir. 2019) (quoting *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997)).

Here, while not including exemption in the list of affirmative defenses to the SAC, Defendants repeatedly denied Plaintiff's allegations that the SAFT was not subject to any exemption from registration under the Securities Act. *See, e.g.,* Dkt. 170-1, ¶¶6, 91, 105. The SAC contained subsections labeled, "The Atonomi SAFT Was Not Exempt From Registration" and "The Atonomi Token Was Not Exempt From Registration," and which comprised some sixty paragraphs of the amended pleading in total. Dkt. 137 at 14-23, ¶¶104-63. Defendants' answers responded to those allegations and denied that the SAFT and tokens were not exempt. *See, e.g.*, Dkt. 170-1 at 11-15, ¶¶104-63. Defendants also repeatedly, substantively asserted that the SAFT was exempt from registration. For example, in responding to allegations depicting the SAFT as a security instrument and investment contract, Dkt. 137, ¶¶54-55, 70, Defendants admitted the SAFTs "*were exempt from certain U.S. securities regulations*[]" and "*a security subject to exemption*." Dkt. 170-1, ¶¶55, 70 (emphasis added). Also, in responding to the allegation that, "[i]n filing the Form D, Atonomi acknowledge[d] that it was selling a security[,]" Dkt. 137, ¶67, Defendants admitted "that the Form D acknowledged *that the SAFT was a security subject to exemption*." Dkt. 170-1, ¶ 67 (emphasis added). The answers to the SAC thus cannot be reasonably construed to reflect that Defendants had abandoned their exemption defense.

Moreover, subsequent events show both that Defendants had not abandoned the defense and that Plaintiff was well aware of that fact. For example, in a May 2021 motion seeking class certification filed some five months after the answers to the SAC, Plaintiff anticipated

Defendants would continue to argue exemption.  Dkt. 197 at 20 ("Atonomi filed a 'Notice of Exempt Offering' Form D with the SEC . . . claiming to be exempt from registration pursuant to 'Rule 506(b),' so Defendants will certainly assert that registration was not required."; "Defendants are also anticipated to argue that the SAFT-based first stage of the ICO complied with Rule 506(c)").  A month later, depicting a one-day mediation held in March 2021, Plaintiff observed that Defendants had offered "their view that the SAFT offering was exempt from securities registration requirements," that the ATMI tokens were not securities, and that, even if the tokens were found to be securities, "the public sale was separate from (not integrated with) the SAFT offering and therefore the securities registration requirements would not apply to the SAFTs."  Dkt. 205 at 9-10.  Defendants, as anticipated and in responding to the class certification motion, stated Plaintiff's "sole claim for sale of an unregistered security implicates Atonomi's fact-based affirmative defenses, including that the SAFTs were exempt from registration under Rule 506."  Dkt. 208 at 29.[7]  These filings demonstrate Plaintiff had fair notice that Defendants continued to pursue an affirmative defense of exemption.

In his reply, Plaintiff asserts he would be prejudiced if Defendants are allowed to now assert the allegedly withdrawn affirmative defense.  He argues Defendants deleted the exemption defense in response to a challenge from Plaintiff as to its inadequacy, "and specifically to avoid the prospect of a motion for sanctions flowing from their admitted spoliation of important evidence:  the Telegram accounts they used to engage in general solicitations and discussions with unaccredited investors."  Dkt. 297 at 11-15.

---

[7] While Defendants cite to an Answer to the FAC in support of this argument, *see* Dkt. 208 at 29 (citing Dkt. 81 at 17), it remains that they continued to maintain the SAFT was exempt from registration well after filing their answers to the SAC.

It is well established that the Court need not consider arguments raised for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). *See also Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived."). In failing to argue prejudice based on spoliation in the motion for summary judgment, Plaintiff deprived Defendants of the opportunity to respond and deprived the Court the opportunity to fully consider the spoliation argument. The Court could, for this reason alone, decline to consider this argument. *Eberle v. Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1990). It is, in any event and as discussed above, apparent that Plaintiff was aware Defendant continued to maintain the SAFT was exempt from registration.

The Court, in sum, finds no basis for concluding Defendants abandoned an exemption defense. The Court instead finds that Plaintiff had fair notice of the defense and will not be prejudiced by its consideration.

Plaintiff also asserts his entitlement to summary judgment due to Defendants' inability to satisfy an exemption. However, because arguments on exemption are only fully addressed in the briefing associated with Atonomi Defendants' dispositive motion, the Court considers those arguments below. *See also* Fed. R. Civ. P. 56(f)(1) (providing that the Court may, after giving notice and a reasonable time to respond, grant summary judgment to a nonmovant).

B.    Atonomi Defendants' Motion for Summary Judgment

In seeking dismissal of Plaintiff's WSSA claim, Atonomi Defendants raise arguments relating to the ATMI tokens, the SAFT, and the alleged integrated offering.

1.    ATMI Tokens:

Atonomi Defendants raise several arguments specific to the ATMI tokens. They assert an absence of standing to challenge the tokens, noting Plaintiff and the class were parties only to

1    a SAFT, received their tokens pursuant to a SAFT, and did not participate in the public sale.

2    They note that the class, by definition, excludes anyone who agreed to the Terms of Token Sale

3    and thus excludes anyone who purchased tokens in the public sale.  They also deny a

4    requirement to register "utility" tokens and the absence of any obligation to "lock" the tokens.

5         Plaintiff does not, however, raise a challenge to the ATMI tokens separate and apart from

6    the SAFT.  In addition to arguing that the SAFT does not qualify for an exemption, Plaintiff

7    argues the SAFT and public sale were two consecutive stages of a single integrated offering and

8    that that offering was not subject to exemption by virtue of the non-exempt nature of the public

9    sale.  *See* 17 C.F.R. § 230.502(a).[8]  The Court, as such, need not and does not separately address

10   the arguments specific to only the ATMI tokens.  The arguments are considered, as needed, in

11   conjunction with the assessment of an alleged integrated offering under Rule 502(a).

12       2.    <u>The SAFT</u>:

13        Regulation D of the Security Act provides "safe harbors" from registration requirements,

14   including the exemptions set forth in subsections 506(b) and 506(c) to 16 C.F.R. § 230.506.  In

15   order to further the Security Act's purpose of ensuring full and fair disclosure of the character of

16   securities and to prevent further frauds in their sales, exemptions from registration are construed

17   narrowly.  *S.E.C. v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (citations omitted).  As stated

18   above, Defendants assert the SAFT was exempt from registration under Rule 506(b) and Rule

19   506(c), and bear the burden of proving such exemption.  *See Freeman*, 2021 WL 423135, at *6;

20   *Robinson*, 2010 WL 11565185, at *3; and RCW 21.20.540.

21       / / /

22

23

---

[8] SEC Rules 502 and 506 were amended effective March 31, 2021, *see* 86 F.R. 3496, 3598 (Jan. 14, 2021), and the Court herein considers the versions of the Rules in effect at the time of relevant events.

REPORT & RECOMMENDATION
PAGE - 16

a.   <u>Rule 506(b) Exemption</u>:

Exemption under Rule 506(b) allows for a limited number of non-accredited investors, each of whom has or is reasonably believed by the issuer to have "such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment[.]"  17 C.F.R. § 230.506(b)(2).  To qualify for exemption under Rule 506(b), an offering must also comply with Rule 502.  § 230.506(b)(1).  As pertinent to the current dispute, Rule 502 prohibits the issuer from offering or selling "by any form of general solicitation or general advertising."  § 230.502(c) (identifying forms of solicitation or advertising as including, but not limited to "(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and (2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising").  *See also Cheng Hsu v. PBIG Mgmt. Co.*, 291 F. Appx. 809, 810-11 (9th Cir. 2008) (affirming finding of general solicitation when defendants offered to sell securities at corporation's meetings in a public library that any interested party could attend); *SEC v. Johnson*, No. 20-1493, 2022 WL 423492, at *4 (C.D. Cal. Jan. 26, 2022) ("Public advertising via a website is impermissible general solicitation.").

Atonomi Defendants deny they generally solicited or advertised the SAFT.  They contend they generally advertised or marketed only Atonomi's products and services – that is, the Atonomi Network – a practice that is not prohibited by § 230.502(c).  *See* Securities Offering Reform, 70 FR 44722-01 at 44735-36, n. 122 (Aug. 3, 2005) ("[O]rdinary factual business communications that an issuer regularly releases are not considered an offer of securities.") (citations omitted).  They provide declarations from Emery and the Individual Defendants to

support their contention that Atonomi did not offer or sell the SAFT through general solicitation or advertising. *See* Dkts. 50, 271-78.

Plaintiff argues Atonomi Defendants fail to meet their burden of production on summary judgment. Plaintiff notes the absence of any documentary evidence submitted in support of an exemption defense, and deems the declarations relied upon conclusory, unsupported, self-serving, and otherwise insufficient. *See, e.g., Atkins v. Rios,* No. 20-0193, 2022 WL 4280198 (E.D. Cal. Sept. 15, 2022) (finding "conclusory and unsupported declarations and contentions" insufficient to meet burden of production on summary judgment), *report and recommendation adopted sub nom. Atkins v. Rocha*, 2022 WL 17542032 (E.D. Cal. Dec. 8, 2022) (citing *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")). Plaintiff also argues that the evidence shows Defendants explicitly and repeatedly engaged in public solicitation and general advertising. *See* Dkts. 290 & 295.

As the parties moving for summary judgment, Atonomi Defendants carry "the initial burden of establishing the absence of a genuine issue of fact with regard to the affirmative defense." *Lehman Bros. Holdings v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1197 (W.D. Wash. 2011). *See also Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) ("'Where, as here, the *moving party* bears the burden of proof [on an affirmative defense] at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'") (emphasis in original; quoted source omitted). With such a showing, the burden then shifts to Plaintiff, the nonmoving party, to set forth specific facts showing the existence of genuine issues of material fact on the affirmative defense. *Houghton*, 965 F.3d at 1537.

REPORT & RECOMMENDATION
PAGE - 18

In his declaration, Emery attests he did not solicit anyone to participate in the SAFT or public sale, stating he "merely responded" to inquiries of potential investors, asked questions, and advised as to next steps in the accreditation process. Dkt. 271, ¶¶19-20, 22. He attests that Atonomi did not rely on general solicitation and "only marketed its technology and services, not the SAFT." *Id.*, ¶21. Emery "did not know" and had "no reason to believe" any investing opportunities were marketed to the general public, and shifts any responsibility for marketing onto others. *Id.*, ¶¶21-25. He states, for example, that while he "edited some, but not all, marketing materials before they were finalized," Perkins Coie made all final decisions on those materials, that he "had no real control over anything[,]" and that Launch, Benson, and others, with the guidance of Deloitte and Perkins Coie, exercised total control over Atonomi and made "every major decision[.]" *Id.*, ¶¶6-17, 21-22. *See also* Dkt. 272, Ex. 4 at 152:1-10 (Emery testified Launch controlled the Atonomi ICO and CENTRI Board of Directors). He further attests: "I had no knowledge at all that Atonomi was not following the law, nor did I ever have any reason to believe that Atonomi was not following the law, particularly because the entire process was under the guidance of Deloitte and Perkins Coie." Dkt. 271, ¶23.

Other declarations are similar. Strickland, Wisehart, and DeLoach attest that Launch entirely controlled Atonomi, that they personally did not know and had no reason to believe any securities or investing opportunities were marketed or advertised to the general public, that they had no marketing or advertising responsibilities, and that they reasonably relied on information provided to them by others. Dkt. 272, ¶¶14, 17; Dkt. 273, ¶¶11, 14; Dkt. 274, ¶¶11, 16. Salter attests he personally did not market or advertise the SAFT to the general public and that, to the best of his knowledge, all of Atonomi's "publicly-facing content" focused on its product and services. Dkt. 276, ¶5. He adds that, while he held marketing responsibilities as an employee,

1   he sent all materials, such as website copy, press releases, and newsletters, to Perkins Coie for

2   review prior to publishing and "had no reason to believe Atonomi was not following the law."

3   *Id.*, ¶¶4, 8.  Mackey clarifies that, as a CENTRI employee, his sole responsibility was to create

4   the Atonomi Network, and that he did not communicate with potential investors or investors, had

5   no part in any marketing or advertising decisions, and has "no knowledge of how any of that was

6   handled," other than his presence at a single event to answer technical questions about the

7   Atonomi Network.  Dkt. 275, ¶¶15, 18.

8         An affidavit or declaration offered in support of a motion for summary judgment "must

9   be made on personal knowledge, set out facts that would be admissible in evidence, and show

10  that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P.

11  56(c)(4).  The Court here finds the declarations to provide some support for Atonomi

12  Defendants' assertion of a safe harbor under Rule 506(b), but not the absence of a genuine issue

13  of material fact.  Nor do Atonomi Defendants provide sufficient explanation for their failure to

14  identify other support for their motion.  They state that deposition testimony was largely

15  unavailable because Plaintiff elected not to depose DeLoach, Mackey, or Salter and asked

16  Strickland questions only about a non-relevant time period.  Dkt. 277, ¶4.  They do not explain

17  why they did not elicit or identify any other evidence in support of their affirmative defense.

18  They also note that the declarations offered in support of their motion were consistent with

19  responses to Requests for Admissions, wherein all Defendants denied Atonomi generally

20  solicited unaccredited investors.  Dkt. 290, Ex. 40 (Requests for Admissions Nos. 10-11).

21  However, like the declarations, the mere denials in discovery responses, unaccompanied by

22  supportive facts or evidence, do not establish the absence of a genuine issue of material fact.

23

REPORT & RECOMMENDATION
PAGE - 20

1    Plaintiff identifies evidence as showing Defendants engaged in public solicitation and

2  general advertising.  *See* Dkts. 290 & 295.  Emails dated in November 2017 reflect that

3  Defendants hired a public relations (PR) firm to issue press releases, Emery's request for a list of

4  hedge funds "making cypto investments" so that they could be added to "the ICO contact list",

5  and DeLoach's compilation of a preliminary "FAQ" list "intended to address the question 'why

6  [would] I write a check? From an investor viewpoint."  Dkt. 290, Exs. 2-4.  In a December 2017

7  email to DeLoach, Strickland, Wisehart, and others, Emery noted a press release announcing

8  Atonomi had been picked up by close to 400 media outlets, his live interview on Bloomberg

9  Market Watch, that the PR firm was "working to get more analyst coverage and interviews[,]"

10  and that they were "launching a couple new media outlets on Reddit and Telegram to build a

11  blockchain and crypto followers."  *Id*., Exs. 5, 32.  As further stated by Emery:

12      The most pressing goal is to get $3m in SAFT commitments for our pre-sale. We
        are on our way, but this is really about one-on-one selling and being present at
13      event [sic] where there are active ICO participants.  I think our PR firm can do a
        better job making introductions during these events and I will work with them to
14      make that happen.

15  *Id.*

16    Emery also describes a December 2017 "cryptocurrency event" with more than 300

17  attendees, where he and others "launched Atonomi", "were there to promote our ICO pre-sale",

18  and he had "one-on-one conversation with 20+ people about the work we are doing at Atonomi."

19  *Id.*  Through conversations and subsequent "background checking", Emery found "5 ICO

20  investor potentials[.]"  *Id*.  Additional emails and screenshots show other events followed.  *See*

21  *id*., Ex. 6 (picture on Telegram captioned:  "Mob scene after panel.  Took 2 hours to talk to

22  everyone about Atonomi afterward!");  Dkt. 266, Ex. 20 (December 2017 email from Emery to

23  DeLoach, Strickland, Wisehart, Mackey, and others stating Atonomi would "begin the road show

phase leading up to our ICO by attending four blockchain events the following month, including CoinAgenda in Las Vegas, World Crypto Economic Forum in San Francisco, and North American BitCoin Conference in Miami, and London Blockchain Week).

Other evidence shows that, in January 2018, Atonomi launched its Telegram channel, which included links to Twitter and Facebook pages, a "registration" page and "recent news and interviews" on Atonomi's website, and a Reddit thread. Dkt. 290, Ex. 7. Emery testified the Telegram channel was open to the public, *id*. Ex. 45 at 47:7-48:3, and screenshots show Defendants used it to communicate with potential investors and investors, *id*., Exs. 7-11, 33. *See id.*, Exs. 8-11 (comments reflecting that the channel had 100 members within days of opening, more than 14,000 members by February 2022, and in excess of 28,000 members by May 2018). *See also* Dkt. 266, Ex. 5 (June 9, 2018 email from Emery to DeLoach, Strickland, Wisehart, and others noting "28,000+ people from around the world following the project on Telegram"). In a March 2018 email, Emery thanked a Launch employee for "helping to get the word out to our community on the current status of the pre sale and events where people can meet with us" and asked that updates be made via a newsletter, Telegram post, and on the website. Dkt. 290, Ex. 36. In April 2018, Salter posted an announcement on Telegram and other social media regarding an "AMA" ("Ask Me Anything") event to be headlined by Emery. *Id*., Ex. 37.

In their reply, Atonomi Defendants assert Plaintiff's failure to present any "public-facing" communications, such as actual press releases or other materials showing Atonomi advertised anything other than its planned product. They contend the above-described internal communications show Defendants approached only potential accredited investors, such as hedge fund companies with experience in investing in blockchain technology, talked "about the work we are doing at Atonomi", spoke to investors on a "one-on-one basis", and identified potential

investors after conducting background checks.  *See id.*, Exs. 2 & 5.  They point to other evidence as showing general information on a Telegram channel to which users were required to join in order to see the content and which included a warning that Atonomi would "NEVER solicit payments via Telegram", as well as responses to third parties inquiring about investing or in relation to the public sale of tokens.  *Id.*, Exs. 7-8, 10-11.  They also assert that, even if the Court were to find they conducted general solicitation or advertising in certain instances, it would be at most "insignificant deviations" from Rule 506(b) allowed by "Rule 508."

Rule 508 provides that a "failure to comply with a term, condition or requirement" of Rule 506 "will not result in the loss of the exemption . . . for any offer or sale to a particular individual or entity," if the person relying on the exemption shows that failure "(1) . . . did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity; (2) . . . was insignificant to the offering as a whole . . . ; and (3) [a] good faith and reasonable attempt was made to comply with all applicable terms, conditions and requirements" of Rule 506.  17 C.F.R. § 230.508(a).  However, this rule is not applicable because it also provides that "any failure to comply with paragraph (c) of § 230.502," meaning the prohibition on general solicitation or advertising, "shall be deemed to be significant to the offering as a whole[.]"  § 230.508(a)(2).

Further, and as stated above, Atonomi Defendants bear the burden of establishing the absence of a genuine issue of fact.  They could have, but did not submit press releases or other materials supporting their contention any marketing or advertising related only to the Atonomi Network.  Nor do they otherwise sufficiently distinguish Plaintiff's evidence, including evidence showing one or more cryptocurrency events where Emery and others "were there to promote our

ICO pre-sale", Dkt. 290, Exs. 5, 32, or the public mediums through which Atonomi provided information in regard to the sale of unregistered securities.

The Court, having considered all of the evidence presented, concludes genuine issues of material fact preclude a determination as to the availability of a defense under Rule 506(b).  As such, neither party is entitled to summary judgment.

b.   Rule 506(c) Exemption:

Exemption under Rule 506(c) does not preclude the use of general solicitation or advertising.  However, safe harbor under Rule 506(c) requires, in relevant part, that *all* purchasers are accredited investors, that the issuer take reasonable steps to verify accreditation, and that the issuer had no knowledge an investor was not accredited.  17 C.F.R. § 230.506(c). Accredited investors include any person who comes within, or "who the issuer reasonably believes" comes within, any one of several enumerated categories which entail consideration of income, net worth, and knowledge and experience in financial and business matters.  § 230.501(a).  Reasonable care may be demonstrated through (1) reasonable inquiry to determine if a purchaser is acquiring securities for him/herself or for other persons, (2) written disclosure prior to sale that the securities have not been registered and cannot be resold unless registered or an exemption from registration is available, and (3) placement of a restrictive legend on the securities certificate.  § 230.502(d) (noting that other actions may also satisfy this provision).

In asserting their compliance with the requirements for exemption under Rule 506(c), Atonomi Defendants observe that each SAFT signatory was an accredited investor who completed an investor questionnaire, was verified by third parties TokenMarket and Onfido, and attested to their accredited investor status in signing the SAFT.  *See* Dkt. 50, ¶¶22-32, Ex. B and Dkt. 266, Ex. 1 at 6-7 (¶ 6(b)).  The signatories also agreed, through the SAFT, that their

REPORT & RECOMMENDATION
PAGE - 24

1   purchase was on their own behalf, not for others and not for the purpose of resale, and that the

2   SAFT had not been registered and could not be transferred unless registered or exempt from

3   registration.  *See id*.  The SAFT contained a restrictive legend on its first page, stating, in all

4   capital letters, that it had not been registered and could not be transferred unless registered or

5   exempt.  Dkt. 50, Ex. A at 1; Dkt. 266, Ex. 1 at 1.

6       Plaintiff again argues that Atonomi Defendants fail to meet their burden of production,

7   noting an absence of evidentiary support and asserting the improper reliance on "sham

8   declarations" that contradict deposition testimony.  *See Yeager v. Bowlin*, 693 F.3d 1076, 1080

9   (9th Cir. 2012) (explaining that the "sham affidavit rule prevents a party who has been examined

10  at length on deposition from raising an issue of fact simply by submitting an affidavit

11  contradicting his own prior testimony, which would greatly diminish the utility of summary

12  judgment as a procedure for screening out sham issues of fact.") (cleaned up and quoted source

13  omitted).  Plaintiff also argues that the evidence shows Defendants systematically violated the

14  Rule 506(c) safe harbor requirements by knowingly selling SAFTS to "groups", "pools", and

15  "syndicates" that included both accredited and nonaccredited investors.  He points, in support, to

16  Emery's contemporaneous emails and Telegram chats, an "internal SAFT tracker spreadsheet",

17  and deposition testimony.  *See, e.g.,* Dkt. 290, Exs. 12-22, 45.

18      Plaintiff's sham declaration argument is not persuasive.  The sham affidavit rule is

19  properly applied only with caution and where the inconsistency between a party's deposition

20  testimony and a *subsequent* affidavit is "clear and unambiguous" enough to justify striking the

21  affidavit.  *Yeager*, 693 F.3d at 1080.  Plaintiff here argues a declaration submitted by Emery

22  *prior* to his deposition, and in which he attested that "pools" of investors were not allowed and

23  were weeded out, Dkt. 50, ¶¶64-66, contradicted his later testimony in relation to the SAFT

tracker spreadsheet, *see* Dkt. 290, Ex. 45 at 48:11-63:7. As reflected in the discussion below, the alleged contradiction is not clear and unambiguous. *See also* Dkt. 290, Ex. 45 at 30:20-31:9 (Emery testified that pooling, which he defined as meaning a single entity representing a group and using a single wallet and single clearance, was not allowed, but was distinguishable from "[g]rouping or syndicates[.]") and 34:2-15 ("And when we discovered [pooling], we took steps immediately.") Moreover, in declarations written *subsequent* to his deposition, Emery attests that he only asked preliminary questions to ensure there was no pooling, but that Launch, Launch's leaders and employees, and Perkins Coie bore responsibility for and had control over the screening and accreditation verification process. Dkt. 271, ¶¶13-20.[9]

However, as argued by Plaintiff and as with Rule 506(b), Atonomi Defendants provide minimal support for their affirmative defense under Rule 506(c). For example, Emery attests to only a limited role in the process of screening and verifying the accreditation status of investors, stating he had no input or control over either process, that TokenMarket and Perkins Coie bore that responsibility, and that he had no reason to doubt the process was done lawfully and correctly. *Id.*, ¶¶19-20. The Individual Defendants deny any involvement and assert they did not know and had no reason to believe any SAFT investors were not accredited. Dkt. 272, ¶¶8, 15; Dkt. 273, ¶¶8, 12; Dkt. 274, ¶¶11, 14; Dkt. 275, ¶¶15, 17; Dkt. 276, ¶¶3, 7.

Plaintiff, on the other hand, identifies emails dated in January and February 2018 and the SAFT investor tracker spreadsheet as showing numerous examples of unaccredited investors

---

[9] Plaintiff also asserted the existence of a sham declaration pertinent to the Rule 506(b) exemption, contrasting Emery's testimony that the Telegram channel was open to the public, with Emery's earlier declaration that Atonomi did not use general solicitation or advertising to sell the SAFT. *See* Dkt. 50, ¶69 ("Defendants' public statements were focused on the product, the Atonomi Network, and Defendants were extremely careful not to make any general solicitations.") However, this argument is likewise not persuasive because it neither points to a declaration subsequent to Emery's testimony, nor identifies a clear and unambiguous inconsistency.

REPORT & RECOMMENDATION
PAGE - 26

involved in SAFTs.  For example, Krešimer Radoš, at rados.kreso@gmail.com, thanked Emery "for giving us the 100 ETH allocation", while noting he was "not an accredited investor, only a representative of [his] group[,]" and asking if Emery would "change the name on the document to 'Dražen Kapusta'", the "accredited investor in our group."  Dkt. 290, Ex. 14.  The spreadsheet identifies Kapusta as the contact for the "Kresimer Rados" group, at rados.kreso@ gmail.com. *Id*., Ex. 13.  Also, at the request of Jared Polites, at jared@blockteam.com, Emery sent an accreditation questionnaire and "Know Your Customer" (KYC) documentation to Kyle Wang, with whom Polites and another individual "co-invest with often" and who was "taking the lead on KYC documentation."  *Id*., Ex. 15.  The spreadsheet identifies Wang as the contact for the "Blockteam.io" group.  *Id*., Ex. 13.  Similarly, Ezhilarasan Irulappan, at ezhilji@gmail.com, asked Emery to change the application from Irulappan's name to "Shafiuddin Mohammed", stating:  "Shafi is our sales lead with the approved USA Accredited Investor privilege via VerifyInvestor.com."  *Id*., Ex. 16.  A SAFT contains Mohammed's name, *id*., Ex. 17, and the spreadsheet identifies Mohammed as the contact for the "Ezhilarasan Irulappan" group at ezhiliji@gmail.com, *id*., Ex. 13.  Later, after the token release, Irulappan told Emery he joined Atonomi's Telegram channel "when it had only 10 members" and "invested 85K in your project (that's all my savings for the past 5 years) and all that is left is only 25K."  *Id*., Ex. 18.  *See also id.*, Ex. 12 (David Wang stated he was "part of a few ICO/Trading groups" and interested in a larger investment, Emery advised that bonus tokens would be available for everyone in a syndicate "of more than $1mil" if coordinated by Wang, and Wang replied:  "I'm happy to do $100k on my own but can potentially pool more from a syndicate that I would be representing.") and Ex. 13 (spreadsheet identifies Wang as the contact for a group labeled "DW Trades Pty LTD").

Plaintiff also points to DNA Fund as an individual investor group.  For example, forwarding an inquiry from Takashi Yanagi, Emery asked TokenMarket whether DNA Fund should "pool their funds with a single SAFT or split and get a SAFT per person[,]" and TokenMarket replied:  "Personally I would go for each individual for absolute transparency." *Id.*, Ex. 19.  DNA Fund subsequently "decided to invest as an entity instead of having individual investors[,]" stating "[o]nly DNA will sign the SAFT agreement and do KYC."  *Id.*, Ex. 20.  The spreadsheet shows Scott Walker as the contact for the DNA Fund group.  *Id.*, Ex. 13.  *See also id.*, Ex. 22 (September 2018 email from Atonomi employee to Strickland:  "In the process [of reviewing Emery's emails] we noted dna opted to participate as a company way back in january.  Corp docs were provided.  But the saft and questionnaire were all scott walker.  I cant find evidence of any due diligence on the company.  Have to keep digging.")[10]

In challenging this evidence in their reply, Atonomi Defendants assert that DNA Fund could and did permissibly invest as a company.  *See* 17 C.F.R. § 230.501(a)(3) (including corporations and other entities within the definition of an accredited investor); Dkt. 299, ¶2 & Ex. 1 (DNA Fund's Investor Questionnaire signed by DNA Fund Manager Scott Walker and indicating accredited investor status pursuant to § 230.501(a)(3) and as a corporation).  However,

---

[10] Plaintiff also points to other evidence submitted earlier in this case and associated with alleged group investments in the pre-sale.  *See, e.g.,* Dkt. 60, Ex. I (Emery:  "we are oversubscribed by at least 3x and need to make hard choices to allow as many positive groups into the private"), Ex. J (Emery:  "fyi, there are three syndicates that we have allocated more than 1M ETH among many . . . your group is one of the three"), Ex. K (Emery:  "No problem with 5k ETH. We have a couple groups in the same range… Can you tell me a little more about the group?"); and Ex. L (potential investor:  "My pool had a representative [at a conference] doing research and was impressed with your answers. Watching the project closely."); Dkt. 97, Ex. A (Emery:  "I am in touch with each of the larger syndicate groups to better understand their unique needs and a solution [that] works for all. . . .  Ideally the leaders of each syndicate agree on how they will hold and sell once listed.  I would prefer to not have a firm lockup policy. . . . [M]y preference [is] to have each group decide how best to support their liquidity and growth needs.")

REPORT & RECOMMENDATION
PAGE - 28

even assuming a proper investment by DNA Fund, Atonomi Defendants do not adequately

distinguish other evidence before the Court.

Atonomi Defendants, for example, point to evidence showing Plaintiff and the TPDs

were advised that "each person participating in the private pre-sale must be an accredited

investor and be approved via KYC, regardless of whether you are in a syndicate." Dkt. 304, ¶2

& Ex. Y (Plaintiff stated: "for atonomi you have to get an accredited doc or u wont be allowed

in lol wow"). Yet, this shows only that Plaintiff and the TPDs were advised as to the rules for

proper investment, not that those rules were followed.

Atonomi Defendants also broadly challenge evidence as inadmissible because it contains

hearsay or lacks authentication, citing to *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

summary judgment.") However, a 2010 amendment altered Rule 56 and superseded the Ninth

Circuit's decision in *Orr. Cottrell v. I.C. Sys., Inc.*, No. C21-1167-JHC, 2022 WL 17582374, at

*1 (W.D. Wash. Dec. 12, 2022). Since that change, in reviewing a motion for summary

judgment, "the Court may consider admissible evidence, as well as evidence that can be

presented in a *form* that would be admissible at trial[.]" *Sagdai v. Travelers Home & Marine Ins.

Co.*, No. C21-0182-LK, __ F. Supp. 3d __, 2022 WL 16699190, at *4 (W.D. Wash. Nov. 3,

2022) (cleaned up, emphasis retained, and containing citations to *Weil v. Citizens Telecom Servs.

Co., LLC*, 922 F.3d 993, 998 (9th Cir. 2019), *Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349,

2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022), and Fed. R. Civ. P. 56(c)(2)).

Atonomi Defendants further observe that Plaintiff did not attempt to depose any of the

third parties involved in the email communications, and that Emery's testimony does not show

his personal knowledge as to whether anyone other than SAFT signatories contributed to an

investment. They assert a failure to demonstrate how Plaintiff's counsel, who provided the SAFT investor tracker spreadsheet, has any personal knowledge regarding the contents of that document, noting it was produced by Launch and that Plaintiff did not depose or present a declaration from any Launch employee. They also note Emery's testimony that a Launch employee authored the spreadsheet and that Emery did not know the meaning of the "group" category. Dkt. 290, Ex. 45 at 62:5-11, 67:9-68:20 ("I don't know the allocation of an entry in 'Group.' . . . The group could have been how they were introduced to us. It could have been arbitrary. It was just part of our management of the process here."), and 69:10-71:3 ("It doesn't mean anything to me in that context. It's a column that has words in it that helped us manage it. Our process was clear. We KYC'd everybody. There was no pooling allowed. If we discovered it, we ended the – engagement, period.") They deem the spreadsheet inadmissible as unauthenticated and Plaintiff's reliance on it as pure speculation. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.")

There is no basis for concluding Plaintiff would be unable to present either the email communications or the spreadsheet in an admissible form at trial. It is clear from Emery's testimony that numerous individuals, including some Individual Defendants and the Settling Defendants, could authenticate and/or testify in relation to the spreadsheet. Dkt. 290, Ex. 45 at 61:19-63:11 (Emery testified "the team", which included each board member and Atonomi's "senior team", had "collaborated around" the spreadsheet, and that: "The team used this in a very collaborative way with counsel, with our bankers, everybody involved."; also explaining that Jason Gray at Launch was the primary author of the spreadsheet and maintained it for the

1    project, but that the entire team had access to it through "Google Docs").  The email

2    communications likewise involve numerous individuals potentially available as witnesses at trial.

3      Because it appears Plaintiff would be capable of providing the spreadsheet and email

4    communications in admissible form, the evidence is properly considered herein.  *See Lober v.*

5    *Dejoy*, 845 F. App'x 672, 673 (9th Cir. 2021) (finding district court did not abuse its discretion

6    in overruling objections to evidence "because such evidence was not inadmissible hearsay, or

7    was capable of being provided in admissible form at trial.")  The Court further finds the evidence

8    to establish the existence of genuine issues of material fact as to the involvement of unaccredited

9    investors in the pre-sale and, therefore, as to exemption under Rule 506(c).

10     The Court also acknowledges Atonomi Defendants' contention that any instances in

11   which they could be found to have sold securities to certain unaccredited investors would at most

12   be insignificant deviations permissible under Rule 508(a).  However, given the disputed issues of

13   fact, the Court is unable to determine whether any deviations exist and could be deemed

14   insignificant.  *See also* 17 C.F.R. § 230.508(a)(1) (requiring, for insignificant deviations, that

15   "[t]he failure to comply did not pertain to a term, condition or requirement directly intended to

16   protect that particular individual or entity").  For this reason and for the reasons stated above, the

17   Court does not find summary judgment warranted for either party in relation to Rule 506(c).

18     c. Rule 502(a) Integrated Offering:

19     The parties also dispute whether the SAFT and the public sale of tokens constituted an

20   integrated offering under Rule 502(a).  Integration serves to "prevent the circumvention" of the

21   requirement to register an offering by splitting a single sale "that should be registered between a

22   registered offering and an otherwise exempt offering."  *Anegada Master Fund, Ltd. v. PXRE*

23   *Grp. Ltd.*, 680 F. Supp. 2d 616, 622 n.9 (S.D.N.Y. 2010).  If integration under Rule 502(a)

applies, "a self-styled private offering" would constitute a so-called "public offering" under the Securities Act, *id.*, and could not qualify for exemption under Regulation D, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 181 (S.D.N.Y. 2020).

Pursuant to the version of Rule 502(a) in effect at the time of the events at issue, "[a]ll sales that are part of the same Regulation D offering must meet all the terms and conditions of Regulation D." 17 C.F.R. § 230.502(a). Rule 502(a) also set forth five factors to apply in determining whether sales should be integrated: (1) whether sales are part of a single plan of financing; (2) whether sales involve issuance of the same class of securities; (3) whether sales were made at or about the same time; (4) whether the same type of consideration is received; and (5) whether sales are made for the same general purpose. 17 C.F.R. § 230.502(a) Note. *See also Murphy*, 626 F.2d at 645 ("These factors guide our evaluation.") (citations omitted).

Plaintiff argues that the SAFT and public sale were sub-parts of a single integrated offering and that the public sale to some 14,000 unaccredited investors necessarily removes the SAFT from any safe harbor. He points to the similar two-stage ICO in *Kik Interactive Inc.*, 492 F. Supp. 3d at 174, 181-82, wherein the court found the sale of "Kin" digital tokens through a SAFT and subsequent public sale constituted a single, nonexempt integrated offering. Here, Plaintiff identifies evidence as showing Defendants internally considered the ICO a single fundraising event. For example, in their offering documents, Defendants defined the SAFT pre-sale and the public sale as "together, the 'Token Sale.'" Dkt. 290, Ex. 26 at 1 ("Atonomi, Inc. . . . intends to make Atonomi Tokens available for sale, in both a private pre-sale (the "Pre-Sale") and a public sale ("Public Sale") at dates and times to be announced. During the Pre-Sale and Public Sale (together, the "Token Sale"), it is anticipated that up to 500 million Atonomi Tokens may be sold out of the initial 1 billion total Atonomi Tokens created.") Other evidence shows

Atonomi Defendants received only ETH in both segments of the ICO, *see id*., Ex. 25 at 2-4, and consolidated the receipts from both stages into one account for accounting purposes, *see id*., Ex. 34 (CENTRI October 2018 Financial Report).  *See also* Dkt. 266, Ex. 14 (March 2018 email including Benson, Emery, DeLoach, Wisehart, and Strickland and stating: "Very important we sync the cash flows between Centri and Atonomi.")  Also, as a result of both the SAFT and the public sale, the same ATMI tokens were issued, and the June 2018 public sale closely followed the two rounds of SAFTs in February and April 2018.

Plaintiff argues that, given the above, the Court should deny Atonomi Defendants' motion and find Plaintiff and the class entitled to summary judgment.  That is, because the public sale was indisputably not subject to an exemption and because it was integrated with the private sale, the entire ICO is not exempt independent of whether the SAFT itself was compliant.  *See Kik Interactive Inc.*, 492 F. Supp. 3d at 181 (finding integrated offering where, while different forms of consideration were received, the private and public sales were part of a single financing plan, proceeds went to the same purpose, the seller did not differentiate between funds raised, private sale participants could receive tokens only with a successful public sale, all purchasers received fungible tokens equal in value, the pre-sale ended the day before the public sale, and tokens were distributed at the same time); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367-68 (S.D.N.Y. 2020) (rejecting depiction of two distinct sets of transactions, first through allegedly exempt token "Purchase Agreements", followed by sale of the tokens themselves) ("*Telegram I*"), *appeal withdrawn* at 2020 WL 3467671 (2d Cir. May 22, 2020), and *request for clarification denied*, 2020 WL 1547383, at * 1 (S.D.N.Y. Apr. 1, 2020) ("[T]he 'security' was neither the Gram Purchase Agreement nor the Gram but the entire scheme that comprised the

1  Gram Purchase Agreements and the accompanying understandings and undertakings made by

2  Telegram[.]") ("*Telegram II*").

3        Atonomi Defendants argue Plaintiff and the class lack standing to sue for any transaction

4  other than the SAFT.  They observe that the integration cases cited by Plaintiff were filed by the

5  SEC, not private parties, and deny the cases can be relied upon to show Plaintiff and the class

6  have standing to challenge anything beyond the SAFT.

7        Atonomi Defendants also distinguish the SEC integration cases on the facts.  For

8  example, while both the public and private token sales in *Kik* were used to fund Kik's operations

9  and "build[]the ecosystem for Kin[,]" *Kik Interactive Inc*., 492 F. Supp. 3d at 181, the Atonomi

10  SAFT proceeds were used to build the Atonomi Network before the public sale took place.  Also,

11  the Kik pre-sale ended the day before the public sale began, *id*. at 182, while some two months

12  passed between the SAFT Series 2 and the June 2018 public sale.  In addition, and unlike the

13  current case, the *Telegram* cases entailed the sale of "Grams" to initial sophisticated purchasers

14  with the expectation that those purchasers would resell the Grams to the general public.

15  *Telegram I*, 448 F. Supp. 3d at 380.  Atonomi Defendants further assert that grouping profits

16  together in financial statements is a typical practice.

17        Atonomi Defendants do not sufficiently support their contention that Plaintiff and the

18  class lack standing to challenge an integrated offering.  They focus their arguments on the

19  tokens, fail to present an analysis of the elements of standing, and distinguish cases as brought by

20  the SEC without identifying any support for the contention that private parties may not similarly

21  challenge an integrated offering.  Also, while highlighting factual differences with the SEC

22  cases, Atonomi Defendants ignore similarities and the fact that not all of the Rule 502(a) factors

23  "need be established to justify a finding that transactions claimed to be separate were in fact one

REPORT & RECOMMENDATION
PAGE - 34

integrated transaction.'" *Kik Interactive Inc.*, 492 F. Supp. 3d at 181 (quoting *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 364 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998)).

It is further not clear, given the limited factual record available for the Court's consideration and disputes of fact in relation to that record, that the SAFT and token sale can be said to constitute an integrated offering. Summary judgment is not, for this reason and for the reasons stated above, warranted in relation to Rule 502(a).

C.    Emery and Individual Defendants' Motions for Summary Judgment

Plaintiff seeks to hold Emery and the Individual Defendants liable for the sale of unregistered, non-exempt securities pursuant to RCW 21.20.430(3).   Under that provision:

> Every person who directly or indirectly controls a seller or buyer liable [for offering or selling an unregistered, non-exempt security], every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. . . .

RCW 21.20.430(3).

To establish "control person" liability under the WSSA, a plaintiff must show a defendant (1) "exercised control over the operations of the corporation allegedly in violation of the law," and (2) "had the actual power to control the relevant transactions." *Bastida v. Nat'l Holdings Corp.*, No. C16-388-RSL, 2016 WL 4250135, at *2 (W.D. Wash. Aug. 4, 2016) (citing *Hines v. Data Lines Sys.*, 114 Wn.2d 127, 136, 787 P.2d 8 (1990)). *Accord Tumelson Fam. Ltd. P'ship v. World Fin. News Network*, 242 F. App'x 385, 387 (9th Cir. 2007).  A plaintiff need not show the defendant "culpably participated" in the alleged violation. *Hines*, 114 Wn.2d at 137.  The

REPORT & RECOMMENDATION
PAGE - 35

WSSA instead "shifts the burden onto the defendant to prove that 'he or she did not know, and in the exercise of reasonable care could not have known' of the liability-producing facts." *Id*.

The WSSA also holds every officer and director liable to the same extent as a seller unless they satisfy this same burden to "prove the affirmative defense of no knowledge." *Id.* at 142-43. The defense requires "affirmative action" on the part of the officer or director. *Id*. at 144. A "passive, good faith, lack of knowledge defense" does not suffice. *Id*. at 144-45. As explained by the Washington Supreme Court:

> [T]he plain language of the affirmative defense provision requires something more than actual knowledge. . . . Ignorance will be bliss only to the extent that the director can prove that even by the exercise of reasonable care he would have remained ignorant of the true state of affairs. The defendant, at a minimum, must apprise himself of facts reasonably within his grasp.

*Id.* at 146 (internal citation omitted).

The WSSA further provides for the liability of an employee who "materially aids" in the sale of unregistered securities. RCW 21.20.430(3). While there is little case law addressing this standard, courts have required that the material aid be given "in the course of the sales transaction." *Burdick v. Rosenthal Collins Grp., LLC*, 194 Wn. App. 1016, 2016 WL 3082652, at *5-6 (2016) (addressing material aid with respect to a "broker-dealer") (cited cases omitted).

In seeking dismissal of Plaintiff's claims against them, Emery and the Individual Defendants reiterate arguments raised by Atonomi Defendants, such as Plaintiff's reliance on purportedly inadmissible evidence and exemption under Regulation D. Those arguments fail for the reasons stated above. The Court addresses the remaining arguments below.

1.  Emery, Strickland, DeLoach, and Wisehart:

Irrespective of the applicability of control person status, there is no dispute that Emery, Strickland, DeLoach, and Wisehart served as officers and/or directors of CENTRI and/or its

wholly owned subsidiary Atonomi.  *See* Dkt. 269 at 7, Dkts. 271-74, and Dkt. 301 at 11.  *See also* Dkt. 279, Ex. C (Form D filing for SAFT by issuer Atonomi, listing Emery as Executive Officer and Director and Strickland, DeLoach, and Wisehart as Directors); Dkt. 265 at 8-9 and Dkt. 266, Ex. 7 (showing the "unanimous written consent" and "Approval of SAFT pre-sale" by joint CENTRI/Atonomi Board, with consent signed by Emery, Strickland, DeLoach, and Wisehart).  These "Director Defendants" argue they nonetheless cannot be held liable because they did not know and in the exercise of reasonable care could not have known any "liability producing facts."  *Hines*, 114 Wn.2d at 146.

Because Defendants rely on an affirmative defense to preclude their liability under the WSSA for the sale of unregistered securities, the liability producing facts in this case include facts associated with a general solicitation or advertising of the SAFT and the involvement of unaccredited investors.  Accordingly, to be entitled to a defense under RCW 21.20.430(3), the Director Defendants must prove they did not know and could not have learned of such facts through the exercise of reasonable diligence.

Emery attests Atonomi did not rely on general solicitation and marketed only its technology and services, that he did not solicit anyone to participate in the SAFT or public sale, and that he merely responded to inquiries, asked preliminary questions, and advised as to next steps in the accreditation process.  Dkt. 271, ¶¶19-22.  Strickland, DeLoach, and Wisehart deny any knowledge as to marketing or advertising of securities or the involvement of unaccredited investors, and assert the limited nature of their roles in relation to Atonomi, the SAFT, and the public sale.  Dkts. 272-74.  All of the Director Defendants place the responsibility for Atonomi, and tasks including advertising, marketing, screening, and accreditation, on Launch, Launch's

leaders and employees, Perkins Coie, Deloitte, and TokenMarket, and assert they reasonably relied on information from and the expertise of those entities and individuals.  Dkts. 271-74.

However, as discussed above, Plaintiff identifies evidence relating to both general solicitation and advertising and the involvement of unaccredited investors.  Much of that evidence directly or indirectly involves the Director Defendants.  It includes emails discussing public ICO-related events and unaccredited investors, and the SAFT investor tracker spreadsheet and its "group" category.  Other evidence similarly raises questions as to whether the Director Defendants were aware of liability producing facts.  *See* Dkt. 266, Ex. 5 (June 9, 2018 email from Emery to DeLoach, Strickland, Wisehart, and others captioned "Atonomi - post ICO Board update" and stating the "extraordinary effort by the entire team this year" resulted in the launch of the Atonomi Network and "a very successful token sale."), Ex. 9 (April 2018 email exchange including Emery, Strickland, and Wisehart with list of board meeting topics including "Atonomi ICO timeline, milestones and risks"), and Ex. 13 (March 2018 email from Strickland stating:  "I am on the BoD of a current ICO - Atonomi.  We are on the verge of doing about a $20M raise and digging through the utility/security issues, as everyone seems to be sorting out."); Dkt. 290, Ex. 46 at 46:6-49:14 (discussing a calendar invite to a "board ICO status call" addressed to attendees including Wisehart, Emery, and Strickland) and 48:11-49:14 (Wisehart testified Strickland was involved in board meetings that discussed the ICO), and Ex. 41 (calendar invite for "Board ICO status call" on May 15, 2018, including Emery, Benson, Wisehart, Strickland, and DeLoach as required attendees).

The Director Defendants also fail to identify steps taken to apprise themselves of liability producing facts.  Their declarations suggest they did little in that regard.  Emery attests that he reviewed investor-related documents only to determine whether all of the questions had been

completed and that he relied on the advice and expertise of Launch, Perkins Coie, and others that the offering complied with the law. Dkt. 271, ¶20 ("The only decision I made in this process was whether the questions were answered or blank. . . . Even if I had reviewed the SAFT and accreditation paperwork, which I did not, I would not have found that any SAFT signatories were unaccredited, because TokenMarket and Perkins Coie verified the process and I had no reason to doubt the professionals, as they were believed to be the most experienced in the crypto space at the time.") Strickland, DeLoach, and Wisehart deny any day-to-day involvement, pointing to the control exercised by Launch and the expertise of Perkins Coie and Deloitte, and assert they had no reason to believe Atonomi was not following the law. Dkts. 272-74.

The Director Defendants state that ignorance can "be bliss" if a director "can prove that even by the exercise of reasonable care he would have remained ignorant of the true state of affairs." *Hines*, 114 Wn.2d at 146. Yet, they do not make such a showing. The mere fact that they relied on the expertise and guidance of others does not demonstrate their entitlement to a defense under the WSSA. *See generally Hines*, 114 Wn.2d at 147 ("Reliance on counsel regarding the materiality of facts does not sustain the officer's burden of proof that he didn't know of the *existence of the facts* by reason of which liability is alleged to exist. The statute makes no reference to knowing about the *materiality* of a fact, but merely the *existence* of certain facts. . . . The State Securities Act imposes liability on those who know the facts without regard to whether the law deemed those facts material.") This reliance instead suggests a "passive, good faith, lack of knowledge" defense insufficient under the WSSA. *Id.* at 144-45.

The Director Defendants also argue it would be fundamentally inequitable to hold them liable. They again point to their reliance on the expertise and guidance of Deloitte and Perkins Coie, as well as to Plaintiff's acknowledgment of the "relatively novel" nature of this case. Dkt.

205 at 17 ("This is a relatively novel case, the application of state securities laws to a cryptocurrency fundraiser on the blockchain.")  They note that they did not profit from the SAFT or public sale, that Strickland, Wisehart, and DeLoach were uncompensated Board members, that Emery, Wisehart, and DeLoach lost money through SAFTs,[11] and that DeLoach and Emery lost their jobs.  *See* Dkts. 271-74.  However, they do not identify any authority allowing for the dismissal of Plaintiff's WSSA claims on this basis.  *See Go2Net, Inc. v. Freeyellow.com, Inc.*, 126 Wn. App. 769, 782-83 109 P.3d 875 (2005) (equitable defenses are not available under the WSSA), *aff'd*, 158 Wash. 2d 247, 143 P.3d 590 (2006).  As observed by the Washington Supreme Court, the WSSA "endeavors to protect *investors*" and is construed broadly to effectuate that purpose.  *Hines*, 114 Wn.2d at 144-45 (emphasis in original) (also distinguishing the "passive, good faith, lack of knowledge defense" allowed under the Washington Business Corporation Act as serving to allow corporations to "function effectively" by giving management "the freedom to make in good faith the many necessary decisions quickly and finally without the impairment of having to be liable for an honest error in judgment").

Considering the above, the Court also finds the existence of material disputes of fact on the question of whether the Director Defendants may be found liable under the WSSA. Summary judgment is therefore not warranted.

2.    Mackey and Salter:

Mackey and Salter deny they were directors or officers of Atonomi or CENTRI.  They note Plaintiff's only support for this contention is their "admissions" of their titles in responsive pleadings – Mackey as "Chief Technology Officer of CENTRI" and Salter as "Director of

---

[11] Emery and Wisehart entered into SAFTs for 100 ETH, worth some $85,000.00, while DeLoach entered into a SAFT for 4 ETH, worth some $3,400.00.  Dkt. 271, ¶18; Dkt. 273, ¶9; and Dkt. 274, ¶7.

REPORT & RECOMMENDATION
PAGE - 40

Marketing for Atonomi", Dkt. 170-3, ¶31 and Dkt. 170-6, ¶30 – and attest that they were always only employees, Dkt. 275, ¶3; Dkt. 276, ¶2 (Salter states he was "essentially a technical writer and a one-person marketing "team."). They note that, for the relevant time period, Emery and DeLoach were the only officers listed on CENTRI's annual report. Dkt. 303, Ex. X.

Plaintiff argues Mackey and Salter impermissibly rely on sham declarations to contradict admitted facts, but does not set forth a clear and unambiguous inconsistency warranting application of the sham affidavit rule. *See Yeager*, 693 F.3d at 1080. Mackey and Salter's responsive pleadings are reasonably read to admit to the titles of their positions and not as an admission that they served as corporate officers or directors. Nor does Plaintiff identify any other evidence suggesting Mackey or Salter occupied such roles. Considering the evidence as a whole, the Court finds no genuine dispute of material fact with respect to the status of Mackey and Salter as employees.

The parties also dispute whether Mackey and Salter could be found liable as employees who materially aided in the sale of unregistered securities, or that they knew or could have known of any liability producing facts. As stated above, material aid must be given "in the course of the sales transaction." *Burdick*, 2016 WL 3082652, at *5. *See also id*. at *5, n.11 (noting a lack of consistency in regard to the "quality of actions" found to constitute material aid, and comparing a case finding an act of assistance was material where it "influenced or induced the decision to purchase[,]" with a case requiring aid that was "considerable, significant or substantial.") (cleaned up and quoted sources omitted).

    a.   <u>Mackey</u>:

In asserting Mackey materially aided in the sale of unregistered securities, Plaintiff notes that Mackey attended a public AMA session "to answer any technology-related questions." Dkt.

275, ¶¶15, 18.  He also notes that Mackey bore the responsibility for creating the Atonomi

Network, *id*., ¶15, and that Atonomi entered into SAFTs to raise money to build that network,

*see* Dkt. 268 at 6.

The Court is not persuaded the evidence suffices to create liability under the WSSA.

Contrary to Plaintiff's contention, *Tumelson*, 242 F. App'x 385, does not involve comparable

conduct.  In that case, the Ninth Circuit affirmed a finding of WSSA liability not only because an

employee "gave a 20–minute PowerPoint presentation to investors", but because the employee,

in so doing, "held himself out as the Chief Financial Officer", made at least one statement "that

was specific, factual, and material that he knew he had no basis whatsoever to make[,]" and other

evidence showed plaintiffs relied on the employee's statements in making their investments.  *Id*.

at 388.  Plaintiff also points to a decision finding, in relation to a similar state statute, that "aid is

material if it has a natural tendency to influence, or was capable of influencing, the decision of

the purchaser."  *Connecticut Nat. Bank v. Giacomi*, 242 Conn. 17, 52, 699 A.2d 101 (1997)

(cleaned up and quoted source omitted).  However, in that case, the court found individuals aided

and abetted in the security fraud of a real estate investment enterprise through specific statements

and actions endorsing untrue statements by the enterprise committing the fraud, and that the

individuals' statements and actions influenced the decisions of investors.  *Id*. at 52-56.

The facts before the Court do not show Mackey materially aided in the sale of

unregistered securities.  The facts show that Mackey's "sole responsibility as to Atonomi was to

create the Atonomi Network" and that he appeared at one event to answer questions relating to

technology.  Dkt. 275, ¶15.  There is no evidence he was involved with the sale of unregistered

securities or that he knew or could have known of any liability producing facts.  *Id*. ("I did not

communicate with potential investors or investors.  I did not direct or execute the public token

1   sale. I did not market or advertise on behalf of CENTRI or Atonomi.")  Mackey is therefore

2   entitled to dismissal of the claims against him on summary judgment. *See Burdick*, 2016 WL

3   3082652, at *6 (finding law firm's role in sale of securities insufficient as a matter of law where

4   firm "did not participate at all" in the sale, investors admitted the firm "did not factor into their

5   decision to invest", the firm "did not issue, promote, or solicit the sale of alleged securities and,

6   in fact, had absolutely no contact whatsoever with the investors", and the securities sales were

7   completed prior to any money being sent to the firm's account for trading).

8           b.      Salter:

9           While maintaining all publicly facing marketing content centered on the Atonomi

10  Network and its capabilities, Salter attests he "helped roll out the Atonomi website, managed the

11  PR agency hired by Atonomi, drafted press releases, drafted newsletters, and set up events or

12  meetings if Launch directed him to do so."  Dkt. 276, ¶3.  There is, as such, no question that

13  Salter was involved in marketing and advertising for Atonomi.

14          The question before the Court is whether Salter materially aided the sale of unregistered

15  securities.  Plaintiff argues that, because Atonomi entered into SAFTs to raise money to build the

16  Atonomi Network, Salter's touting of that Network and its capabilities constituted material aid to

17  the unregistered offering.  He further asserts that Salter's marketing efforts and supervision of

18  the PR firm ensured that the offering was well marketed through a general solicitation campaign.

19          Plaintiff also identifies evidence suggesting that Salter's involvement in marketing and

20  advertising extended beyond the Atonomi Network.  That evidence includes, for example, an

21  April 2018 email from Salter to Emery and others regarding a script for "community call[s]" to

22  "interested investors, speculators or potential customers", noting a video broadcast of Emery

23  available on the Twitter channel, an upcoming "happy hour networking event on blockchain and

1    IoT security", and a "demo" of the Atonomi Network at a conference.  Dkt. 266, Ex. 24.  *See*

2    *also id.*, Ex. 23 (email from TokenMarket to Salter and others concerning "Marketing Agenda",

3    AMA event, and social channels) and Ex. 25 (email exchange between Salter and TokenMarket

4    discussing FAQ, Bitcoin Podcast, and list of action items including calls to PR firm regarding

5    timelines and calls to confirm sale amounts and ICO listing and announcement); Dkt. 290, Ex. 33

6    (Telegram post with links to find the "the address for the sale and presale" and "registration

7    website", and stating:  "Talk to us in our group . . .  +Atonomi Team: @vaughanemery . . .

8    @jamessalter"), Ex. 36 (email chain showing Emery asked Salter to "create a mailchip [sic]

9    piece from the highlevel pre-sale language and the events we will be at" and Salter's agreement

10   to shift out "phone briefings" another week "as long as we still keep them scheduled"), Ex. 37

11   (email from Salter to Emery and others providing announcement on Telegram and other social

12   media regarding AMA event), Ex. 38 (email from Emery to Salter and others asking for review

13   of a draft "task list to get Atonomi up and running[]" and for the addition of "tasks that you feel

14   are missing and essential to launching the new company through the completion of an ICO."),

15   and Ex. 39 (email from PR firm responding to draft press release provided by Salter and

16   suggesting "we could strengthen the angle by putting more emphasis on the fact that it's a VC-

17   backed project.")  This evidence, considered in conjunction with Salter's declaration, precludes a

18   determination on summary judgment on the question of whether Salter could be said to have

19   materially aided the sale of unregistered securities.

20        Nor does Salter demonstrate his entitlement to summary judgment through an affirmative

21   defense.  Salter attests that he sent all publicly-facing content for Atonomi to Perkins Coie for

22   review before it was published and that he "had no reason to believe that Atonomi was not

23   following the law."  Dkt. 276, ¶4.  He further attests that, because he had only marketing

responsibilities, he had no involvement with any decisions regarding or executions for security

registrations. *Id.*, ¶8. However, as with the Director Defendants, Salter does not demonstrate he

did not know and in the exercise of reasonable care could not have known any liability producing

facts, fails to identify any steps taken to apprise himself of such facts, and suggests a "passive,

good faith, lack of knowledge" defense insufficient to avoid liability under RCW 21.20.430(3).

D.    Counterclaim and TPDs' Motion for Summary Judgment

Atonomi's remaining claims against Hunichen and the TPDs (hereinafter collectively

"TPDs") include breach of contract and civil conspiracy to commit breach of contract. *See* Dkts.

82, 170-1 & 244. Atonomi alleges the TPDs breached the SAFT by transferring tokens

beginning July 12, 2018, ten days after they were delivered and "unlocked", resulting in a higher

supply than demand, quickly diminished trading value, and other "dumping" of tokens. Dkt. 82,

¶¶27-37; Dkt. 170-1, ¶¶27-32. Atonomi specifically alleges a breach of ¶ 6(l) of the SAFT, Dkt.

82, ¶22, 45; Dkt. 170-1, ¶¶22, 40, a provision that states in full:

> The Purchaser will at all times maintain control of the Purchaser's
> wallet where any Tokens are stored, and the Purchaser will not
> share or disclose the account credentials associated with such
> wallet with any other party. If the Purchaser transfers Tokens into
> another wallet or vault, the Purchaser will likewise at all times
> maintain control of such other wallet or vault*,* and will not share or
> disclose the account credentials associated with such other wallet
> or vault with any other party.

Dkt. 137-1 at ¶ 6(l). Atonomi also alleges civil conspiracy through the TPDs' engagement in a

scheme to breach their contractual duties. Dkt. 82, ¶¶60-66; Dkt. 170-1, ¶¶55-61.

The Court previously addressed these claims in considering a motion to dismiss. *See*

Dkts. 218 & 244. In denying dismissal, the Court took note of the fact Atonomi conceded the

"success of its network depended on developers acquiring tokens", but agreed with Atonomi that

REPORT & RECOMMENDATION
PAGE - 45

¶ 6(l) could nonetheless be read to prohibit the transfer of tokens from the purchaser to another party and that the obligations set forth in that provision were, at minimum, ambiguous.  Dkt. 244 at 9-10.  The Court thereafter considered whether ¶ 6(l)'s "wallet control provision" survived the SAFTs' termination, which, pursuant to ¶ 1(d), occurred upon the delivery of the tokens.  *Id*.  *See also* Dkt. 137-1 at ¶ 1(d) ("This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the delivery of Tokens to the Purchaser pursuant to Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b).")  The Court stated:

> Atonomi insists that it did, because [the TPDs] could not transfer tokens to other wallets until Atonomi released the tokens to their wallets – the same event that triggers termination of the SAFTs.  Because the SAFT does not specify when purchasers could begin to trade their tokens after delivery, Atonomi urges the court to imply that purchasers were prohibited from trading until a "reasonable" amount of time passed.  It asserts that by transferring tokens to wallets outside of their control on the day Atonomi unlocked the tokens, [the TPDs] did not wait a "reasonable" amount of time to conduct those transfers and, as a result, breached ¶ 6(l).  It further contends that how "reasonable" is defined in this case will depend on extrinsic evidence.  [The TPDs] argue that the only possible "reasonable" time is the date Atonomi itself unlocked the tokens for trading, thus "freely allowing any token holder to trade any amount of tokens at any price the market would bear, with no suggestion to any person of any restriction."

Dkt. 244 at 10-11 (citations omitted).  Considering these arguments, the Court concluded it could not decide, based on the pleadings, how to define a "reasonable" time for token holders to wait before commencing trading, and that, given existing ambiguities, the interpretation of ¶ 6(l) would depend on extrinsic evidence.  *Id*. at 11.  The Court left open the question of whether Atonomi could proceed on its civil conspiracy claim, which was dependent on an underlying breach of contract claim.  *Id*. at 14.

Now, in seeking summary judgment, the TPDs assert that the ambiguities identified by the Court should be resolved in their favor. They first assert that, under applicable Delaware law,[12] the SAFT – an identical, form contract unilaterally drafted by Atonomi – must be construed against Atonomi and in favor of the TPDs' construction that ¶ 6(l) terminated with the token delivery and termination of the SAFT. *See SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 42 (Del. 1998) (stating that the issuer of securities bears the obligation "'to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document[,]'" and that, if the contract is ambiguous, "'the principle of *contra proferentem* dictates that the contract must be construed against the drafter.'") (quoted source omitted). The TPDs assert that extrinsic evidence shows Atonomi always intended for the immediate transfer and trading of tokens upon unlocking, and that the only holding period occurred prior to unlocking and resulted from Atonomi's coding to temporarily freeze the tokens after their delivery and before unlocking for transfers. *See* Dkt. 257 at 5-10, 18-20; Dkt. 264. The TPDs assert that Atonomi lacks evidence to support a claimed breach of contract and that, even if it could identify damages, the evidence shows damages did not flow from the TPDs' alleged breach. *See* Dkt. 257 at 8-14, 20-23; Dkts. 258-64. They note, for example, that while Hunichen sold about 97,865 tokens in the course of some six weeks after the tokens were unlocked – comprising 0.017% of the total circulating supply of 567.7 million tokens – *53 million* tokens left the wallet of DNA Fund, Atonomi's "'strategic partner,'" on day one of unlocking. Dkt. 257 at 21 (citing Dkt. 263; Dkt. 264, Exs. A, K & X). The TPDs also assert that, with no viable breach of contract claim, the derivative civil conspiracy claim fails.

---

[12] The Court previously determined Delaware law applies to the breach of contract claims. Dkt. 218 at 4-5 and Dkt. 244 at 7, n.2.

REPORT & RECOMMENDATION
PAGE - 47

In its opposition brief, Atonomi does not identify extrinsic evidence supporting an interpretation of the SAFT as prohibiting purchasers from transferring tokens until a "reasonable" amount of time passed, or showing how such a time period should be defined. Atonomi, in fact, entirely abandons this argument and posits a different reading of ¶ 6(l). Atonomi argues:

> All evidence . . . shows that (1) before the TPDs entered into the SAFTs, they received and read the Atonomi White Paper, which explained the Tokens' utility on the Atonomi Network, (2) the SAFT itself referenced the purpose of the Tokens as utility tokens on the Atonomi Network, (3) the SAFT also stated that the Final Terms of Token Sale would supersede the terms of the SAFT, and (4) the Final Terms of the Token Sale dictate that the Tokens should only be used for utility purposes. Therefore, the only reasonable interpretation of [¶ 6(l)] is that TPDs could only transfer the Tokens *if such transfer were for utility purposes.*

Dkt. 292 at 4 (emphasis in original). In other words, Atonomi argues that the tokens purchased through the SAFTs could only be used for utility purposes and that the TPDs breached their contracts by transferring tokens for non-utility purposes. It asserts that all of the TPDs excluding Blieden had an existing arrangement to pay Hunichen a five percent "finder's fee" for investments and transferred tokens to him for that non-utility purpose. Dkt. 292 at 5; Dkt. 294, ¶¶6-9, Exs. I-L; *see also* Dkts. 259-62. Also, while conceding their fault was minimal as compared to DNA Fund, Atonomi asserts that the TPDs were at least in part responsible for a portion of the loss in value of the tokens and the damages Atonomi sustained.

1.    Breach of Contract:

For a breach of contract claim, a pleading party must allege (1) a valid contract, (2) a breach of a duty arising under that contract, and (3) resulting damage. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003). In interpreting intent, a court first looks to the text of the contract. *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d

836, 846 (Del. 2019) (citation omitted).  When clear and unambiguous, a court gives "'effect to the plain-meaning of the contract's terms and provisions,' without resort to extrinsic evidence." *Id*. (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010)).  "'Delaware adheres to the "objective" theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.'"  *Id*. (citations omitted).   A court gives priority to the intentions of the parties "'as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."  *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *GMG Capital Inv., LLC. v. Athenium Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).  "'Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'"  *Id*.  (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).  Contractual ambiguity exists "'[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'"  *GMG Capital Inv., LLC*, 36 A.3d at 780 (quoting *Eagle Indus., Inc.*, 702 A.2d at 1232).  If ambiguous, a court must look beyond the contract language and consider extrinsic evidence to determine intent.  *Id*.  *Accord Sunline Com. Carriers, Inc.*, 206 A.3d at 847.

Because Atonomi has abandoned its prior argument in relation to ¶ 6(l), the Court first sets aside that argument and the Court's prior ruling, and considers Atonomi's current contention that the SAFT precluded any transfer of tokens if not for a utility purpose.  In so doing, the Court finds neither significant probative evidence supporting this interpretation of the SAFT, nor any material disputes of fact.

1    Paragraph 6(l) does not say anything about a utility purpose of the token.  Nor can it be

2  inferred from the evidence cited by Atonomi that this interpretation of the SAFT would be

3  understood by an objective, reasonable third party.  Atonomi points specifically to language in its

4  "White Paper" as to the "utility of the Atonomi Network, which would require Tokens to

5  function[,]" and the SAFT definition of "Atonomi Protocol" as meaning "Atonomi protocol and

6  infrastructure under development . . . that is designed to enable, through specified uses of the

7  Token, security for Internet-of-Things devices."  Dkt. 292 at 6; *see also* Dkt. 137, Ex. A at ¶2.

8  However, it does not follow from this language that tokens obtained pursuant to a SAFT could

9  be transferred only for a utility purpose.  It is, moreover, undisputed that the White Paper was not

10  a part of any agreement between the TPDs and Atonomi.  Atonomi similarly fails to support its

11  position through reference to the Terms of Token Sale.  Indeed, this Court has, on more than one

12  occasion, rejected Atonomi's argument that SAFT signatories had notice of or assented to the

13  Terms of Token Sale.  *See* Dkts. 40, 66, 233, 246.  As Atonomi concedes, the terms "were

14  released and posted publicly and available to TPDs . . . no later than June 6, 2018[,]" Dkt. 292 at

15  7, more than three months *after* the TPDs entered into SAFTs.  While the SAFT stated that the

16  "Final Terms" would supersede the terms of the SAFT, Dkt. 137, Ex. A at ¶¶ (1)(a), 6(d), and

17  those terms contained language as to the utility use of the tokens, Dkt. 50-4, ¶¶ 1(b), 1(c), 10(e),

18  10(f), there is no evidence the language in the terms was disclosed to the TPDs before they

19  signed their SAFTs.  Finally, there is no evidence Atonomi itself interpreted the SAFT as

20  precluding the transfer of tokens for anything other than a utility purpose.  Instead, and as

21  discussed below, evidence contradicts this contention.  For these reasons, the interpretation

22  proffered by Atonomi in response to the TPDs' motion for summary judgment is neither

23  supported, nor reasonable.

REPORT & RECOMMENDATION
PAGE - 50

There is, on the other hand, substantial support for the TPDs' interpretation. The Court notes, as an initial matter, that Atonomi does not identify evidence supporting a contention that, at any point prior to entering into the SAFTs, it communicated to the TPDs an intent to restrict the transfer of tokens once they were unlocked. There is therefore no evidence the parties entered into SAFTs with an understanding or agreement that the TPDs could not transfer unlocked tokens. This argues in favor of interpreting the SAFT as not imposing any such restriction. *See Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) ("When making a determination regarding the 'shared intent' of the parties to an ambiguous contract, if a review of the extrinsic evidence does not lead the court to an 'obvious' conclusion, the court may apply another principle:  'Only an objectively reasonable interpretation that is in fact held by one side of a negotiation and which the other side knew or had reason to know that the first party held can be enforced as a contractual duty. This principle is capable of resolving disputes arising from ambiguous contract language because it is logically impossible for a contracting party, operating in good faith, both to have a subjective interpretation of ambiguous language different from that of her counterparty and to know of her counterparty's differing interpretation.'") (quoted source omitted).

Further assuming an ambiguity arising from ¶ 6(l) and imposing a "reasonable" time restriction on token transfers outlasting token delivery and termination of the SAFT under ¶ 1(d), there is contemporaneous extrinsic evidence allowing for a determination as to the parameters of the ¶ 6(l) "wallet control provision."  Specifically, Atonomi provided for a ten-day period – between the July 2, 2018 delivery of tokens and the July 12, 2018 unlocking of tokens – in which ¶ 6(l) could be inferred to survive termination of the SAFT and impose restrictions on token transfers.  Emery testified that ATMI tokens were coded to include "Smart Contracts" which

REPORT & RECOMMENDATION
PAGE - 51

imposed a specific time period in which the tokens were locked.  Dkt. 264, Ex. B at 24:6-9 ("Q. When you say a lock and restricted in their transfer, are you referred [sic] to a time period?  A. Yes.  The Smart Contracts had a time period associated with the lock of the ATMI.")  Emery testified that, outside of that lock period, the tokens could be "freely moved."  *Id*. at 23:16-23. When asked if the lock meant that the tokens could not be transferred, Emery stated he did not "have the knowledge to know for sure that they couldn't be transferred[,]" but that he thought "the lock had more to do with – you couldn't move them to an exchange and liquidate them."  *Id*. at 24:10-22.  He testified that, "exclusive of a lock and tokens are not restricted by a Smart Contract, then you could send tokens to anybody that . . . you trust and provided a wallet address[.]"  *Id*. at 25:15-26:5.  He clarified that the "ATMI were all treated the same[,]" and "the Smart Contracts determined the lock/unlock."  *Id*. at 63:16-64:19, 66:12-23.  *See also id*. at 165:18-21 (agreeing that, to the best of his knowledge, "all ATMI tokens, both public and private sale, would be unlocked at the same time and were unlocked at the same time").

Emery did not identify evidence supporting a different understanding of a time period in which tokens could not be transferred.  When asked about "the boundary line between when a sale of tokens is permissible and when it's not permissible[,]" Emery responded:  "I don't have an answer to that."  *Id*. at 169:5-10.  He did opine as to a "reasonableness factor" associated with ¶ 6(l), stating that someone who transferred a token to an exchange immediately after the token sale "violated the intent" of what Atonomi was "trying to do."  *Id*. at 172:2-21.  However, he conceded there was nothing in ¶ 6(l) that would make it clear to a SAFT purchaser when a token could and could not be transferred.  *Id*.

The TPDs point to other evidence supporting their contention Atonomi intended for the tokens to be available for transfer upon unlocking.  For example, prior to entering into a SAFT,

REPORT & RECOMMENDATION
PAGE - 52

Plaintiff asked Emery whether there would be a lockup period, and Emery clarified Atonomi was "not asking for lockup for amounts below 1000ETH." *Id.*, Ex. A at 4. When Hunichen proposed there be additional lockup periods for bonus tokens to prevent "dumping" but allow for "liquidity options after 3 months", Emery stated "liquidity is important to get wide support" and that he "would prefer to not have a firm lockup policy[,]" and that "each group decide how best to support their liquidity and growth needs." *Id*. at 4-5. Shortly after the tokens were delivered, but before they were unlocked, a SAFT purchaser expressed concern that, if not unlocked at the same time, public sale purchasers would be able to "move their tokens whereas private sale won't be able to do so." *Id*., Ex. D at 1. In response, Emery did not express any concern about movement of the tokens following unlocking, and stated: "All tokens will be unlocked at the same time, both public and private sale plus bonus (other than allocations about [sic] 1k)[.]" *Id*. Even now, in moving for summary judgment, Defendants' declarations make clear that they did not intend to prohibit the transfer of tokens after unlocking and that availability of the tokens was necessary for the Atonomi Network to function. *See* Dkt. 271, ¶24 (Emery: "The Atonomi network relied on a utility token for operation, and the network was launched prior to the public sale. I understood from the attorneys that there was no requirement to lock the tokens, and I had no reason to doubt this conclusion."); Dkt. 272, ¶12 (Strickland: "Even though the ATMI Tokens were technically worth little in terms of Ether or U.S. Dollars, they never lost their utility or worth as a utility token on the Atonomi Network. I wanted more companies and people to adopt the Atonomi Network and use the ATMI Tokens for the purpose they were created—to facilitate transactions on the Atonomi Network."); Dkt. 275, ¶¶12-13 (Mackey: "The ATMI Tokens were mandatory to the use of the Atonomi Network. One ATMI Token was needed to both register and activate a device on the network. . . . I do not know if anyone at Atonomi

REPORT & RECOMMENDATION
PAGE - 53

discussed whether the ATMI Tokens should be locked after the public token sale.  If such discussions existed, they did not include me.  However, from a practical and technical standpoint, if ATMI Tokens were locked, no one could use the Atonomi Network, as the use of the ATMI Tokens were needed for device registration, activation, and reputation.")

The evidence also shows Atonomi provided for token transfers by promptly listing the tokens on multiple exchanges.  Dkt. 264, Ex. C at 1 (June 9, 2018 email from Emery:  "The issue of listing the Atonomi token on exchanges is the next step in getting broad adoption of the Network and tokens in the hands of developers and users."), Ex. F (July 12, 2018 Telegram message identifying at least six different exchanges where tokens had been listed), and Ex. B at 116:21-25 (Emery testified the first listing "would have been around the time that . . . tokens unlocked.")  As explained by Emery, Atonomi "wanted tokens to get in the hands of developers so that makes sense for us to work with select exchanges to make that happen[,]" and listing the tokens provided "the ability for the exchange to accept tokens to be bought and sold."  *Id*., Ex. B at 117:4-25.

Moreover, when token sales immediately commenced upon unlocking and purchasers raised questions, there was no indication from Atonomi that those sales were not permissible.  Instead, Emery stated on Telegram:  "[S]eems there were more sellers then [sic] buyers on a day when the overall market was down."  *Id*., Ex. F at 5.  Similarly, when asked in August 2018, "Why DNA fund which is your strategic partner dumped 4m of tokens on day one?", Emery pointed to independent SAFT investors in the DNA fund who "participated with their own investment strategies", and suggested:  "The price of ETH and the overall bear market perhaps played a role as well when SAFT investors evaluate their overall crypto holdings."  *Id*., Ex. G at 1.

REPORT & RECOMMENDATION
PAGE - 54

In fact, and as Emery later confirmed, DNA Fund sold their tokens *before* they were unlocked. *Id.*, Ex. B at 120:11-24. *See also id.*, Exs. H & I (August 2018 emails from Emery stating that DNA Fund "sold their ATMI over the counter prior to the unlock, which removed a meaningful amount of unmet demand from the market.") and Ex. J (August and November 2018 Telegram messages in which Emery confirmed DNA Fund's early sales which "killed the momentum" and put a tone of downward pressure on the project.")  The evidence also shows that, on July 12, 2018, almost 54 million tokens left DNA Fund's ATMI wallet. *Id.*, Ex. K.  In contrast, evidence shows that three of the TPDs never sold any tokens, that Hunichen sold under five percent of his holdings, and that the remaining two TPDs continued to buy more tokens after unlocking. *See* Dkts. 258-64.

There is, in sum, an absence of evidence supporting Atonomi's interpretation of ¶ 6(l) of the SAFT as either wholly precluding the transfer of tokens unless used for a utility purpose or as precluding transfers for some "reasonable" period of time after unlocking.  There is evidence supporting the TPDs' interpretation of the SAFT as allowing for token transfers after unlocking, as well as providing for an earlier, ten-day period during which tokens could not be transferred to others and ¶ 6(l) could be construed as surviving termination of the SAFT under ¶ 1(d).  The TPDs therefore establish an absence of evidence supporting an allegation that they breached a duty arising under the SAFT by transferring tokens to others after unlocking, and provide evidence negating any such contention.  The TPDs are entitled to summary judgment on Atonomi's breach of contract claim.[13]

/ / /

---

[13] Having reached this conclusion, the Court need not and therefore does not assess the TPDs' arguments as to an absence of evidence to support any claimed breach of contract damages or any damages flowing from the TPDs' alleged breach.

REPORT & RECOMMENDATION
PAGE - 55

1    2.    <u>Civil Conspiracy to Commit Breach of Contract</u>:

2        Atonomi also alleges civil conspiracy to commit breach of contract.  However,

3    "[b]ecause the conspiracy must be combined with an unlawful purpose, civil conspiracy does not

4    exist independently – its viability hinges on the existence of a cognizable and separate

5    underlying claim."  *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d 1162, 1171 (W.D. Wash.

6    2011) (cited source omitted).  In this case, because Plaintiff's breach of contract claim fails, the

7    derivative civil conspiracy claim necessarily fails and should be dismissed.

8                                CONCLUSION

9        For the reasons set forth above, Plaintiff's Motion for Summary Judgment, Dkt. 265,

10   Atonomi Defendants' Motion for Summary Judgment, Dkt. 268, and Vaughan Emery's Motion

11   for Summary Judgment, Dkt. 270, should be DENIED.  Further, the Individual Defendants'

12   Motion for Summary Judgment, Dkt. 269, should be GRANTED in part and DENIED in part,

13   and Plaintiff's claims against Michael Mackey, but not against any other Individual Defendant,

14   should be DISMISSED with prejudice.  Finally, Counterclaim and TPD's Motion for Summary

15   Judgment, Dkt. 257, should be GRANTED and the counterclaims and third party claims should

16   be DISMISSED with prejudice.  A proposed order accompanies this Report and

17   Recommendation.

18                                OBJECTIONS

19       Objections to this Report and Recommendation, if any, should be filed with the Clerk and

20   served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

21   Recommendation is signed.  Failure to file objections within the specified time may affect your

22   right to appeal.  Objections should be noted for consideration on the District Judge's motions

23   calendar for the third Friday after they are filed.  Responses to objections may be filed within

REPORT & RECOMMENDATION
PAGE - 56

**fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 21, 2023**.

DATED this 6th day of April, 2023.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT & RECOMMENDATION
PAGE - 57